# United States District Court
### EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | CRIMINAL ACTION NO.  4:18-CR-87 |
| v. | § | JUDGE MAZZANT |
| | § | |
| LAURA JORDAN and MARK JORDAN | § | |
| | § | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Defendants Laura and Mark Jordan (the "Jordans") seek a new trial based on claims that the jury was exposed to outside influence shortly before a verdict was reached.  This is a serious complaint.  The Constitution promises that, when defendants are charged with a criminal offense, they will face criminal sanctions only after a jury of their peers finds them guilty beyond a reasonable doubt based solely on the evidence before them.  The Court is mindful of the substantial burden a new trial poses on the Government, which, through no fault of its own, would lose a favorable verdict after a nearly month-long trial.  But, after much reflection, the Court must agree with the Jordans and grant their Motion for New Trial under Rule 33 (Dkt. #174).

## BACKGROUND

Laura Jordan served as Mayor of the City of Richardson from May 2013 to April 2015.  As Mayor, Ms. Jordan voted as part of the Richardson City Council on whether to approve zoning projects, among other matters.   During her term, Ms. Jordan allegedly exchanged votes on apartment development projects for cash, sex, and luxury hotel stays, among other items and services from Mark Jordan, the apartment developer.  The Government charged the Jordans with violating several federal bribery statutes on this basis.  A nearly month-long trial followed.

At the trial's close, the Court instructed the Jury to "decide the case for yourself," and "not give up your honest beliefs as to the weight or effect of the evidence solely because of the opinion

of your fellow jurors, or for the mere purpose of returning a verdict." (Dkt. #153 at p. 26). The case was then left for the Jury to decide. Over the next day-and-a-half of deliberations, the Jury sought guidance from the Court through eight written notes. Only Jury Note No. 8 (the "Note") is at issue. According to the Note, Juror No. 11 was "very upset," felt she could not continue, and "ask[ed] to be excused." (Dkt. #178, Exhibit 1 at p. 2).

Neither the Court nor the Parties seemed sure on how to proceed. The Note did not explain why Juror No. 11 sought release from the panel, and a juror may be excused only if she is "unable to perform" her duties, or is disqualified. FED. R. CRIM. P. 24(c)(1). The Court offered to interview Juror No. 11 to further investigate, if the Parties requested. The Parties did not object. Instead, Counsel for Laura Jordan stated that "[w]e would like, your Honor, for you to talk to her" since "[w]e don't even know what we're dealing with." (Dkt. #174, Exhibit 1 at pp. 4–5). And Counsel for Mark Jordan and the Government promptly agreed (Dkt. #174, Exhibit 1 at p. 5).

The Court then met with Juror No. 11 in chambers, with a law clerk and court reporter, and asked why she was unable to serve on the panel (the "First Meeting"). The Court emphasized that she should not reveal how the jurors had voted. But the vote was apparently what caused her distress. Juror No. 11 explained that she could not vote because she was worried about causing a "hung jury." (Dkt. #174 at p. 6). At this point, the Court reminded her of what is written in the Final Jury Instructions—that:

> What I say in the charge is that you can't worry about the consequences. Every juror should re-examine their own views is what I say in the charge, and if you have a firmly held conviction, whatever that conviction is, that's up to you to decide. You have to make your own decision.

(Dkt. #174, Exhibit A at p. 7). The Court also stated that, if she "had a certain conviction about what the vote should be or not be," then she "should stay firm to [her] convictions, whether that is yes or no, whatever that vote would be." (Dkt. #174, Exhibit A at p. 7).

Juror No. 11 responded that it was making her "sick to my stomach to convict them." (Dkt. #174, Exhibit A at p. 8). The Court tried to assuage those concerns. This meant reminding her that, "if your decision isn't with the rest of the group, you should stand firm on what your convictions are." (Dkt. #174, Exhibit A at p. 8). After all, as the Court would go on to explain, jurors do not have to agree. The jury can always "send a note back saying we can't reach a unanimous verdict," and certain procedures would follow at that point (Dkt. #174, Exhibit 1 at p. 8). But Juror No. 11 remained unpersuaded. The Court apologized for her symptoms, dismissed her from chambers, and apprised the Parties of this conversation.

The Court relayed that Juror No. 11 was "physically ill" out of concerns of causing a mistrial, and that it had advised her to "stand by [her] conviction, whatever [that] is," without regard to the consequences (Dkt. #174, Exhibit 1 at p. 8). A debate over Juror No. 11's health followed. While the Government asked the Court to take Juror No. 11 at her word and release her from the panel, the Jordans were less concerned. Counsel for Mark Jordan insisted "the deliberations continue with this juror and . . . object[ed] to her being excused," and Counsel for Laura Jordan urged that the Court could release her only if she was "incapacitated." (Dkt. #174, Exhibit A at p. 11).

The Court signaled that it would likely keep Juror No. 11 on the panel, as the Jordans requested, but was open to dismissing her based on "how she reacts when I tell her you're going to have to remain" on the jury (Dkt. #174, Exhibit 1 at p. 13). At least at the time, Counsel for Mark Jordan found this to be a "fair" way to proceed and Counsel for Laura Jordan had "no objection[s]." (Dkt. #174, Exhibit 1 at p. 13). The Court then met with Juror No. 11 a second time, with a law clerk and court reporter present (the "Second Meeting"). When told she would not be released, Juror No. 11 said she understood, committed to "go[ing] back" and "stay[ing]

strong," and agreed when the Court said that she seemed better (Dkt. #174, Exhibit 1 at p. 14). The Court reiterated that jurors are to vote on their convictions, thanked her for her service, and apologized for her discomfort. This prompted Juror No. 11 to quip that this process had been "torture" and that she was "a nice person." (Dkt. #174, Exhibit 1 at p. 15). The Court replied that it "[a]t least . . . gave [her] sugar"—referring to the pastries the Court baked for the jurors over the course of the month—before offering to purchase her lunch, as it had for the other jurors. But Juror No. 11 declined as she was unable to eat, and was "trying to diet anyway[]." (Dkt. #174 at p. 16). She then left chambers in "much better" spirits, as the Court reported to the Parties shortly afterward (Dkt. #174 at p. 16). At the recommendation of Counsel for Mark Jordan, the Court then responded to the Note by stating that "Juror No. [11] will continue to deliberate with the panel." (Dkt. #174 at p. 17). This meant that an Allen charge would likely be necessary, the Court noted, just before dismissing the Parties for lunch.

But an Allen charge was never read. Two-and-a-half hours after Juror No. 11 expressed her reluctance to convict, the jury reached a unanimous verdict. They found the Jordans guilty on nearly all counts.[1] According to the Jordans, a conversation between three of the Court's Law Clerks (the "Law Clerks") and a Court Security Officer (the "Officer") may provide insight into Juror No. 11's swift change of heart. The Law Clerks contend that the Officer told him that he had spoken with Juror No. 11 just thirty to forty-five minutes before a verdict was reached. Finding her in tears, which he seemingly attributed to her role as a dissenting voter, the Officer told Juror No. 11 to put her emotions aside, not worry about the sentence the Jordans might face, and decide the case solely on whether she believed they were guilty or not.

---

[1] Laura Jordan was found not guilty on one count.

The morning after a verdict was reached, the Officer told one law clerk of another encounter he had with an unidentified juror (the "Unidentified Juror").[2] This juror apparently shared that, when polled, she would tell the Court her vote was cast "with reservation." (Dkt. #169 at p. 1). As before, the Officer told this juror "that she should not be concerned about any punishment the defendants may receive." (Dkt. #169 at p. 2). If "she did not believe the defendants were guilty, she should vote not guilty." (Dkt. #169 at p. 2). The Officer added that the juror could not state that her vote was "with reservation" since her vote would not be believed—though it is unclear whether the Officer was explaining his rationale for speaking to the juror to the law clerk, or whether he made this comment to the juror (Dkt. #169 at p. 2). The Court informed the Parties of both conversations within twenty-four hours, filed a memorandum on the Docket containing separate statements from the Law Clerks on these events (the "Statements" or "Memorandum"), and made the Officer available for examination, on request. Defense Counsel declined the Court's offer, despite their perplexing insistence that the offer was never made (Dkt. #180 at p. 4).[3]

The Jordans now move for a new trial and, if necessary, an evidentiary hearing to support this motion. They fault the Court for meeting with Juror No. 11 in chambers and not dismissing her from the panel—without referencing their encouragement of the meeting or their objections to excusing her (*see generally* Dkt. #174).[4] *See supra* footnote 3. They also fault the Officer for

---

[2] The Parties assume that the second conversation occurred with Juror No. 11 without basis. Although this juror certainly could have been Juror No. 11, nothing in the record allows the Court to make this inference.

[3] Defense Counsel accuses the Court of making the Officer unavailable to the Parties. This is one of several facts Defense Counsel misrepresents or omits in this motion. Defense Counsel are reminded of their duty of candor in all court matters. *See* LOCAL RULE AT–3(b) ("A lawyer owes candor, diligence, and utmost respect to the judiciary."). Although the Court appreciates zealous advocacy, deception is an ill–advised legal strategy, especially on matters within the Court's personal knowledge. The Court, of course, does not fault the Jordans for the conduct of their counsel.

[4] The Court acknowledges that Defense Counsel discusses their role in these events in their reply, after the Government pressed them to do so.

speaking with Juror No. 11, especially in light of the topic of conversation: her hesitance to convict.

## LEGAL STANDARDS

Rule 33 provides that, on request, "the court may vacate any judgment and grant a new trial if the interest of justice so requires." FED. R. CRIM. P. 33(a). "The decision to grant or deny a motion for new trial or remittitur rests in the sound discretion of the trial judge." *Eiland v. Westinghouse Elec. Corp.*, 58 F.3d 176, 183 (5th Cir. 1995). This discretion allows the Court "'to set aside a jury verdict and order a new trial based on a "miscarriage of justice" to avert the perception of a miscarriage of justice,'" which typically occurs in "extraordinary" circumstances. *United States v. Scroggins*, 379 F.3d 233, 253 (5th Cir. 2004) (quoting *United States v. Ferguson*, 246 F.3d 129, 133 (2d Cir. 2011)), *vacated on other grounds*, 543 U.S. 1112 (2005). As such, a new trial is proper where the defendant's "substantial rights" have been harmed—either based on a single error or the cumulative effect of multiple errors. *United States v. Bowen*, 799 F.3d 336, 349 (5th Cir. 2015).

## ANALYSIS

The parties dispute whether the Jordans were deprived of a fair trial based on the single or cumulative effect of three "errors:" (1) the Court's decision to allow Juror No. 11 to remain on the panel; (2) the Court's ex parte meetings with Juror No. 11; and (3) the Officer's ex parte conversations with Juror No. 11 and the Unidentified Juror.

### I. Juror No. 11's Health

The Jordans fault the Court for requiring Juror No. 11 to stay on the panel after her reported health concerns. They note that, in the First Meeting, Juror No. 11 stated that she could not continue and was unable to eat. Federal Rule of Criminal Procedure 24 provides that an alternate

juror may "replace any jurors who are unable to perform or who are disqualified from performing their duties." FED. R. CRIM. P. 24(c)(1). The Court has broad discretion in deciding whether a person's "'ability to perform his duty as juror is impaired.'" *United States v. Rodriguez*, 573 F.2d 330, 332 (5th Cir. 1978) (quoting *United States v. Smith*, 550 F.2d 277, 285 (5th Cir. 1977)). Legal error occurs only "on 'a showing of bias or prejudice to the defendant,' or to any other party." *Id.* (quotation omitted). A defendant can meet this standard by establishing that the court lacked any sound basis to dismiss the seated juror in question, or not. *See Rodriguez*, 573 F.2d at 332 (discussing how the showing is met); *United States v. Velez*, 24 F.3d 237, 237 n.3 (5th Cir. 1994) (explaining the burden is on the party challenging the seated juror).

The Jordans cannot credibly argue that the Court kept Juror No. 11 on the panel out of bias or prejudice toward them. The Court did not keep Juror No. 11's symptoms a secret. While the Government sought Juror No. 11's release, Counsel for Mark Jordan insisted that she should continue deliberations, and Counsel for Laura Jordan urged that a dismissal was warranted only if Juror No. 11 was found to be "incapacitated." (Dkt. #174, Exhibit 1 at p. 12). The Court would then keep Juror No. 11 on the panel, as the Jordans requested. *See Velez*, 24 F.3d at 237 (noting the defendant's failure to object to excusing a juror as a reason to affirm the juror's dismissal).

The Court also had good reason to keep Juror No. 11 on the panel, separate and apart from the Jordans' objections. The Court assessed Juror No. 11's ability to continue deliberating in two meetings in which she seemed able to continue. The Jordans make much of Juror No. 11's remark in one meeting that this process had been "torture." (Dkt. #174, Exhibit 1 at p. 15). But the remark was stated in jest, after Juror No. 11 seemed to accept the decision to keep her on the panel. This is evident from the transcript, which lacks Defense Counsel's flair for dramatization. Juror No. 11 explained that she "unders[tood]" why she had to remain on the jury, committed to "go[ing] back"

and "stay[ing] strong," agreed with the Court's assessment that she "seemed better," and apologized for letting this process "g[et] the best of [her]." (Dkt. #174, Exhibit 1 at pp. 14–15). It is only after the Court thanked her for her continued service that she quipped, "It's just torture. You're torturing me. I'm a nice person." (Dkt. #174, Exhibit at p. 15). The Court countered that it had at least provided her and the other jurors baked goods during the month-long trial—before offering to purchase her lunch, as the Court had for the other jurors. She declined, citing her inability to eat before joking that she was on a diet anyway. The Court could not find her unable to perform her duties under these circumstances, especially given her status (at the time) as a holdout voter whom the Jordans objected to releasing.[5]

## II.     Meetings with Juror No. 11

The Jordans' challenge to the Court's ex parte meetings with Juror No. 11 is just as unpersuasive. The Jordans encouraged the Court to meet with Juror No. 11 to determine whether she could continue serving on the jury.[6] They now fault the Court for having this conversation. When Juror No. 11 expressed concern over causing a mistrial, the Court told her that:

> You can't worry about the consequences. Every juror should re-examine their own views is what I say in the charge, and if you have a firmly held conviction, whatever that conviction is, that's up to you to decide. You have to make your own decision.

(Dkt. #174, Exhibit A at p. 7). The Jordans contend that, by telling Juror No. 11 that "[e]very juror should re-examine their own views," the Court pressured Juror No. 11 into voting to convict by giving her an incomplete Allen charge (Dkt. #174 at p. 6).

---

[5] The Jordans argue that the decision to keep Juror No. 11 on the panel warrants a new trial even if it does not amount to legal error, citing the Court's ability to order a new trial even based on the appearance of a miscarriage of justice. The Court rejects this argument for the same reasons.

[6] The Jordans insist that they did not encourage the Court to meet with Juror No. 11. The transcript reflects otherwise. After given time to consider the Court's offer to meet with Juror No. 11, Counsel for Laura Jordan said, "[w]e would like, your Honor, for you to talk to her," and Counsel for Mark Jordan quickly agreed (Dkt. #174, Exhibit 1 at pp. 4–5). Any suggestion that Defense Counsel did not encourage the meetings with Juror No. 11 is simply dishonest. *See supra* note 3.

The Court is unconvinced. An Allen charge refers to the supplemental jury instructions given to "urge deadlocked juries to forego their differences in order to reach a unanimous verdict." *Boyd v. Scott*, 45 F.3d 876, 878 n.1 (5th Cir. 1994) (citing *Allen v. United States*, 164 U.S. 492, 501 (1896)) (emphasis added). This is accomplished by warning juries that "should [they] fail to agree on a verdict, the case is left open and may be tried again;" that "[t]his is an important case;" that there is no reason to believe "that more or clearer evidence could be produced;" and that jurors have a "duty to agree upon a verdict if you can do so without surrendering your conscientious opinion." FIFTH CIRCUIT PATTERN JURY INSTRUCTIONS (Criminal Cases) § 1.45 (2015). The Court is mindful of the dangers of reading an Allen charge inartfully, or under the wrong circumstances. A misreading could leave jurors with the impression that the Court was expecting some or all of the jurors "to sacrifice their conscientious scruples for the sake of reaching agreement." *Green v. United States*, 309 F.2d 852, 854–55 (5th Cir. 1962). After all, the Court is in a position of great authority and is rightfully seen as a neutral party charged with ensuring criminal defendants the fair trial the Constitution guarantees.

But the Court struggles to see how the statements in question amounted to an Allen charge. Nothing the Court stated could have led Juror No. 11 to reasonably believe that it was urging her to work through her disagreements for the sake of a unanimous verdict. *See United States v. Cook*, 586 F.2d 572, 577 (5th Cir. 1978) (finding it "unfair to characterize [the Court's statements] as a traditional Allen charge" where the "judge merely asked each of the jurors to avoid announcing an emphatic opinion until listening to others" and "requested them to re-examine their views, while admonishing them not to surrender an honest conviction simply for the purpose of returning a verdict"). This is evident when viewing the conversation in context, beyond over simplistic soundbites. The Court met with Juror No. 11 in response to her anxiety about continuing

deliberations. When Juror No. 11 expressed concerns about being a holdout voter, the Court explained that dissenting is an expected part of the process. This meant telling her that the Final Jury Instructions state that "every juror is to re-examine their own views," and emphasizing, *on several occasions*, that she *should* dissent if this was her honestly held belief, even if this caused a mistrial. *See United States v. Granadeno*, 605 F. App'x 298, 302 (5th Cir. 2015) (finding court did not err in sending an ex parte communication to the jury that the verdict should be unanimous, noting that the Court had previously told the jurors "not to 'give up your honest beliefs as to the weight or effect of the evidence solely because of the opinion of your fellow jurors, or for the mere purpose of returning a verdict'"). Stated differently, the Court merely reminded Juror No. 11 of her right to disagree. *Compare with* FIFTH CIRCUIT PATTERN JURY INSTRUCTIONS (Criminal Cases) § 1.45 (2015) (expressly pressuring jurors to agree if they can, as summarized above). And there is no indication that she understood otherwise, or that she reasonably could have. Again, toward the end of the Second Meeting, Juror No. 11 committed to going back to deliberations and "stay[ing] strong." (Dkt. #174, Exhibit 1 at p. 14).

The Court's conversations with Juror No. 11 are not grounds for a new trial, even construing the Court's statements as an Allen charge. Error occurs from the recitation of an Allen charge only where the Court's word choices were "so prejudicial as to require reversal," where the charge was given under coercive circumstances, or both. *United States v. Heath*, 970 F.2d 1397, 1406 (5th Cir. 1992).[7] This is a fact-specific inquiry based on an assessment of "the impact of the judge's statements in light of his language and the facts and circumstances which formed their

---

[7] This is also evident from the cases outside this Circuit that the Jordans cite. *See United States v. Zabriskie*, 415 F.3d 1139, 1148 (10th Cir. 2005) ("[W]e have concluded an *Allen* instruction is impermissibly coercive when it imposes such pressure on the jury *such that the accuracy and integrity of their verdict becomes uncertain*.") (emphasis added).

context." *See United States v. Fossler*, 597 F.2d 478, 483–85 (5th Cir. 1979) ("We do not elect to adopt such a [p]er se rule.").  This is true even when the charge is given ex parte.

The Supreme Court's decision in *United States v. U.S. Gypsum Co.* is illustrative.  438 U.S. 422, 459–62 (1978).  In that case, the district court spoke with the jury foreman (the "Foreman") ex parte after it had read two Allen charges and several days of deliberation had passed.  Much of this conversation concerned the jury's deteriorating health "after almost five months on the case followed by five days of intensive deliberation."  *Id.* at 432.  But the Foreman also "stressed at least twice . . . his belief that the jury was unable to reach a verdict and that further discussion would not eliminate the disagreements which existed."  *Id.*  The district court was seemingly unmoved, telling the Foreman that it "would like to ask the jurors to continue their deliberations," though promising to "take into consideration what you have told me."  *Id.*  When the Foreman replied that he "d[id not] know how to help you get what you are after," the Court stated that it was not "after anything."  *Id.*  But the Foreman remained unconvinced, insisting that the district court must have been "after a verdict one way or another."  *Id.*  This time, rather than deny this suggestion, the district court simply stated that "*[w]hich way* it goes doesn't make any difference." *Id.* (emphasis added).

One Third Circuit judge concluded that the verdict should be set aside since "the trial judge had 'encroach[ed] on [the] jury['s] authority' and had foreclosed 'a possible 'no verdict' outcome,'" and the Supreme Court agreed.  *Id.* at 459 (quoting *United States v. United States Gypsum Co.*, 550 F.2d 115, 134 (3d Cir. 1977) (Adams, J., concurring)).  To be sure, the Supreme Court warned against ex parte meetings between the court and a member of the jury due to the "*possibilities* for error."  *See id.* at 462 (emphasis added).  But it also made clear that "it is not simply the action of the judge in having the private meeting with the jury foreman, standing alone"

that "constitutes the error." *Id.* Instead, the error occurred because "the *ex parte* discussion was inadvertently allowed to drift into what amounted to a supplemental instruction relating to the jury's obligation to return a verdict." *Id.*[8] The Supreme Court reasoned that "there [had] developed a set of circumstances in which it can be fairly assumed that the foreman undertook to restate to his fellow jurors what he understood the judge to have implied regarding the resolution of the case in a *definite verdict* 'one way or the other'"—presumably referring to (1) the Foreman's insistence that further deliberation would not change a deadlock (even after the Court read two *Allen* charges), (2) the court's desire for deliberations to continue anyway, and (3) the court's suggestion that it wanted a unanimous verdict, "which[ever] way it goes." *See id.* at 461.

Accordingly, even when it is given ex parte, a court abuses its discretion in reading an *Allen* charge only when the court has placed undue pressure on a juror to break a deadlock, based on the totality of the circumstances. *See, e.g., id.* But a court acts within its discretion otherwise. *See Granadeno*, 605 F. App'x at 302 (finding the court did not place undue pressure on the jury by suggesting in an ex parte communication that it needed a unanimous verdict since the jury was "undecided" at the time and not deadlocked); *see also United States v. Jones*, 664 F.3d 966, 983 (5th Cir. 2011) (finding in a different context that an ex parte communication did not amount to error because it did not cause prejudice).

The Court cannot find that the meetings caused Juror No. 11 undue pressure to convict in this case—even taking the Jordans' new concerns about them at face value. *See United States v. Reyes*, 645 F.2d 285, 288 (5th Cir. 1981) (noting in a different context that "the defendant's willing

---

[8] *See also United States v. Nieto*, 721 F.3d 357, 369–71 (5th Cir. 2013) (rejecting argument that ex parte communication between the court and each of the individual jurors amounted to per se error); *United States v. Thomas*, 742 F.3d 632, 644–45 (5th Cir. 2013) (quoting *United States v. Gagnon*, 470 U.S. 522, 526 (1985)) (stating in a different context that the "'mere occurrence of an ex parte conversation between a trial judge and a juror does not constitute a deprivation of any constitutional right.'").

acquiescence in and express acceptance of the procedure followed" indicates that prejudice is unlikely). None of the Jordans' citations are remotely similar to this case. The Court did not weigh in on the merits, question the jury's capabilities, imply that there was a time limit on deliberations, promise leniency in the event of a conviction, or suggest it was expecting a unanimous verdict. *Compare with Gypsum*, 438 U.S. at 459–60 (expectation of unanimous verdict); *Jenkins v. United States*, 380 U.S. 445, 446 (1965) (expectation of unanimous verdict); *Shields v. United States*, 273 U.S. 583, 584 (1927) (indicating unanimous verdict required); *United States v. Peters*, 349 F.3d 842, 847–49 (5th Cir. 2003) (weighed in on the merits, questioned juror's capabilities); *United States v. Cowan*, 819 F.2d 89, 91–92 (5th Cir. 1987) (suggested there was a time limit on deliberations); *Demetree v. United States*, 207 F.2d 892, 896 (5th Cir. 1953) (promising juror that sentence would be light). Instead, the Court reminded Juror No. 11 that she was entitled to "stay firm to your convictions, whether that is yes or no;" that she did not "have to agree;" that if she had "a firmly held conviction, whatever that conviction is, that's up to you to decide;" that she "ha[d] to make [her] own decision;" that, although the Parties are entitled to a decision, if the Jury "can't reach a verdict, then that's an answer too and there is a process for that;" that "whatever your convictions are, those are your convictions, and each juror makes their own decision about what the evidence is and what the verdict should be;" that "[e]very juror is entitled to their opinion about the evidence and the result;" and that "[i]f the consequence is a mistrial, you shouldn't be concerned about that." (Dkt. #174, Exhibit A at p. 15). In this context, a passing reminder that the Court tells "[e]very juror to re-examine their own views" could not have reasonably led Juror No. 11 to believe that the Court expected her to cede her beliefs for the sake of a unanimous verdict, that the Court wanted one to be reached, or that it was pressuring her to vote with the majority in any other way. *See Fossler*, 597 F.2d at 483–85 (citing *United States*

*v. Robinson*, 560 F.2d 507, 517–18 (2d Cir. 1977)) (indicating that an Allen charge's "brief and mild" nature weighs against finding it coercive).  Nor is there evidence that she somehow reached this conclusion.  To the contrary, shortly before she left chambers, Juror No. 11 committed to "go back and just stay strong."  (Dkt. #174, Exhibit 1 at p. 14).  *See Jones*, 664 F.3d at 983 (finding that the district court did not abuse its discretion in ex parte communications where the record did not "raise[] even an inference of prejudice").

But the Jordans, tellingly, spend little time on what the Court told Juror No. 11.  They, instead, focus on what the Court did not say.   The Jordans argue that the Court should have given a full Allen charge to the entire jury once Juror No. 11's concerns were apparent, despite never asking for one and blessing the Court's response to the Note:  that deliberations would continue with Juror No. 11.  *See Fossler*, 597 F.2d at 485 (citing *United States v. Seawell*, 550 F.2d 1159, 1163 n.9 (9th Cir. 1977), *cert. denied*, 439 U.S. 991 (1978)) (indicating that an Allen charge given without objection from the defendant is a factor to consider when determining whether it was coercively given).  They contend that such a charge could have reminded all of the jurors of the burden of proof; that they may decide the case at their leisure; and that, although they should reconsider their stances, none is expected to yield a conscientious opinion.  These may be good things to remind a jury during deliberations.  But courts are required to do so only when they have pressured a deadlocked jury to try and reach a unanimous verdict in the first place.  *United States v. Straach*, 987 F.2d 232, 243 (5th Cir. 1993).  The Court exerted no such pressure here.  Again, the Court repeatedly apprised Juror No. 11 of her *right to disagree*, and simply told the other jurors to continue deliberations with her.  *See id.* (finding that the district court did not err in telling a deadlocked jury to continue deliberating, without reading the full Allen charge, since such a statement does "not coerce the minority jury members into agreement with the majority" or "set a

time limit on deliberations," and "expresse[s] no opinion as to what kind of verdict the court preferred").

## III.    Outside Influence

This motion thus turns on one issue:  whether evidence of outside influence on at least one weary juror just before a verdict was reached is grounds for a new trial.  *See supra* note 2 (explaining that Juror No. 11 and the Unidentified Juror may or may not be the same person).  The Sixth Amendment provides every criminal defendant the right to be tried by a jury of their peers. That a verdict is based only on "the evidence developed at trial goes to the fundamental integrity" of this right.  *Turner v. Louisiana*, 379 U.S. 499, 549 (1965).  After all, when statements are presented in court, "there is full judicial protection of the defendant's right to confrontation, of cross-examination, and of counsel."  *Id.*  Evidence that the jury was subject to external influences consequently "subvert[s] these basic guarantees of trial by jury."  *Id.*  Accordingly, if a defendant can establish "that prejudice is likely," the government will "be required to prove its absence." *United States v. Sylvester*, 143 F.3d 923, 934 (5th Cir. 1998).[9]

The Jordans rely on Statements from the Law Clerks to establish that outside influence infected jury deliberations.  The Statements reflect that the Officer engaged in at least two conversations with one or more jurors on the panel.  In the first, the Officer saw Juror No. 11 in tears.  Believing that she was struggling with how to cast her vote, he advised her to put her emotions aside, decide the case without considering the Jordans' potential sentences, and vote only on whether she believed they were guilty or not.  The Jury reached guilty verdicts less than an hour

---

[9] The Parties dispute whether this is the correct standard to apply.  This dispute appears to be reflected in the case law. Some Fifth Circuit cases require the defendant to show that outside influence "likely" prejudiced them before a presumption of prejudice arises.  *See, e.g., Sylvester*, 143 F.3d at 934; *Young v. Herring*, 938 F.2d 543, 558 (5th Cir. 1991).  Others state that a presumption of prejudice automatically arises in every case where outside influence has reached the jury.  *See, e.g., Drew v. Collins*, 964 F.2d 411, 415–16 (5th Cir. 1992) (quoting *United States v. Webster*, 750 F.2d 307, 338 (5th Cir. 1984)).  Because the Court would reach the same result either way, the Court assumes that the stricter standard applies without weighing in on this dispute.

later.  In the second conversation, the Unidentified Juror told the Officer of her plans to tell the Court that her vote was made "with reservation."  As with the first, the Officer told this juror to disregard the sentences the Jordans may face, and "that if she did not believe the defendants were guilty, she should vote not guilty."  (Dkt. #169 at p. 2).  The Officer may have also told her that a vote cast "with reservation" would not be believed—though it is not clear if this was simply the Officer's commentary to the Law Clerk.  Regardless, the Statements reflect that the Officer spoke with at least one weary juror about how her vote should be cast, and that a verdict was reached quickly after.

The Government casts the Statements as unreliable "triple hearsay" since the Jordans' evidence consists of "[1] a memorandum produced by the Court's law clerks relating to what a CSO had told them [2] about what he had purportedly told Juror No. 11 and [3] what Juror No. 11 had allegedly told him earlier that day."  (Dkt. #178 at p. 11).  But these out-of-court statements are each covered by an exclusion from or exception to the rule against hearsay.

> 1. The Memorandum sets out a matter the Law Clerks observed while under a legal duty to report as Court agents, *see United States v. Chiantese*, 546 F.2d 135, 138 (5th Cir. 1977) (finding that, on learning of jury's exposure to prejudicial comments from counsel, the lower court erred by not, "at a minimum," conducting "an inquiry into the alleged misconduct to determine what prejudice, if any, resulted therefrom and thereafter"),[10] and were not written under circumstances that indicate a lack of trustworthiness.  *See* FED. R. EVID. 803(8) (excluding "[a] record or statement of a public office if (A) it sets out . . . (ii) a matter observed while under a legal duty to report . . . and (B) the opponent does not show that the source of information or other circumstances indicate a lack of trustworthiness").  After all, the Law Clerks

---

[10] Although a court, surely, has a duty to disclose evidence of outside influence it has witnessed to the parties, this duty does not necessarily require courts to conduct a full hearing.  *United States v. Ramos*, 71 F.3d 1150, 1153 (5th Cir. 1995) (citing *United States v. Smith*, 354 F.3d 390, 394 (5th Cir. 2003)) ("We do not understand *Smith* to require a full-blown evidentiary hearing in every instance in which an outside influence is brought to bear upon a petit juror.  Our precedents allow the trial judge the flexibility, within broadly defined parameters, to handle such situations in the least disruptive manner possible.").  This is especially true here since (1) the evidence before the Court is sufficient, (2) a hearing would raise difficult questions about the extent to which the parties should be able to examine former jurors and court staff with a new trial potentially forthcoming, and (3) a hearing would garner unnecessary attention in a high-profile case.  *See Sheppard v. Maxwell*, 384 U.S. 333, 354–55 (1966) (discussing dangers of excessive media coverage infecting jury deliberations in high profile cases).

have no personal interest in this case—aside from the burdens a new trial may pose and the unwanted scrutiny they and a friend and coworker (the Officer) now face (Dkt. #174 at p. 24).[11] They also prepared the Statements shortly after the events in question,[12] which the Court found reliable enough to file on the Docket. *See Ams. Ins. Co. v. Jarreau*, No CV 18-5055, 2019 WL 935586, at *4 (E.D. La. Feb. 26, 2019) ("The other bulk of Defendants' exhibits are public records consisting of court filings and decisions which are admissible hearsay under Rule 803(6).").

2. The Officer's remarks are offered for the effect on the listener (Juror No. 11 and the Unidentified Juror), not for the truth of the matter asserted. *See* FED. R. EVID. 801 (defining hearsay as an out of court statement "a party offers in evidence *to prove the truth of the matter asserted* in the statement").

3. And the comments from the Juror(s) in question—that Juror No. 11 was in tears and that the Unidentified Juror stated that she would tell the Court her vote was made "with reservation"—reflect the speaker's "then-existing state of mind" or "emotional sensory, or physical condition." *See United States v. Newell*, 315 F.3d 510, 522–23 (5th Cir. 2002) (finding a note that reflected the speaker's "concerns" was admissible under the state of mind exception).

The Statements are properly considered as a result.

The question, then, is whether the Statements were likely to prejudice the jury. The Government dismisses the Officer's comments as innocuous remarks duplicative of the Court's Final Jury Instructions. The Court cannot agree. To be sure, one law clerk reports that the Officer

---

[11] Defense Counsel warns that, "[w]hile the defendants have no desire to embarrass any courtroom personnel and have the utmost respect for the roles they play, if an evidentiary hearing is required, the parties must be permitted to elicit testimony from the relevant witnesses, including from jurors, the judge's law clerks, and the CSO." (Dkt. #174 at pp. 24–25). Although the Court appreciates Defense Counsel's thoughts on what the Court "must" permit and their concerns about the "embarrass[ment]" they may cause to its staff, the Court assures them that its consideration of this motion is based only on what justice requires. *See* FED. R. CRIM. P. 2 ("These rules are to be interpreted to provide for the just determination of every criminal proceeding, to secure simplicity in procedure and fairness in administration, and to eliminate unjustifiable expense and delay.").

[12] The Memorandum would also be admissible under the Residual Exception to the Hearsay Rule, which provides that a hearsay statement may be considered where: "(1) the statement has equivalent circumstantial guarantees of trustworthiness; (2) it is offered as evidence of a material fact; (3) it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts; . . . (4) admitting it will best serve the purposes of these rules and the interests of justice," and (5) "the proponent gives an adverse party reasonable notice of the intent to offer the statement and its particulars." FED. R. EVID. 807. Each of these elements is met here. The Jordans notified the Government of its intent to rely on the Memorandum by email, even before the motion was filed (Element No. 5). Additionally, the Memorandum concerns a material fact (Element No. 2); is more probative than any other evidence reasonably available, *see supra* note 10 (citing the difficult questions regarding what testimony would be permissible and the unnecessary attention a hearing would cause in this high profile case) (Element No. 3); would allow the Court to determine whether the Jordans received their constitutional right to a fair trial (Element No. 4); and was written under circumstances that warrant trust (Element No. 1).

told Juror No. 11 to vote her conscience. But the Officer also made statements that are either incorrect, ripe for misinterpretation, or prejudicial when considering the context of those conversations. For instance, two law clerks report that the Officer told Juror No. 11 to decide the case based on whether the Jordans were guilty or not. Yet, jurors are not supposed to convict defendants based on their personal beliefs as to whether they committed the criminal acts in question. They are to determine whether the Government has proven guilt "beyond a reasonable doubt." *In re Winship*, 397 U.S. 358, 371 (1970). Accordingly, in some cases, a defendant who a juror believes is guilty will go free due to the justice system's long-standing concern over the irreparable harm imposed when an innocent person faces criminal sanctions. *See id.* ("If, for example, the standard of proof for a criminal trial were a preponderance of the evidence rather than proof beyond a reasonable doubt, there would be a smaller risk of factual errors resulting in freeing guilty persons, but a far greater risk of factual errors that result in convicting the innocent."). Any confusion about the proper standard to apply could have easily impacted the jury's decision in this case.

The Officer's comments to Juror No. 11 to "put her emotions aside" and not vote based on the Jordans' potential sentence are just as problematic (Dkt. #169 at pp. 1–2). This is apparent from the context in which these comments were made. The Officer spoke with Juror No. 11 after seeing her emotional during deliberations. By telling a distraught, holdout voter to set her emotions aside and not consider the sentences the Jordans may face, the Officer could have reasonably left her with the impression that he viewed any doubts she had to convict as unfounded and that, if she looked at the evidence without undue sympathy for the Jordans, she would have found them guilty—just as her peers had. *See Parker v. Gladden*, 385 U.S. 363, 365 (1966) (finding a bailiff's comments to a juror reflecting his belief that the defendant was "guilty" and

"wicked" caused "extreme prejudice"); *Best v. Johnson*, 714 F. App'x 404, 410–11 (5th Cir. 2018) (citing the pressure holdout voters already face as a reason why reading two *Allen* charges to the jury within twenty minutes was prejudicial).[13]  The Supreme Court has found that jurors can be unduly pressured by less.  *See Gypsum*, 438 U.S. at 460 (finding a court's comment to the foreman that he "wanted a verdict 'one way or the other'" could have pressured the jury since the foreman could have believed the court preferred a unanimous verdict over a mistrial).[14]  The Officer's comments are especially concerning given his status as a neutral party charged with "protect[ing] the jury *from* outside influences," *see United States v. McNeal*, No. 16cr014–GEB, 2017 WL 950478, at *2 (E.D. Cal. March 10, 2017) (emphasis added), and as someone in a position of power who spent a great deal of time with the jurors.[15]  *See Parker*, 385 U.S. at 365 (finding a bailiff's comments to be prejudicial in part because "the official character of the bailiff—as an officer of the court as well as the State—beyond question carries great weight with a jury which he had been shepherding for eight days and nights").  Perhaps unsurprisingly, this conversation appeared to have its intended effect.  The jury reached a verdict just thirty to forty-five minutes after the conversation, and just an hour-and-a-half after Juror No. 11 warned that her vote could cause a hung jury.  *See Gypsum*, 438 U.S. at 462 (citing "the swift resolution of the issues in the face of positive prior indications of hopeless deadlock" as an indication that the defendant may have been prejudiced by the judge's conversation with a juror); *United States v. Mix*, 791 F.3d 603, 609 (5th

---

[13] *See also Zabriskie*, 415 F.3d at 1147–48 (explaining that an *Allen* charge read to a lone juror is problematic out of concern that "jurors in the minority position, while perhaps privately unconvinced, vote with the majority for the sake of unanimity and to please the judge").

[14] In fact, courts consistently find that a trial court errs when it suggests that it would prefer a unanimous verdict.  This is true even when the trials courts did not express a preference for a particular verdict like the Officer did in this case.  *See, e.g., Jenkins*, 380 U.S. at 446; *Shields*, 273 U.S. at 584; *Zabriskie*, 415 F.3d at 1147–48.

[15] In fact, Court Security Officers are typically tasked with protecting the jury from outside influences.  *See, e.g., United States v. McNeal*, No. 16cr014–GEB, 2017 WL 950478, at *2 (E.D. Cal. March 10, 2017) (noting in a different context plans to have "[a] Court Security Officer . . . maintain a post outside the jury deliberation room to protect the jury from outside influences").

Cir. 2015) (citing the fact that extrinsic evidence was given to the jury "within two hours" of the guilty verdict "further supports a holding that prejudice was likely").

The impact these comments had on deliberations is compounded by the Officer's response to the Unidentified Juror's remark that, when polled, she would tell the Court her vote was cast "with reservation." (Dkt. #169 at p. 2). Rather than letting this situation play out, or seeking guidance from the Court, the Officer advised "that she should not be concerned about any punishment the defendants may receive" and vote based on her belief on whether the Jordans were guilty or not (Dkt. #169 at p. 2). *See supra* at p. 18 (explaining that jurors are to vote based on whether the Government proved guilt beyond a reasonable doubt, not based on their belief of guilt or innocence). The Officer was apparently concerned that the Unidentified Juror's vote would not be believed under these circumstances, and may have even advised her against expressing this sentiment to the Court—though the record is unclear on this point (Dkt. #169 at p. 2). Regardless, the Officer's second conversation was seemingly just as effective as the first. When asked to confirm that the verdict reflected their respective votes, not one juror stated that her vote was cast "with reservation." If the Unidentified Juror had told the Court of her reservations when polled, as she had originally planned, the Court could have consulted with the Parties on whether to declare a mistrial; read an Allen charge before directing the jury to continue deliberations; confirm that the Unidentified Juror had, in fact, found the Jordans guilty beyond a reasonable doubt; or pursue another appropriate response. *See United States v. Jefferson*, 258 F.3d 405, 411 (5th Cir. 2001) (finding that a court acted in its discretion to confirm potentially dissenting juror's vote); *United States v. Edwards*, 469 F.2d 1362, 1367 (5th Cir. 1972) (explaining that, when a juror responds to a poll by stating that, "it's my verdict, but I am still in doubt," trial courts

should either require the jury to continue deliberations or dismiss them entirely).  In short, the Officer's comments likely altered the course of deliberations in a meaningful way.

It is possible the jury would have reached the same conclusion, even in the absence of the Officer's interventions.  But this is not the point, or the standard governing this motion.  Instead, when defendants can show that prejudice is likely, as they have here, justice requires that a new trial is granted unless the Government can prove that no prejudice occurred.  *See supra* footnote 9 (explaining why the Court assumes this standard applies on this motion).  Although the Government's briefs were thoughtful and well-written, the Court cannot find that it met this burden, or that it could.[16]  The risk that the Officer's comments meaningfully contaminated jury deliberations appear to be quite serious.  Acting on its broad discretion, based on its experience presiding over eighty-six trials, the Court concludes that the Jordans were denied the Sixth Amendment's promise of a fair trial decided solely by a jury of their peers.  *See Ramos*, 71 F.3d at 1154 ("In granting broad discretion to the trial judge, we acknowledge and underscore the obvious, that the trial judge is in the best position to evaluate accurately the potential impact of the complained-of outside influence.").[17]

## CONCLUSION

The Court is entrusted with the sacred responsibility of assuring that every person charged with a crime receives a fair trial.  Upholding this duty is especially important at a time when many

---

[16] The Government asks the Court to conduct an evidentiary hearing to determine whether the jury had already voted on at least some of the charges before the Officer made the comments in question.  But the Court fails to see what this would accomplish.  Jurors are free to change their minds at any time before a verdict is reached.  As a result, even if these conversations occurred after the jury had tentatively reached a unanimous decision on some charges, it would still be impossible to know whether the Officer's comments affected the outcome in this case.  This is especially true since these jurors appeared to have lingering doubts at the time both conversations occurred.

[17] *See also United States v. Goodale*, 667 F. App'x 91, 91–92 (5th Cir. 2016) (per curiam) (citing *United States v. Hare*, 873 F.2d 796, 798 (5th Cir. 1989)) ("[I]f a trial judge could have reasonably come to the opposite conclusion when viewing the question as an original matter, the abuse-of-discretion standard of appellate review requires us to defer to the district court.").

have lost faith in public institutions. After all, the legitimacy of the criminal justice system depends on the public's faith that, if they are charged with a criminal offense, they will be deprived of their freedoms only after a jury finds them guilty beyond a reasonable doubt, based solely on the evidence before them. It is far from clear whether the Jordans were afforded such a trial. The Officer conversed with Juror No. 11 and the Unidentified Juror after perceiving their reluctance to convict. Sure enough, a jury that seemed deadlocked after more than a day of deliberations, rendered guilty verdicts thirty to forty-five minutes later. The Court has broad authority to decide whether to grant a new trial under these circumstances. But "'[in] this world, with great power there must also come—great responsibility.'" *Kimble v. Marvel Entm't, LLC*, 135 S. Ct. 2401, 2415 (2015) (quoting S. Lee and S. Ditko, *Amazing Fantasy No. 15: 'Spider-Man*,' p. 13 (1962)). If the Court's role as the defender of the judicial process is to have any meaning, the Court cannot find that the verdicts reflect the jury's unanimous decision, free from outside influence. The Constitutional right to a fair trial by jury demands better.

Accordingly, Defendants Laura and Mark Jordan's Motion for New Trial Under Rule 33 (Dkt. #174) is **GRANTED**, and their Motions for Acquittal (Dkt. #177) and for Leave to Interview Jurors (Dkt. #182) are **DENIED AS MOOT**.[18] The new trial is hereby set for July 8, 2019, with a pretrial order forthcoming.

**IT IS SO ORDERED**.
**SIGNED this 2nd day of May, 2019.**

_____
AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE

---

[18] The Jordans requested leave to interview the jurors based on evidence indicating that, prior to deliberations, one juror had stated to another that she "didn't care which way she voted and would just go with the majority" (Dkt. #182 at p. 2).