## THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## SHERMAN DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § | |
| | § | |
| **VS.** | § | **NO. 4:18CR87-1** |
| | § | |
| **LAURA JORDAN** | § | |

### LAURA JORDAN'S SENTENCING MEMORANDUM & MOTION FOR A DOWNWARD VARIANCE

*/s/ Brent E. Newton*
Brent E. Newton
**GERGER, HENNESSY & MARTIN**
700 Fannin, Suite 2300
Houston, Texas 77002
713.224.4400 – Telephone
713.224.5153 – Fax
bnewton@ghmfirm.com


*/s/ Jeff Kearney*
Jeff Kearney
**KEARNEY LAW FIRM**
One Museum Place
3100 West 7th Street, Suite 420
Fort Worth, Texas 76107
Office: 817-336-5600
Facsimile: 817-336-5610
jkearney@kearneylawfirm.com


**COUNSEL FOR LAURA JORDAN**

## TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS ........................................................................................... ii

TABLE OF AUTHORITIES ................................................................................... iii

I.    Objections to the Revised Presentence Report ........................................... 1

   A.  This Court Should Apply USSG § 2C1.2 Rather than USSG § 2C1.1. .................... 1

   B.  The Evidence Shows that at Most a Single Gratuity Was Given to Ms. Jordan by Mark Jordan. .......................................................................... 7

   C.  Alternatively, if this Court Were to Apply USSG § 2C1.1, Ms. Jordan's Offense Level Under that Guideline Would Be 18. .................................... 9

   D.  The Tax Guideline, USSG § 2T1.4, Does Not Affect the Combined Offense Level. ........................................................................... 10

   E.  The Enhancement for Obstruction of Justice Should Not Apply. ........................... 11

   F.  Ms. Jordan's Final Offense Level Should Be 15 and Her Advisory Guideline Range Should Be 18-24 Months. .......................................... 12

   G.  Restitution Is Not Applicable. ..................................................................... 12

II.   Personal History, Family Circumstances, and Supporting Letters ........................ 12

III.  Post-*Booker* Sentencing Process .............................................................. 18

IV.   Statutory Sentencing Factors (Including the Sentencing Guidelines) .................. 20

   A.  Non-*Guidelines* § 3553(a) Factors ......................................................... 21

   B.  Two *Guidelines Manual* Factors (Guidelines and Policy Statements) .................. 29

CONCLUSION .................................................................................................. 33

CERTIFICATE OF SERVICE ............................................................................. 34

ii

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Bennett v. City of Grand Prairie, Tex.*,
  883 F.2d 400 (5th Cir. 1989)......................................................................5

*Burlington N. R.R. Co. v. Brotherhood of Maintenance of Way Employees*,
  961 F.2d 86 (5th Cir.1992).........................................................................2

*Gall v. United States*,
  552 U.S. 38 (2007)..............................................................18, 19, 22, 31

*Kimbrough v. United States*,
  552 U.S. 85 (2007)........................................................................19, 29

*Nelson v. United States*,
  555 U.S. 350 (2009)..................................................................................18

*Pepper v. United States*,
  562 U.S. 476 (2011)...........................................................................5, 21

*Rita v. United States*,
  551 U.S. 338 (2007).................................................................................18

*Tapia v. United States*,
  564 U.S. 319 (2011)........................................................................22, 25

*United States v. Adelson*,
  441 F.Supp.2d 506 (S.D.N.Y. 2016)................................................30, 32

*United States v. Booker*,
  543 U.S. 220 (2005)..............................................................18, 21, 25, 29

*United States v. Brewer*,
  978 F. Supp.2d 710 (W.D. Tex. 2013)...........................................23, 24, 27

*United States v. Campos-Maldonado*,
  531 F.3d 337 (5th Cir. 2008)...................................................................29

*United States v. Canestraro*,
  282 F.3d 427 (6th Cir. 2002).......................................................................7

United States v. Chapman,
  No. 11-cr-0904, 2012 WL 2574814, at *13-18 (D.N.M. June 22, 2012) ....................28

*United States v. Cole*,
  765 F.3d 884 (8th Cir. 2014)....................................................................27

*United States v. Corsey*,
  723 F.3d 366 (2d Cir. 2013)..............................................................30, 32

*United States v. Dokmeci*,
13-CR-00455 & 13-CR-00565, 2016 WL 915185, at *1 (E.D.N.Y. Mar. 9,
2016) ....................................................................................................................33

*United States v. Duhon*,
440 F.3d 711 (5th Cir. 2006).............................................................................29

*United States v. Givens*,
767 F.2d 574 (9th Cir. 1985)...............................................................................5

*United States v. Grant*,
850 F.3d 209 (5th Cir. 2017)................................................................................3

*United States v. Gupta*,
904 F. Supp. 2d 349, 351 (S.D.N.Y. 2012).......................................................30

*United States v. Haltom*,
113 F.3d 43 (5th Cir. 1997).................................................................................10

*United States v. Hamilton*,
No. 19-cr-83 (N.D. Tex. Nov. 9, 2021) ..............................................................28

*United States v. Hamilton*,
No. 21-11157 (5th Cir.)........................................................................................11

*United States v. Hills*,
27 F.4th 1155, 1201 (6th Cir. 2022) ..................................................................28

*United States v. Johnson*,
No. 16-CR-457-1, 2018 WL 1997975, at *3-*4 (E.D.N.Y. Apr. 27, 2018)................31

*United States v. McNair*,
605 F.3d 1152, 1232 (11th Cir. 2010)................................................................28

*United States v. Moeller*,
80 F.3d 1053 (5th Cir. 1996)...........................................................................1, 2

*United States v. Neilson*,
721 F.3d 1185 (10th Cir. 2013)............................................................................3

*United States v. Nesbeth*,
188 F. Supp.3d 179 (S.D.N.Y. 2016).................................................................23

*United States v. Parris*,
573 F. Supp. 2d 744 (E.D.N.Y. 2008) ...............................................................32

*United States v. Patel*,
164 F.3d 620, 1998 WL 650589, at *2 (2d Cir. 1998)........................................8

*United States v. Posado*,
557 F.3d 428 (5th Cir. 1995)................................................................................5

iv

*United States v. Reinhart*,
    442 F.3d 857 (5th Cir. 2006)..........................................................................................29

*United States v. Richard*,
    775 F.3d 287 (5th Cir. 2014)..........................................................................................2

United States v. Roussel,
    705 F.3d 184, 187-88 (5th Cir. 2013) ..........................................................................28

*United States v. Soumano*,
    318 F.3d 135 (2d Cir. 2003)..........................................................................................8

*United States v. Tucker*,
    404 U.S. 443 (1972).......................................................................................................5

*United States v. Whitfield*,
    590 F.3d 325 (5th Cir. 2009)..........................................................................................2

*United States v. Wright*,
    Criminal No. 4:16-CR-00052, 2017 WL 6408997 (E.D. Tex. Dec. 15, 2017) ..............5

*Walker v. Martel*,
    709 F.3d 925 (9th Cir. 2013)........................................................................................22

**Statutes, Rules and Guidelines**

18 U.S.C. § 201(c)(1) ........................................................................................................2

18 U.S.C. § 3553(a)(4) & (5).............................................................................................20

18 U.S.C. § 666(a)(1) ...............................................................................................1, 3, 11

18 USC § 3553(a) .......................................................................................18, 19, 22, 34

18 USC § 3661...............................................................................................................21

26 U.S.C. § 102(a) ..........................................................................................................10

Fifth Circuit Pattern Jury Instructions (2019)...................................................................2

U.S. Sent'g Comm'n, *Guidelines Manual* Appendix C, Amendment 666.........................2

USSG § 2B1.1(b)(1) .................................................................................................9, 32

USSG § 2C1.1 .................................................................................................................10

USSG § 2C1.1 ...................................................................................................1, 7, 9, 20

USSG § 2C1.1(b)(2) .........................................................................................................9

USSG § 2C1.1(b)(3) .......................................................................................................10

USSG § 2C1.2 .................................................................................................... passim

USSG § 2C1.2(b)(1) .........................................................................................................8

USSG § 2T1.4...................................................................................................................10

USSG § 3C1.1 ............................................................................................................11

USSG 2C1.2 .............................................................................................................10

USSG, Chpt. 5, Pt. A ...............................................................................................12

**Other Authorities**

Barry Boss & Kara Kapp, *How the Economic Loss Guideline Lost Its Way, and How to Save It*, 18 OHIO ST. J. CRIM. L. 605, 606 (2021) .............................................26

D. Weisburd & E. Waring, WHITE COLLAR CRIME AND CRIMINAL CAREERS 151 (2001) ......................................................................................................................24

Daniel S. Nagin, *Deterrence in the Twenty-First Century: A Review of the Evidence* ....................................................................................................................24

Judge Mark W. Bennett *et al.*, *Judging Federal White-Collar Fraud Sentencing: An Empirical Study Revealing the Need for Further Reform*, 102 IOWA L. REV. 939, 959 (2017) .......................................................................................................26

Richard Frase, *Punishment Purposes*, 58 STANFORD L. REV. 67, 80 (2005) ...................24

*The Past Predicts the Future: Criminal History and Recidivism of Federal Offenders* (2017) .........................................................................................................25

U.S. Sentencing Commission, *Alternative Sentencing in the Federal Criminal Justice System* at 1 (Jan. 2009)....................................................................................25

U.S. Sentencing Commission, *The Effects of Aging on the Recidivism Among Federal Offenders* (2017)............................................................................................25

Vol. 42, No. 1, CRIME AND JUSTICE IN AMERICA (August 2013).....................................24

If this Court denies her pending motion for a new trial and renewed motion for judgment of acquittal, Laura Jordan will stand before this Court for sentencing on August 4, 2022. This memorandum, which reiterates her prior objections to the presentence report (PSR), will address various issues related to the guideline and statutory factors that this Court must consider before imposing sentence. It concludes that this Court should find a final offense level of 15, which yields an advisory guideline sentencing range of 18-24 months, and then vary downwardly to a below-range sentence.

## I.     Objections to the Revised Presentence Report

Ms. Jordan incorporates her prior objections to the initial PSR (ECF No. 377) and makes the same objections to the revised presentence report.

### A.  This Court Should Apply USSG § 2C1.2 Rather than USSG § 2C1.1.

With respect to her primary objection – to the PSR's application of § 2C1.1 (the bribery guideline) rather than § 2C1.2 (the gratuity guideline) – she notes that the Fifth Circuit affords this Court substantial discretion to apply either guideline based on this Court's "fact-intensive determination" of a defendant's conviction under 18 U.S.C. § 666(a)(1). *United States v. Moeller*, 80 F.3d 1053, 1062 (5th Cir. 1996); *see also* PSR Addendum, at vii ("[I]t is acknowledged the determination of whether a defendant convicted under these circumstances should be sentenced under USSG § 2C1.1 (bribes) or

USSG § 2C1.2 (gratuities) is a fact-intensive issue justifying deference to the sentencing court.").[1]

Any money or property given to Ms. Jordan by her future husband was *at most* a gratuity as opposed to a bribe.[2]  As the evidence at trial demonstrated, Ms. Jordan publicly supported the Palisades development before she ever met Mark Jordan, she and the city

---

[1] Ms. Jordan notes that two subsequent Fifth Circuit decisions held that § 2C1.1 always applies when a defendant's conviction included an element of a "corrupt purpose," as Ms. Jordan's § 666(a)(1) conviction did in this case.  *See United States v. Richard*, 775 F.3d 287, 296 (5th Cir. 2014) (holding that "§ 2C1.1 is the appropriate Guideline when the offense conduct includes a 'corrupt purpose,' as a section 666(a)(1) offense necessarily does) (citing *United States v. Whitfield*, 590 F.3d 325, 367 n.31 (5th Cir. 2009)). However, the Fifth Circuit's decision in *Moeller* – rather than *Richard* and *Whitfield* – is clearly controlling for two separate reasons.

First, *Moeller*, a § 666(a)(1) case, was decided first in time and was not mentioned in the subsequent decisions in *Richard* and *Whitfield*.  It is well-established that an earlier Fifth Circuit decision is controlling over subsequently rendered decisions when the former precedent has never been overruled by the en banc Fifth Circuit or the Supreme Court.  *See, e.g., Burlington N. R.R. Co. v. Brotherhood of Maintenance of Way Employees*, 961 F.2d 86, 89 (5th Cir.1992).  No en banc or Supreme Court decision has undermined *Moeller*.  Therefore, *Moeller* – rather than *Richard* and *Whitfield* – is the controlling precedent.

Second, as the sole basis for its holdings, the Fifth Circuit in *Richard* and *Whitfield* expressly relied on language in the commentary ("background") to § 2C1.2 that existed from 1987 until 2003 – providing that "[a] corrupt purpose is not an element of this offense" – that the Sentencing Commission later deleted in 2004.  *See* U.S. Sent'g Comm'n, *Guidelines Manual* Appendix C, Amendment 666; *see also Whitfield*, 590 F.3d at 367 n.31 (citing 2001 version of § 2C1.2's commentary); *Richard*, 775 F.3d at 296 (same).  The Fifth Circuit's decisions in *Richard* and *Whitfield*, which were decided years after the 2004 amendment, simply failed to recognize that the Sentencing Commission had amended § 2C1.2 in 2004 by deleting that sentence in the commentary on which *Whitfield* – and later *Richard* – relied in holding that the "corrupt intent" element of a § 666 offense always requires application of § 2C1.1.  Also notable is the fact that the sentence in the original commentary to the 1987 version of § 2C1.2, in effect until the 2004 amendment, referred explicitly only to 18 U.S.C. § 201(c)(1) (as "this offense").  *See* USSC § 2C1.2, comment. ("Statutory Provision") (1987-2003).  Unlike § 666(a)(1), § 201(c)(1) then did not (and still does not) require a "corrupt purpose" as an element.  *See* Fifth Circuit Pattern Jury Instructions (2019), Instruction 2.09C.  That sentence in the original 1987 commentary clearly has no relevance to a conviction under § 666(a)(1), which likely explains the Sentencing Commission's deletion of it in 2004.

[2] Ms. Jordan has filed a motion for a new trial and, if it is not granted, intends to appeal her convictions.  She denies that she received any benefit from Mark Jordan with a corrupt intent, either as a *quid pro quo* "bribe" or as a "reward" given after the fact because of her official action (a "gratuity").  For purposes of this sentencing memorandum, however, she sets forth why the evidence at most proves a gratuity rather than a bribe and, thus, why this Court should sentence her under § 2C1.2 rather than § 2C1.1.

council cast multiple votes furthering the project before Mark Jordan provided any monetary benefits to Ms. Jordan, and the city council would have favored the development even without Ms. Jordan's votes. *See* PSR ¶ 9 (bribes "[b]eginning around January 6, 2014 . . ."); V. Messer, Vol. 8, at 2322-25. Mark Jordan gave Ms. Jordan gratuities – such as allowing her to share his hotel rooms – only *after* the first vote related to the Palisades project was cast by Ms. Jordan and financial assistance only *after* Ms. Jordan's final vote. Likewise, the benefits for which no monetary value can be assigned, such as romance and sex, also did not occur before the first vote. L. Jordan, Vol. 13, at 3399, 3562, 3646-47.[3]

Indeed, no evidence was introduced at trial to demonstrate a preconceived agreement between the Jordans to trade benefits for votes. The evidence, as the government argued in its opposition to the Jordans' post-trial motions, was that Laura Jordan "coveted" "the time and attention of a younger, charming, and very rich man," and that he provided her benefits. ECF No. 363, at 14. That is hardly consistent with a *quid pro quo* that is necessary for bribery. And, at a minimum, the specific trial evidence that the government pointed to in its post-trial opposition brief to demonstrate a *quid pro quo* did not show an agreement, only a friendly relationship and, perhaps, a later sense by Mark

---

[3] Even if this Court were to conclude that Mark Jordan provided some benefits to Laura Jordan in advance of the final vote and that those benefits were bribes, it is undisputed that the vast majority of the benefits were provided after the city council's final vote. *See* Mark Jordan's Sentencing Memorandum, at 8 (Exhibit 1). Thus, the "conduct overall" related to the § 666 offenses "had more to do with" gratuities than with bribes; therefore, the gratuities guideline applies. *See United States v. Neilson*, 721 F.3d 1185, 1188 (10th Cir. 2013) ("Although some of Defendant's conduct may also have obstructed justice, his conduct *overall* had more to do with taxation.") (emphasis added)). Focusing on the charges rather than the evidence adduced at trial, as suggested in *United States v. Grant*, 850 F.3d 209, 219-20 & n.2 (5th Cir. 2017), does not lead to a different conclusion. Although the superseding indictment characterizes the offense as bribery, the facts alleged, consistent with the PSR and the evidence introduced at trial, reflect a series of benefits that began after the first vote, and that almost entirely took place after the final vote. ECF No. 233 ¶¶ 20.h-.bbb.

Jordan that he owed Laura Jordan for her votes.  ECF No. 373, at 9-10.  That is consistent at most with appreciation in the form of gratuities (without any *quid pro quo* or intent to influence any official act), not a preconceived trade.

It is also important to emphasize the fact that Ms. Jordan was not the deciding vote on the city council in favor of the Palisades project and previously had publicly supported the project and in fact voted for it *before* receiving any benefits from Mark Jordan.[4]  At trial, the other council members testified they voted in favor of it because they believed that it was in the city's best interest and were not convinced to vote for the project by Ms. Jordan.[5]  Such testimony shows that there was no bribe – in that, objectively, the project made good sense for the city and no improper influence was needed –and that anything given to Ms. Jordan by Mr. Jordan was, at most, a gratuity and not a *quid pro quo*.

It is also significant that, after the first vote (which occurred *before* any gratuity was given to Ms. Jordan), the remaining votes were a *fait accompli*.  The second vote ratified decisions made at the first.[6]  The third supported re-zoning land that other city councilmembers told Mark Jordan to buy.[7]  And the fourth vote to allow negotiation of the economic development agreement was unanimous because councilmembers wanted the Palisades project to succeed (after the zoning had passed).[8]  Considering that there was no

---

[4] JDX 19; Trial Transcript, L. Good, Vol. 11, at 3101-02.

[5] P. Voelker, Vol. 7, at 1885-86, 1927-29, 1939-40; S. Mitchell, Vol. 3, at 789.

[6] Trial Transcript, S. Mitchell, Vol.3, at 704, 831-32.

[7] Trial Transcript, S. Mitchell, Vol. 3, at 807-08; P. Voelker, Vol. 7, at 1935-37.
[8] Trial Transcript, S. Mitchell, Vol. 3, at 725.

need to change Ms. Jordan's votes, any benefit given to her was, at most, to reward her for her past official action, not a bribe to induce her future actions.

In further support of her argument that at most she received a gratuity rather than a bribe, Ms. Jordan offers the results of a polygraph exam that she took in 2018, **Exhibit A**, to prove that she was not bribed.[9]  During that examination, which was administered by Eric J. Holden, a highly respected polygrapher (and past president of the American Polygraph Association),[10] she was asked the following questions and provided the following answers:

> Relevant Q1: Did Mark Jordan offer you anything of value in exchange for your vote on the Palisades Project?
>
> Answer: No.

---

[9] Polygraph results are admissible at sentencing hearings, which are not governed by the Rules of Evidence. *Bennett v. City of Grand Prairie, Tex.*, 883 F.2d 400, 405 (5th Cir. 1989) (noting that courts "have permitted such evidence to be introduced at sentencing proceedings"), citing *United States v. Givens*, 767 F.2d 574, 585 (9th Cir. 1985) (holding that "the trial judge possesses . . . discretion in determining whether he should consider polygraph evidence at sentencing") (citing, *e.g.*, *United States v. Tucker*, 404 U.S. 443, 446 (1972)).  As the Fifth Circuit noted, in its decision permitting judges (as opposed to juries) to consider them in deciding whether probable cause exists, "[p]olygraph exams, by most accounts, correctly detect truth or deception 80 to 90 percent of the time." *Bennett*, 883 F.2d at 405-06 (citation omitted); *see also United States v. Posado*, 557 F.3d 428, 434 (5th Cir. 1995) (in later ruling that polygraph results are not *per se* inadmissible even in proceedings governed by the Rules of Evidence, the court noted that "[c]urrent research indicates that, when given under controlled conditions, the polygraph technique accurately predicts truth or deception between seventy and ninety percent of the time.") (citations omitted).

Although this Court has excluded polygraph results during guilt phase under the Federal Rules of Evidence, *United States v. Wright*, Criminal No. 4:16-CR-00052, 2017 WL 6408997 (E.D. Tex. Dec. 15, 2017), that decision did not address the admissibility of polygraph test at a sentencing hearing under the more lenient standard of admissibility for such hearings.  *See also Pepper v. United States*, 562 U.S. 476, 480 (2011) ("This Court has long recognized that sentencing judges 'exercise a wide discretion' in the types of evidence they may consider when imposing sentence . . . ."); *id.* at 489 (holding that "sentencing courts [may] 'conduct an inquiry broad in scope, largely unlimited either as to the kind of information [they] may consider, or the source from which it may come.' *United States v. Tucker,* 404 U.S. 443, 446 (1972).").

[10] Mr. Holden's resume is attached as **Exhibit B**.

Relevant Q2: Did Mark Jordan give you anything of value that influenced your vote on the Palisades Project?

Answer: No.

Relevant Q3: Did you solicit or accept anything from Mark Jordan to influence anyone's vote on the Palisades Project?

Answer: No.

**Exhibit A**, at 2. Mr. Holden concluded that Ms. Jordan's answers indicated no deception. *Id.* at 3.

For these reasons, because *at most* Ms. Jordan accepted a gratuity rather than a bribe, this Court should apply § 2C1.2. Section 2C1.2(b)(2) provides for an increase in the base offense level if "the value of the gratuity exceeded $6,500." Because the economic value of the gratuities provided by Mark Jordan to Ms. Jordan before the final vote clearly did not exceed that threshold amount, as explained in Mark Jordan's sentencing memorandum on pages 7-9, there should be no increase in the base offense level of 11 under § 2C1.2(b)(2). Applying § 2C1.2 in that manner would result in a base offense level of 11 and a 4-level enhancement under § 2C1.2(b)(3). Ms. Jordan's total offense level under that guideline would be 15.

Alternatively, if this Court were to conclude that the economic benefits provided by Mark Jordan to Ms. Jordan after the final vote were part of an illegal gratuity (rather than gifts motivated by love and affection), then the total value of the gratuity would be $78,969, as explained on pages 9-10 and 20-21 of Mark Jordan's sentencing memorandum. That amount would result in a 6-level enhancement under § 2C1.2(b)(2) (cross-referencing § 2B1.1(b)(1)'s Loss Table), yielding a final offense level of 21.

**B. The Evidence Shows that at Most a Single Gratuity Was Given to Ms. Jordan by Mark Jordan.**

The PSR erroneously finds multiple bribes (and presumably would find multiple gratuities in the event this Court applies § 2C1.2 rather than § 2C1.1). PSR ¶ 25.

Both sections 2C1.1 and 2C1.2 contain "more than one" bribe/gratuity enhancements, and the application notes provide as follows:

> **Application Note 2 (§ 2C1.1):** "Subsection (b)(1) provides an adjustment for offenses involving more than one incident of either bribery or extortion. Related payments that, in essence, constitute a single incident of bribery or extortion (*e.g*., a number of installment payments for a single action) are to be treated as a single bribe or extortion, even if charged in separate counts."

> **Application Note 2 (§ 2C1.2):** "Related payments that, in essence, constitute a single gratuity (*e.g*., separate payments for airfare and hotel for a single vacation trip) are to be treated as a single gratuity, even if charged in separate counts."

These two application enhancement provisions should be interpreted in a consistent manner. *See United States v. Canestraro*, 282 F.3d 427, 431 (6th Cir. 2002) (agreeing that the more extensive application note following § 2C1.1 provides "interpretive guidance" for § 2C1.2's "more than one gratuity" enhancement, with a focus on whether there were multiple gratuities offered for "multiple official acts" as opposed to offered for a "single" official act).

Therefore, the most important consideration for both guidelines' enhancements is whether multiple payments were made for a "single [official] action" or, conversely, for

"multiple" distinct official acts by the government official.[11]   As discussed above, the evidence shows that, *at most*, Mark Jordan intended to reward Laura for initially voting for the Palisades project (without any *quid pro quo*) and his intent was to retrospectively reward her – not to prospectively bribe her for her future votes.  Furthermore, as discussed above, the remaining votes after the initial one all were a *fait accompli*.  The money, carpet, and time and attention given to Ms. Jordan by Mark Jordan after the council's first vote were not gratuities or bribes.  They were motivated by love and affection.  By that time, the Jordans were in the process of leaving their original spouses and moving in together (and eventually marrying and blending their families).

Therefore, the multiple *de minimis* gratuities on the various trips after the first vote and before the last vote were, at most, all rewards for a *single action* (rezoning of the Palisades development).  That would constitute a single gratuity, not more than one, under Application Note 2 following § 2C1.2.  Therefore, this Court should not enhance Ms. Jordan's offense level for multiple gratuities under § 2C1.2(b)(1).

---

[11] *Compare, e.g.*, *United States v. Soumano*, 318 F.3d 135, 137 (2d Cir. 2003) ("More importantly, the $2,500 payment and the $500 payment were clearly meant to influence two separate actions."), *with United States v. Patel*, 164 F.3d 620, 1998 WL 650589, at *2 (2d Cir. 1998) (unpublished)  ("Patel did appear to ask the INS agent to take different specific actions – withholding files, securing work permits, securing green cards, and so on – over the course of the ten meetings.  But the general objective that encompasses all of Patel's requests – delaying deportation of his four employees – can also be viewed as a single action for which Patel made multiple payments.  Based on the record, we cannot say that the district court's finding that 'there was a single episode of bribery' was clearly erroneous.").

**C. Alternatively, if this Court Were to Apply USSG § 2C1.1, Ms. Jordan's Offense Level Under that Guideline Would Be 18.**

Even if this Court were to apply § 2C1.1, it should not adopt the PSR's § 2C1.1 guideline calculation.  Section 2C1.1 provides that the offense level is enhanced using § 2B1.1(b)(1)'s loss table based on the greatest of the loss to the government, the amount of the bribe(s), or the benefit to be received by the party who paid the bribe(s).  The PSR correctly observes that the "City of Richardson and its citizens sustained no monetary loss in this case."  PSR ¶ 20.  The government did not object to the PSR's finding of no loss from the bribery counts.  Nor was there any evidence at trial that could support a finding of loss as a result of any bribe or gratuity.[12]

The PSR bases its enhancement pursuant to § 2B1.1(b)(1)'s Loss Table (cross-referenced under USSG § 2C1.1(b)(2)), on its finding that the benefit to be received by Mark Jordan as a result of the alleged bribes was more than $42 million and, on that basis, added 22 levels.  PSR ¶ 25.  As discussed on pages 23-30 of Mark Jordan's sentencing memorandum, the actual value of the benefit received by Mark Jordan is zero (in that the benefit received was entirely speculative). The latter would result in no enhancement pursuant to § 2C1.1(b)(2) (cross-referencing § 2B1.1(b)(1)), rather than the 22-level enhancement used by the PSR.

---

[12] The only loss, which is only relevant to the tax counts, was to the IRS.  PSR ¶ 19-20.  Ms. Jordan discusses that issue below.

9

Applying § 2C1.1 in that manner would result in a base offense level of 14, a 4-level enhancement under § 2C1.1(b)(3); Ms. Jordan's total offense level under that guideline would be 18.

## D. The Tax Guideline, USSG § 2T1.4, Does Not Affect the Combined Offense Level.

With respect to Ms. Jordan's convictions of the tax-related offenses (Counts Eight, Nine, and Ten), the PSR finds a tax loss of $34,275 under § 2T1.4, with an offense level of 12.  PSR ¶ 31.  The PSR errs.  For the reasons stated above, there was no appreciable economic value of any bribe or gratuity for the travel expenses that Mark Jordan paid for her and that the money and carpet that he gave her after the final vote was motivated by romantic feelings (and thus were not illegal bribes or gratuities).  Gifts from one romantic partner to another are not taxable income.  *See* 26 U.S.C. § 102(a).  Therefore, Ms. Jordan's final offense level under § 2T1.4 should be 6.  ECF No. 377, at 11-12.  Because 6 is "9 or more levels less" serious than either 15 or 18 (the offense levels that Ms. Jordan contends should be applicable under § 2C1.1 or § 2C1.2), this Court should not add any additional offense levels under § 3D1.4(c).  *See* ECF No. 377, at 12.

Alternatively, even if this Court were to find a tax loss amount that otherwise would require some additional "units" under § 3D1.4(c) if § 2T1.4 were not "grouped" with § 2C1.1 or § 2C1.2, this Court should not apply § 3D1.4(c) because counts of conviction under § 2T1.4 should always be "grouped" with counts of conviction under § 2C1.1 or § 2C1.2.  *Cf. United States v. Haltom*, 113 F.3d 43 (5th Cir. 1997) (holding fraud counts and tax evasion counts should be "grouped" together); *see also id.* at 47 n.6 (noting "the

10

Sentencing Commission issued an advisory stating that tax evasion should always be grouped with the offense that generated the illegal income-regardless of whether the 2-level increase for criminally derived income was actually applied").[13]   If the tax evasion guideline (§ 2T1.1) should always be "grouped" together with the fraud guideline when the evaded income came from fraudulent activity, then § 2T1.4 likewise always should be "grouped" together with § 2C1.1 or § 2C1.2 when the unreported income came from a bribe or gratuity.

### E.  The Enhancement for Obstruction of Justice Should Not Apply.

Ms. Jordan has objected to the PSR's recommended 2-level enhancement under USSG § 3C1.1.  ECF No. 377, at 7-8, 11.   First, she did not intend to obstruct justice by deleting emails.  Instead, she intended to cover up evidence of her flirtations with Mark Jordan while the two were still married to other people without any intent to obstruct justice.   Second, although Ms. Jordan exercised her constitutional right to go to trial with a jury of peers, she did not dispute the evidence that she received gifts from Mark Jordan. She only denied accepting them with criminal intent.  In addition, as her motion for a new trial evinces, the legal issues concerning the required level of intent are unresolved (in particular, whether a *quid pro quo* is required under 18 U.S.C. § 666(a)(1)), as shown by the pending Fifth Circuit decision in *United States v. Hamilton*, No. 21-11157 (5th Cir.).

---

[13] That advisory is available at:
https://babel.hathitrust.org/cgi/pt?id=osu.32437010689889&view=1up&seq=22&skin=2021 (see pp. 12-13).

Therefore, in this Court's discretion, it should not enhance her guideline calculation for obstructing justice under these circumstances.

### F. Ms. Jordan's Final Offense Level Should Be 15 and Her Advisory Guideline Range Should Be 18-24 Months.

As discussed in her objections to the original version of the PSR, and as further supported by this memorandum, Ms. Jordan's final offense level should be 15 and her corresponding advisory guideline range should be 18-24 months.  *See* USSG, Chpt. 5, Pt. A (Sentencing Table; Offense Level 15/CHC I).

### G. Restitution Is Not Applicable.

The PSR recommends $34,275 in restitution to be paid to the Internal Revenue Service for the tax loss related to Ms. Jordan's convictions of the charges in Counts Eight, Nine, and Ten.  PSR ¶ 82.  As explained above, there is no tax loss attributable to Ms. Jordan.  Accordingly, no restitution should be ordered.[14]

## II.    Personal History, Family Circumstances, and Supporting Letters[15]

As the many character letters submitted to this Court from friends, colleagues, family members, and business associates powerfully attest, Laura Jordan has led a life guided by her core beliefs in family, faith, and community service.  The terms and phrases

---

[14] To the extent the Court considers imposing restitution, $34,275 is not the correct amount.  At most, the amount of monetary benefits received by Ms. Jordan as part of the § 666(a)(1) offense conduct and not reported by her on her tax return was $78,669.02.  Applying the presumptive tax rate of 28% (*see* § 2T1.1(c)(1)(A)), results in a tax loss $22,027.33.  *See* Mark Jordan's Sentencing Memorandum, at 35 & n.15

[15] The letters are being contemporaneously emailed to this Court, as required by this Court's prior order.

that are repeatedly used to describe her qualities and deeds in those letters include – "loving, nurturing, and protecting," "encouraging," and "supportive." She is repeatedly described as someone who "has always made time in her very busy schedule to listen to my struggles . . . without judgment" and who "was always in my corner," "making the lives of those around her better," and as someone who "has intentionally prioritized work that lifts others up."

Ms. Jordan was raised in a close-knit family. She attended high school in Richardson and then attended Texas A & M University. After graduating with a bachelor's degree in Industrial Science, Ms. Jordan worked for the United Way as a fundraiser. After she married and had her three sons (Brooks, now 28; Blake, now 25; and Bennett, now 22), she devoted herself to the roles of mother and wife. As her sons became older, in addition to parenting and creating a nurturing home for her family, she sought out positions where she could serve others: her volunteer work included PTA leadership roles, fundraising for the Richardson swim team, volunteering with the Young Men's Service League – where she also instilled a commitment to philanthropy in her sons – and helping to lead efforts for an outdoor learning space at a local elementary school. Professionally, from 2009 to 2013, she served as Executive Director for the Network for Teaching Entrepreneurship, a non-profit organization focused on supporting youth from low-income communities; and from 2011 to 2015, she served the city of Richardson on the City Council, first as mayor pro tem and then as mayor. Due in large part to Ms. Jordan's leadership, the city of Richardson was able to secure the 59 acres that now make up the Spring Creek Nature Preserve, a signature park enjoyed daily by countless community members. One letter

13

summarized Ms. Jordan's dedication to the community: "Over the years, Laura has been instrumental in initiating and leading efforts to make Richardson, Texas a better place to live for all residents."

Ms. Jordan's commitment to service to her community is commendable; however, it is her complete devotion to her family that is cited in almost every letter.  As one friend wrote, "Above all, she is a mother, a daughter, a wife, a friend, and a sister who intentionally lives a life of integrity and faith."

As a daughter, she has helped care for her parents throughout illnesses; most recently, after a series of strokes suffered by her mother, Ms. Jordan has provided constant support and comfort to her father as they navigated the decision to move her mother into an assisted living facility.  Friends of the Gibbs family, who have known Ms. Jordan since she was an adolescent, wrote: "Her dad depends on his daughter's presence and care for his well-being as well as support for her mom." As a sister, she has provided emotional and financial support to her brother, Doug, throughout his life.  This support was invaluable during an especially difficult time when he was facing challenges due to alcohol use.  She opened her home to Doug and to his young daughter, Jacqueline, and the two of them lived with Ms. Jordan for nearly two years. In Doug's words, "Laura was the last house on the block for me and by giving of herself, her home, and her resources, she saved me."

Ms. Jordan's love and devotion to her husband is referenced in many of the letters written.  Melanie Florsheim, a friend and the wife of Mr. Jordan's business partner, wrote, "Her commitment to live the rest of her life as Mark's soul mate and partner is an outward expression of how she values her relationship with Mark."  Their pastor, Mike Buster,

14

writes "Mark and Laura deeply love each other.  I witnessed this from the very beginning
after they met.  Their marriage is one of the strongest I have seen in my 40 years of
ministry." One of Mr. Jordan's long-time friends wrote "Since meeting her in 2015, I have
enjoyed watching Laura deeply love Mark and serve him and his family selflessly." And
Reverend Lil Smith, who has known Ms. Jordan for almost 25 years and who officiated
their wedding ceremony, describes Laura and Mark's marriage thusly: "There is no doubt
in my being that these two have authentic love for one another and that together they are
serving the community, their families, and the good of humanity."

As a mother to her three sons and stepmother to Mr. Jordan's three children, Ms.
Jordan is described in more than one letter as "the rock" of her family.   Multiple letters
note the loving influence that Ms. Jordan has made in her children's lives.  One noted:
"Laura is such a positive, wise, supportive, and encouraging(step)parent to each of the
children, but I am struck with the profound loving and stabilizing impact Laura has had on
[her stepdaughter] Ivy Grace". Another wrote: "She has embraced the role of mother to
Mark's children, has been a consistent role model to them and to her three sons, and has
taught…them how to live through the difficulties in life with integrity."  The beautiful
letters written by Ms. Jordan's three sons reveal the deep and supportive relationships they
share.  Just as compelling are the letters written by her stepchildren, Alec, Ethan, and Ivy.
Despite the challenges of joining two families, Ms. Jordan has worked hard to build
nurturing relationships with her stepchildren.  Mark's eldest son, Alec, wrote of Ms.
Jordan's selflessness and commitment to serving others: "Laura is so serving that one
cannot help but be motivated to be a better person.  Her constant joy in servitude has left a

15

lifelong impression on how I view selflessness." Ethan wrote, "In a lot of ways since Laura has stepped into my life, she has filled the mother role for me always taking care of me and listening and caring for me." And Ivy, who met Ms. Jordan when she was just nine years old, writes of "Laura's constant guidance and encouragement." Now 17, Ivy describes their bond eloquently: "As our relationship grew, Laura quickly became my confidant, rock, and the mother I never would have known I needed or deserved."

As one of the letter writers put it: "Laura is a wonderful person who thoughtfully and generously encourages and helps others around her [and who has made a] positive impact on her family and on her community." Ms. Jordan is an integral, positive part of so many lives.

**With Sons Brooks, Blake, and Bennett**



**With Her Parents**



**Laura and Mark's Blended Family**



### III.    Post-*Booker* Sentencing Process

In *United States v. Booker*, 543 U.S. 220 (2005), the Supreme Court instructed sentencing courts to "tailor the sentence in light of [the] statutory concerns" found in 18 USC § 3553(a), *id*. at 245-46, and to "take account of the Guidelines together with other sentencing goals" set forth by Congress.  *Id*. at 259.  Section 3553(a) provides that a court, after considering the statutory sentencing factors, should impose a sentence "sufficient, but not greater than necessary," to accomplish the purposes of punishment set forth in § 3553(a)(2)(A)-(D).

Since *Booker*, the Supreme Court has decided several cases that clarify how federal sentencing should proceed.  First, in *Rita v. United States*, 551 U.S. 338 (2007), the Court held that the Guidelines have no presumption of correctness in the trial court (even if they do on appeal), *id.* at 351, and "the sentencing court does not enjoy the benefit of a legal presumption that the Guidelines sentence should apply."  *Id*.; *see also Nelson v. United States*, 555 U.S. 350, 352 (2009) ("Our [post-*Booker*] cases do not allow a sentencing court to presume that a sentence within the applicable Guidelines range is reasonable. . . .  The Guidelines are not only not mandatory on sentencing courts; they are also not to be presumed reasonable.").

In *Gall v. United States*, 552 U.S. 38 (2007), the Supreme Court made explicit the broad discretion that post-*Booker* sentencing courts enjoy.  In particular, the Court rejected any rule "requir[ing] 'extraordinary' circumstances to justify a sentence outside the Guidelines range," *id.* at 47.  In that case, the Court affirmed a sentence of probation despite a guideline range of 30-37 months and despite the fact that the *Guidelines Manual*

18

prohibited "departures" based on the defendant's history and personal characteristics upon which the district court had "varied."  What *Gall* means is that a court has wide discretion, after considering the § 3553(a) factors, to impose a sentence outside of the guideline range (a "variance"), even if the case does not fall outside the so-called, pre-*Booker* "heartland" of the guidelines.

In addition, in *Kimbrough v. United States*, 552 U.S. 85 (2007), the government conceded, and the Supreme Court accepted, that "'courts may vary [from the Guidelines] based solely on policy considerations, including disagreements with the Guidelines.'"  *Id.* at 101 (quoting Brief for United States, at 16).  Relying on that principle, the Court upheld a downward variance sentence based, at least in part, on the district court's disagreement with the previous 100-to-1 powder cocaine-to-crack cocaine ratio in the drug-trafficking guideline.  *See id.* at 109-12.

As a consequence of *Booker* and its progeny, sentencing is no longer bound to the guidelines (as was true when they were "mandatory"); the guidelines are only one among many statutory considerations.  The overarching goal now is to impose a sentence "sufficient, but not greater than necessary," 18 U.S.C. § 3553(a), to accomplish the various statutory purposes of punishment.  The guidelines range is merely the "starting point" for a sentencing court to consider (*Gall*, 552 U.S. at 49) – but one that this Court, in its discretion, may choose to disregard on "policy" grounds or based on a defendant's personal history and characteristics – or for both reasons – where appropriate.

## IV.      Statutory Sentencing Factors (Including the Sentencing Guidelines)

The Sentencing Reform Act of 1984 sets forth seven factors (and several sub-factors in the case of the purposes of punishment) for a court to consider in deciding what sentence is sufficient but not greater than necessary.  The "guidelines" themselves and any relevant "policy statements" are just two of the seven factors.  18 U.S.C. § 3553(a)(4) & (5).  In addition, section 3553(a) lists five additional factors that this Court independently assesses rather than through the lens of the *Manual*:

[1] the nature and circumstances of the offense and the history and characteristics of the defendant;

[2] the need for the sentence imposed

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
(B) to afford adequate deterrence to criminal conduct;
(C) to protect the public from further crimes of the defendant; and
(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

[3] the kinds of sentences available;

[4] the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

[5] the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a)(1), (2), (3), (6), & (7).

We address the five non-guidelines sentencing factors as they apply to Ms. Jordan, and then address why those factors support a sentence well below the applicable sentencing guideline in this case, USSG § 2C1.1 (or USSG § 2C1.2, if this Court grants our objection to the presentence report's guideline calculation).

## A. Non-*Guidelines* § 3553(a) Factors

### *Factor (a)(1):* Nature and Circumstances of Offense & History and Characteristics of Laura Jordan

After *Booker*, there is "no limitation…on the information concerning the background, character, and conduct of the defendant which a court may receive and consider for the purposes of imposing an appropriate sentence."  18 USC § 3661.  The Supreme Court reaffirmed this principle in *Pepper v. United States*, 562 U.S. 476 (2011), which held that post-offense conduct may support a downward variance from the Guidelines range, even if the Guidelines prohibited a departure on that ground (former USSG § 5K2.19, then a "policy statement" in the *Guidelines Manual*).  *Id*. at 501-02.  The Court emphasized that "in the federal judicial tradition…the punishment should fit the offender and not merely the crime" and that "justice generally requires consideration of more than the particular acts by which the crime was committed and that there be taken into account the circumstances of the offense together with the character and propensities of the offender."  *Id.* at 487-88 (citations and internal quotations omitted).

Here, with respect to the nature and circumstances of the offenses of conviction, the government's evidence *at most* established a gratuity rather than a bribe.  Laura and Mark Jordan fell in love in the midst of the city's decision about the Palisades project and engaged in a secret relationship.  The evidence is overwhelming that they genuinely fell in love and became committed to each other – leaving their prior spouses, marrying, and blending their families into a new household.  They were not coconspirators in a traditional bribery scheme.   They should not be sentenced as such.

21

In addition, this Court should consider the other § 3553(a)(1) factor at play here, Ms. Jordan's history and characteristics.  As the attached letters reflect, Ms. Jordan has led an extraordinary life that has benefited countless people, inside and outside her family and local community.  Her record of service and devotion to family, friends, and her community militate strongly in favor of a sentence below the advisory guideline range.

**Factor (a)(2):  Purposes of Punishment**

*a.  Seriousness of the Offense/Just Punishment/Respect for Law*

The Supreme Court has described these three related factors as "retribution."  *See Tapia v. United States*, 564 U.S. 319, 325 (2011).  Retribution is not an inexorable command for a harsh punishment.  Rather, it is a fundamental tenet in our society that retribution, in an appropriate case, should be tempered with mercy, particularly when a defendant is a worthy candidate for redemption.  *See Walker v. Martel*, 709 F.3d 925, 950-51 (9th Cir. 2013) (Gould, J., concurring in part & dissenting in part) ("Shakespeare told us that '[t]he quality of mercy is not strain'd,' Milton instructed us to "temper so [j]ustice with mercy" and advised us that '[m]ercy [must] colleague with justice,' and President Lincoln reminded us that 'mercy bears richer fruits than strict justice.'") (citations omitted).

*Gall* reminds us that a defendant convicted of offenses that fall within Zone D of the *Guideline Manual*'s Sentencing Table need not always be punished with incarceration after consideration of the § 3553(a) factors.  Rather, split sentences or even probationary sentences can provide punishment and promote respect for the law:

> We recognize that custodial sentences are qualitatively more severe than probationary sentences of equivalent terms.  Offenders on probation are nonetheless subject to several standard conditions that restrict their liberty.

22

> Probationers may not leave the judicial district, move, or change jobs without notifying, and in some cases receiving permission from, their probation officer or the court.  They must report regularly to their probation officer, permit unannounced visits to their homes, refrain from associating with any person convicted of a felony, and refrain from excessive drinking.

552 U.S. at 48-49.  Thus, as the Court recognized, carefully crafted conditions of probation "can have a significant impact on both [the] person and society."  *Id*. at 48 n.4.

Probation versus outright imprisonment aside, the fact of a felony conviction is itself substantial punishment, particularly for a person of Ms. Jordan's age and accomplishments in life.  As another district court has cogently written:

> I am writing this opinion because from my research and experience over two decades as a district judge, sufficient attention has not been paid at sentencing by me and lawyers – both prosecutors and defense counsel – as well as by the Probation Department in rendering its pre-sentence reports, to the collateral consequences facing a convicted defendant.  And I believe that judges should consider such consequences in rendering a lawful sentence. There is a broad range of collateral consequences that serve no useful function other than to further punish criminal defendants after they have completed their court-imposed sentences. Many – under both federal and state law – attach automatically upon a defendant's conviction. The effects of these collateral consequences can be devastating.

*United States v. Nesbeth*, 188 F. Supp.3d 179, 180 (S.D.N.Y. 2016) (varying downwardly from a guideline range of 33-41 months to a sentence of probation in part based on the collateral consequences that the defendant would suffer based on her federal drug-trafficking conviction); *see also United States v. Brewer*, 978 F. Supp.2d 710, 712 (W.D. Tex. 2013) (in varying down to a sentence of probation in a case in which the *Guidelines Manual* called for lengthy prison sentences for husband and wife co-defendants, the court observed: "[T]hey will live out their lives as convicted federal felons.").

23

b. *General Deterrence*

"General deterrence" aims to deter *others* from crime.  *See* Richard Frase, *Punishment Purposes*, 58 STANFORD L. REV. 67, 80 (2005); D. Weisburd & E. Waring, WHITE COLLAR CRIME AND CRIMINAL CAREERS 151 (2001).  Respected scholars and judges both have concluded that increasing severity of punishment does not increasingly deter crime.  *See*, *e.g.*, Daniel S. Nagin, *Deterrence in the Twenty-First Century: A Review of the Evidence*, in Vol. 42, No. 1, CRIME AND JUSTICE IN AMERICA (August 2013), at pp. 199-263 (concluding that social science research shows that: "The evidence in support of the deterrent effect of the certainty of punishment is far more consistent than that for the severity of punishment."); *see also Brewer*, 978 F. Supp.2d at 715 ("While the Court recognizes the importance of deterrence, it is also realistic about its limits, especially in the realm of white collar crime, where the powers of greed and ambition are often stronger than any deterrent effect.").

c. *Specific Deterrence/Incapacitation/Protecting the Public*

When appropriate, "specific deterrence" is the most powerful reason for incarceration.  It is necessary to imprison people we fear will commit crimes again.  Here, however, imprisonment clearly is not needed to deter Ms. Jordan from future criminal activity or to incapacitate her.  She has been arrested, convicted, and publicly humiliated. In addition, her Criminal History Category (I) and her age both strongly indicate that she will not recidivate.  *See* U.S. Sentencing Commission, *The Effects of Aging on the*

24

*Recidivism Among Federal Offenders* (2017) and *The Past Predicts the Future: Criminal History and Recidivism of Federal Offenders* (2017).[16]

     d.  *Providing Rehabilitation*

The Supreme Court has specifically held that imprisonment – unlike alternatives to incarceration, such as probation – may not be used as a tool for promoting rehabilitation. *See Tapia v. United States*, 546 U.S. 319 (2011).

     *Factor (a)(3):*  **The Kinds of Sentences Available**

The Court may consider a wide range of alternatives to imprisonment to fashion a just sentence, such as probation with a condition of home detention, community confinement, and community service.  After *Booker*, the Sentencing Commission expressed renewed interest in alternatives to incarceration: "Increasingly, criminal justice professionals have argued that dwindling prison space should be reserved for the most serious and dangerous offenders, necessitating a reconsideration of alternative sanctions for first-time and nonviolent offenders." U.S. Sentencing Commission, *Alternative Sentencing in the Federal Criminal Justice System* at 1 (Jan. 2009).[17]

---

[16] The Commission's two recidivism reports are available at: https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20171207_Recidivism-Age.pdf  & https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20170309_Recidivism-CH.pdf.

[17] The Commission's report on prison alternatives is available at: https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-projects-and-surveys/alternatives/20090206_Alternatives.pdf.

***Factor (a)(4):*** **Avoiding Sentencing Disparity in Treatment of Similar Offenders**

Varying substantially below the advisory guideline range for a non-violent white-collar offense involving a large guideline "loss" amount – under USSG § 2B1.1(b)(1)'s Loss Table[18] – would hardly be aberrational or promote any more sentencing disparity than already exists in white-collar cases. *See* Judge Mark W. Bennett *et al.*, *Judging Federal White-Collar Fraud Sentencing: An Empirical Study Revealing the Need for Further Reform*, 102 IOWA L. REV. 939, 959 (2017) (in 2014, nearly a third of section 2B1.1 defendants with loss amounts exceeding one million dollars were given probationary sentences; citing U.S. Sentencing Commission data). Indeed, following the guideline will do nothing to promote uniformity in sentencing. Rather, following the advisory guidelines' Loss Table will exacerbate disparity. Barry Boss & Kara Kapp, *How the Economic Loss Guideline Lost Its Way, and How to Save It*, 18 OHIO ST. J. CRIM. L. 605, 606 (2021) ("[T]his deep flaw in the [fraud] Guideline's design has led many judges to lose confidence entirely in the Guideline's recommended sentences, leading to a wide disparity of sentences issued to similarly situated economic crime offenders across the country. Accordingly, this Guideline has failed to address the primary problem it was designed to solve – unwarranted disparities among similarly situated offenders. Worse still, it not only has failed to prevent such unwarranted disparities, its underlying design actively exacerbates

---

[18] Although the applicable guideline according to the PSR is USSG § 2C1.1, that guideline cross-references to § 2B1.1(b)(1)'s Loss Table. See PSR ¶ 25. That cross-reference adds 22 offense levels to Ms. Jordan's guideline calculation. It is clearly the tail that wags the dog in this case. If this Court grants Ms. Jordan's objection to the application of § 2C1.1 and instead applies § 2C1.2, the effect of the Loss Table will be significantly less.

26

them.").  Significantly, other courts have substantially varied downwardly in white-collar cases with very large economic loss amounts under the Loss Table.  *See*, *e.g.*, *United States v. Cole*, 765 F.3d 884 (8th Cir. 2014) (finding substantively reasonable a downward variance from a guideline range of 135-168 months to probation in a fraud case where the defendant was convicted at trial); *Brewer*, 978 F. Supp.2d 710 (varying to probation for husband and wife co-defendants convicted of fraud at trial from guideline ranges of 108-135 months and 70-87 months).

In addition, the Sentencing Commission reports that in each of the past five years for which data is available (2017-2021), courts across the country imposed a sentence outside the guidelines range in approximately between 76% and 91% of the cases to which § 2C1.1 applied, nearly always below the guidelines range (less than 1.5% of all cases involved an upward variance).  *See* USSC Interactive Data Analyzer, https://ida.ussc.gov/analytics/saw.dll?Dashboard (last visited July 12, 2022) (Guideline Application > Sentences Relative to Guideline Range > Primary Guideline: § 2C1.1).  In cases with downward variances, the sentence was decreased by an average of 51% to 64% from the guideline over that same five-year period.[19]

---

[19] U.S. Sent'g Comm'n, *Sourcebook of Federal Sentencing Statistics*, Tbl. 40 (2021), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-and-sourcebooks/2021/Table40.pdf; *Sourcebook of Federal Sentencing Statistics*, Tbl. 40 (2020), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-and-sourcebooks/2020/Table40.pdf; *Sourcebook of Federal Sentencing Statistics*, Tbl. 40 (2019), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-and-sourcebooks/2019/Table40.pdf; *Sourcebook of Federal Sentencing Statistics*, Tbl. 40 (2018), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-and-sourcebooks/2018/Table40.pdf.

The Sentencing Commission data for 2017 does not report this data in a format consistent with years 2018 to 2021, and so is not included.

The prevalence of downward variances in these cases is borne out in specific examples, where courts consistently provide for downward departures from § 2C1.1 guideline ranges that reach unreasonable results.  For example, the district court in *United States v. Chapman* calculated a § 2C1.1 offense level of 34 based on approximately $237,000 in bribes, corresponding to a guidelines range of 151 to 188 months, but granted a downward variance to 70 months (46% below guidelines minimum), noting that, as in this case, there was no evidence of economic harm from the conduct.  No. 11-cr-0904, 2012 WL 2574814, at *13-18 (D.N.M. June 22, 2012).  In another case, *United States v. Roussel*, the district court calculated an § 2C1.1 offense level of 38 based on a $1-2.5 million benefit to be received, corresponding to a 235 to 293-month sentence, but granted a 99-month downward variance (42% below guidelines minimum) because the "guidelines themselves came to an unreasonable result."  705 F.3d 184, 187-88 (5th Cir. 2013) (reversing due to errors in calculation of value to be received).  There are many other similar cases.  *See, e.g.*, Sentencing Tr. 5, 23-24, *United States v. Hamilton*, No. 19-cr-83 (N.D. Tex. Nov. 9, 2021), ECF No. 415 (188-month guideline minimum based on $3.8 million value to be received; 92-month downward variance (51% decrease)); *United States v. Hills*, 27 F.4th 1155, 1201 (6th Cir. 2022) (151-month § 2C1.1 guideline minimum based on $661,176 value to be received; 84-month downward variance (35% decrease)); *United States v. McNair*, 605 F.3d 1152, 1232 (11th Cir. 2010) (151-month guideline minimum based on $20 million value to be received; 49-month downward variance from guideline minimum (32% decrease)).

That a majority of public corruption cases result in non-guidelines sentences is not surprising.  Sections 2C1.1 and 2C1.2 rely on § 2B1.1's Loss Table, which is not based on empirical data or reasonably related to a defendant's culpability and, therefore, is not entitled to any deference – as discussed immediately below.  Therefore, downwardly varying from the advisory guideline range would not promote unwarranted sentencing disparities.

### *Factor (a)(5):*  **The Need to Provide Restitution to the Victims**

In the event that this Court overrules her objection to the tax loss amount in this case, Ms. Jordan will pay whatever amount this Court orders in restitution to the Internal Revenue Service.  That factor is not an issue.

### B.  Two *Guidelines Manual* Factors (Guidelines and Policy Statements)

As discussed above, before *Booker*, the guidelines and policy statements were the most significant factors in federal sentencing.  But *Booker*, which rendered the guidelines and policy statements merely "advisory," breathed life into the other § 3553(a) factors and relegated the Guidelines to just two-out-of-seven factors.[20]  Moreover, "[i]n *Kimbrough*, the Court reiterated . . . [that] a sentencing court may vary from the Guidelines based solely on policy considerations, including the disagreements with the Guidelines, if the court feels the guidelines sentence fails to properly reflect § 3553(a) considerations."  *United States v. Campos-Maldonado*, 531 F.3d 337, 339 (5th Cir. 2008).

---

[20] *See United States v. Reinhart*, 442 F.3d 857, 864 (5th Cir. 2006); *United States v. Duhon*, 440 F.3d 711, 715-16 (5th Cir. 2006).

Particularly if this Court applies USSG § 2C1.1, rather than § 2C1.2, and finds a large loss amount under § 2B1.1(b)(1)'s Loss Table cross-referenced by § 2C1.1(b)(2),  this Court should vary downwardly in view of the vastly disproportionate effect of the Loss Table.  Of all the provisions in the current *Guidelines Manual*, there are few that have elicited as resoundingly negative a response from courts and commentators as § 2B1.1's Loss Table.  As Judge Garaufis of the Eastern District of New York has recently written:

> [Section 2B1.1] would have this court place [the defendant] in jail for almost a decade without batting an eyelash simply because of the sizeable profit from [his fraud]. . . .   As far as this court can tell, the Sentencing Commission's loss-enhancement numbers do not result from any reasoned determination of how the punishment can best fit the crime, nor any approximation of the moral seriousness of the crime.  It is no wonder that Judge Stefan Underhill, concurring in a recent Second Circuit opinion, called the loss enhancement Guideline "fundamentally flawed, especially as loss amounts climb." *United States v. Corsey*, 723 F.3d 366, 380 (2d Cir. 2013) (Underhill, J., concurring); see *also United States v. Gupta*, 904 F. Supp. 2d 349, 351 (S.D.N.Y. 2012) (Rakoff, J.) ("By making a Guidelines sentence turn, for all practical purposes, on [loss enhancement], the Sentencing Commission . . . effectively guaranteed that many such sentences would be irrational on their face.").

> Given the feeble underpinnings of the loss enhancement, it is particularly galling that this factor is often more or less solely responsible for a white-collar offender's Guidelines sentence.  Accordingly, Judge Underhill opined that, because the loss Guideline "was not developed by the Sentencing Commission using an empirical approach based on data about past sentencing practices . . ., district judges can and should exercise their discretion when deciding whether or not to follow the sentencing advice that guideline provides."  *See Corsey*, 723 F.3d at 379 (op. of Underhill, J.). I agree with Judge Underhill, and refuse to mechanistically impose such an illogical sentence. . . .   Many in the legal community have urged the Sentencing Commission to right this grievous wrong, and today I add my name to that lengthy list of judges, practitioners, scholars, and other commentators. . . . [[21]]

---

[21] *See also United States v. Adelson*, 441 F.Supp.2d 506, 509 (S.D.N.Y. 2016) (Rakoff, J.) ("What drove the Government's calculation in this case, more than any other single factor, was the inordinate emphasis

> I take seriously my responsibility under Supreme Court and Second Circuit precedent to determine an independently "reasonable" sentence based on an "individualized application of the statutory sentencing factors" in § 3553. [citing *Gall v. United States*, 552 U.S. 38, 46-47 (2007).]…Because the defendant's Guidelines sentence of 87-108 months is overwhelmingly due to the loss enhancement, and because I would find such a sentence well out of proportion to his appropriate sentence, I look closely at the § 3553 factors to guide the court to a reasonable sentence.

*United States v. Johnson*, No. 16-CR-457-1, 2018 WL 1997975, at *3-*4 (E.D.N.Y. Apr. 27, 2018); *see also* Boss & Kapp, *How the Economic Loss Guideline Lost Its Way, and How to Save It*, 18 OHIO ST. J. CRIM. L. at 618 & n.64 (citing several cases and stating that, "a broad judicial consensus has developed that Section 2B1.1's loss table overstates culpability in a great many cases").

In this case, based on the PSR's calculations, § 2B1.1's Loss Table results in a 22-level enhancement added to an offense level otherwise at 22 (14 levels for the base offense, +2 for multiple bribes, +4 for being a public official, and +2 for obstruction of justice). PSR ¶¶ 25-43. The Loss Table enhancement unquestionably is the driving factor in this case. With it, Ms. Jordan's guideline range is 312-312 months (and would be life without parole except for the statutory maximums). PSR ¶ 69. Without it, her guideline range would be 41-51 months. *See* USSG, Chpt. 5, Pt. A (Sentencing Table; Offense Level 22/CHC I). Therefore, the loss enhancement results in an increase from a guideline

---

that the Sentencing Guidelines place in fraud cases on the amount of actual or intended financial loss. As many have noted, the Sentencing Guidelines, because of their arithmetic approach and also in an effort to appear 'objective,' tend to place great weight on putatively measurable quantities, such as…the amount of financial loss in fraud cases, without, however, explaining why it is appropriate to accord such huge weight to such factors.").

minimum of 41 months to 312 months – *an eight-fold increase*.  In the words of judges who presided over other federal white-collar cases with similarly draconian guidelines range driven by the loss enhancement, that is "'patently absurd.'"  *United States v. Parris*, 573 F. Supp. 2d 744, 745, 745 (E.D.N.Y. 2008) (finding that application of 18-level loss enhancement was "'patently absurd'" and varying downward 17 levels; quoting *United States v. Adelson*, 441 F. Supp.2d 506, 515 (S.D.N.Y. 2006)).

No other guideline in the manual has such rapid escalation in the offense level for a single aggravating factor, at least not one that does not involve the loss of human life.  For instance, under the robbery guideline, a defendant who, in addition to the act of robbery, (1) discharged a firearm (+7 levels); (2) caused "permanent, life-threatening bodily injury" (+6 levels); (3) restrained a victim during the robbery (+2 levels); *and* (4) took over $9,500,000 during the robbery (+7 levels) would receive a cumulative enhancement for all four of those aggravating factors of *22 levels* (*see* USSG § 2B3.1(b)(2), (b)(3), (b)(4)(B) & (b)(7)(H)) – *the same enhancement that Ms. Jordan receives under § 2B1.1(b)(1) just for the loss amount in this case, according to the PSR.*

Section 2B1.1's Loss Table is "fundamentally flawed."  *Corsey*, 723 F.3d at 380 (Underhill, J., concurring).  Under *Kimbrough*, this Court should vary substantially from the advisory guideline range, especially if this Court applies § 2C1.1 rather than § 2C1.2. *See also* USSG § 2B1.1 comment 21(C) (providing for a downward departure when the Loss Table "substantially overstates the seriousness of the offense").

## CONCLUSION

Judge John Gleeson, a former federal prosecutor and current nominee for the U.S. Sentencing Commission, wrote shortly before his retirement from the federal bench that: "As a nation, we need to deal with – and not just talk about – our over-incarceration problem.  We need to make smart, bold choices about two things: (1) the lengths of the prison terms we impose on those who need to be imprisoned; and (2) the categories of defendants we routinely incarcerate who don't need to be imprisoned in the first place." *United States v. Dokmeci*, 13-CR-00455 & 13-CR-00565, 2016 WL 915185, at *1 (E.D.N.Y. Mar. 9, 2016).

As Ms. Jordan has explained above, a proper guidelines application – under § 2C1.2 – yields an advisory guideline range of 18-24 months.  A downward variance is appropriate for several reasons.  First, it would reflect the significant positive contributions that Ms. Jordan, who has no criminal record and was convicted of nonviolent offenses, has made in her life – to her family and her community.  Second, it would recognize that the nature of the offenses of conviction was directly related to her romantic relationship with Mark Jordan rather than to greed (which typically motivates public officials who accept bribes or gratuities).  In a related manner, it is significant that the City of Richardson did not suffer any loss.  Moreover, the Palisades development was in the best interest of the city and would have passed even without Ms. Jordan's vote, as the other council members testified at trial.

For these reasons, Ms. Jordan requests that this Court vary downwardly and impose a below-range sentence "sufficient but not greater than necessary" considering all the evidence and the statutory and guideline factors in this case. 18 U.S.C. § 3553(a).

Respectfully submitted,

**GERGER, HENNESSY & MARTIN**

*/s/ Brent E. Newton*
700 Fannin, Suite 2300
Houston, Texas 77002
713.224.4400 – Telephone
713.224.5153 – Fax
bnewton@gkmfirm.com

**KEARNEY LAW FIRM**

*/s/ Jeff Kearney*
One Museum Place
3100 West 7th Street, Suite 420
Fort Worth, Texas 76107
Office: 817-336-5600
Facsimile: 817-336-5610
jkearney@kearneylawfirm.com

**CERTIFICATE OF SERVICE**

On July 28, 2022, the foregoing was filed and distributed to all counsel of record through the Court's ECF system.

/s/ *Brent E. Newton*
 Brent E. Newton

34