## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TEXAS
## (SHERMAN DIVISION)

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § | |
| | § | |
| | § | |
| | § | |
| **v.** | § | **NO. 4:18-CR-87** |
| | § | |
| | § | |
| | § | |
| **LAURA JORDAN,** | § | |
| **and MARK JORDAN** | | |


## MARK JORDAN'S SENTENCING MEMORANDUM

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................. iv

INDEX OF EXHIBITS ....................................................................................................... vi

BACKGROUND ................................................................................................................ 4

I.   The Palisades Development ....................................................................................... 4

II.  Benefits of monetary value provided by Mark Jordan to Laura Jordan. ................................. 7

     A.   No benefits having monetary value were provided by Mark Jordan before Laura
          Jordan's first vote related to the Palisades. .................................................... 7

     B.   No benefits having monetary value were provided by Mark Jordan after the first
          vote, but before the final vote. ................................................................... 7

     C.   Benefits having monetary value provided by Mark Jordan only after the fourth
          and final vote. ....................................................................................... 9

III. Mark Jordan's life of honesty, loyalty, and generosity to his family, church, and
     community. ......................................................................................................... 10

     A.   Mark Jordan is committed to his and Laura Jordan's combined family: "He is my
          rock, my provider, and inspiration." .......................................................... 10

     B.   Mark Jordan is a cherished friend and neighbor who has often helped friends in
          need: "I am thankful and blessed to be Mark's friend." .................................. 12

     C.   Mark Jordan contributes to his church, his community, and charity: "While Mark
          has given money, the most admirable portion of his generosity
          concerns his time." ................................................................................ 13

     D.   Mark Jordan is a trusted business partner and respected employer: "He is the most
          generous person I have ever known." ......................................................... 15

ARGUMENT ..................................................................................................................... 16

I.   The Applicable Guidelines Range .............................................................................. 16

     A.   The § 666 offense conduct is covered by the gratuities guideline, § 2C1.2,
          resulting in an offense level of 15; in the alternative, application of the bribery
          guideline, § 2C1.1, results in an offense level of 18. ...................................... 16

          1.   The gratuities guideline, § 2C1.2, applies to the § 666 offense conduct and
               results in an offense level of 15. ....................................................... 16

               i.   The gratuities guideline applies to the facts of this case. ................... 16

               ii.  The offense level is not increased by 2 levels based on multiple bribes
                    or gratuities. .............................................................................. 18

               iii. No enhancement based on the monetary value of the gratuities is
                    warranted since the monetary value was *de minimis*. ......................... 18

          iv.  In the alternative, if the Court were to conclude the benefits provided after the final vote were gratuities, the correct amount of those benefits is $78,969. ................................................................................ 20

    2.  In the alternative, if the bribery guideline, § 2C1.1, applies to the § 666 offense conduct, the resulting offense level should be 18. .................................. 21

        i.  The PSR is incorrect in concluding the benefit to be received by Mark Jordan was more than $42 million. ................................................................ 23

           a.  The development value was not to be received "in return for" the bribes because the votes would have passed without the bribes. .............. 23

           b.  The development value reflects lawful development, not unlawful zoning votes, and does not support an increase in the offense level ........ 24

           c.  The development value is too speculative and thus cannot be used to increase the offense level based on the benefit to be received. ........... 27

           d.  The development value does not represent the net value of the benefit to be received. .............................................................. 28

           e.  Mark Jordan did not have a 6.233% share of the development value, and there is no evidence of what share, if any, he would have had. ......... 29

        ii.  Any enhancement under § 2C1.1 would need to be based on the amount of bribes paid. ................................................................................ 30

    3.  The obstruction of justice adjustment should not be applied to the § 666 offense conduct. ......................................................................................... 30

  B.  The tax guideline, § 2T1.4, does not affect the combined offense level. ..................... 32

  C.  The final adjusted offense level is 15. ......................................................................... 33

  D.  In the alternative, since a sentence under the bribery guideline enhanced based on the value of the benefit to be received would substantially overstate the seriousness of the offense, a downward departure would be warranted if the bribery offense level were to be enhanced based on the development value. .............. 33

  E.  Restitution is not applicable. ....................................................................................... 35

II.  The § 3553(a) factors demonstrate that a variance from the advisory guidelines is warranted. ......................................................................................................................... 35

  A.  History and characteristics of Mark Jordan ................................................................. 35

  B.  The nature and circumstances of the offense ............................................................... 36

  C.  The need for the sentence to effectuate the statutory goals of sentencing ................... 36

  D.  The need to avoid unwarranted sentencing disparities ................................................. 38

  E.  A downward variance is warranted to ensure that the sentence is not greater than necessary to effectuate the statutory goals of sentencing. ............................................ 38

CONCLUSION ........................................................................................................................ 40

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*United States v. Adelson*,
   441 F. Supp. 2d 506 (S.D.N.Y. 2006)..................................................................36

*United States v. Anderson*,
   517 F.3d 953 (7th Cir. 2008) ............................................................................25

*United States v. Bazemore*,
   839 F.3d 379 (5th Cir. 2016) ............................................................................28

*United States v. Brewer*,
   978 F. Supp. 2d 710 (W.D. Tex. 2013)..............................................................37

*United States v. Chivers*,
   488 F. App'x 782 (5th Cir. 2012) ......................................................................31

*United States v. Griffin*,
   324 F.3d 330 (5th Cir. 2003) ............................................................................24

*United States v. Kalili*,
   100 F. App'x 903 (4th Cir. 2004) ......................................................................33

*United States v. Keller*,
   No. 04-cr-233, 2005 WL 6192897 (N.D. Tex. Oct. 17, 2005) ................................34

*United States v. McBride*,
   362 F.3d 360 (6th Cir. 2004) ............................................................................34

*United States v. Nelson*,
   732 F.3d 504 (5th Cir. 2013) ......................................................................25, 27

*United States v. Ricard*,
   922 F.3d 639 (5th Cir. 2019) ..................................................................18, 26, 28

**Statutes**

18 U.S.C § 666...................................................................................... *passim*

18 U.S.C. § 3553.................................................................................35, 38

18 U.S.C. § 3571.........................................................................................33

**Sentencing Guidelines**

U.S.S.G. § 2B1.1.................................................................................... *passim*

U.S.S.G. § 2C1.1 .................................................................................................... *passim*

U.S.S.G. § 2C1.2 .................................................................................................... *passim*

U.S.S.G. § 2T1.1 .................................................................................................... 35

U.S.S.G. § 2T1.4 .................................................................................................... 32

U.S.S.G. § 3C1.1 .................................................................................................... 30

U.S.S.G. § 3D1.4 .................................................................................................... 33

U.S.S.G. § 5E1.2 .................................................................................................... 33

**Other Authorities**

Daniel S. Nagin, *Deterrence in the Twenty-First Century*, Vol. 42, No. 1, Crime
    and Justice in America (August 2013) ........................................................... 37

## INDEX OF EXHIBITS

Exhibit 1   Summary of Benefits Provided by Mark Jordan to Laura Jordan

Exhibit 2   Summary of Benefits Prepared by IRS

Exhibit 3   Jack Poe Appraisal Report for Palisades III and CV

Exhibit 4   Chris Dellinges Forensic Accounting Report and CV

Exhibit 5   Eric Holden Polygraph Report and CV

Exhibit 6   Trust Agreement for the 2004 Jordan Family Trust

Exhibit 7   Palisades Allocated Land Ownership Charts (JDX 49)

Exhibit 8   Limited Liability Co. Agreement of JP-KBS Richardson Holdings II, LLC (JDX 39)

Exhibit 9   Company Agreement of JP-PAL IV MM, LLC (JDX 40)

Exhibit 10 Closing Document for Palisades IV

Exhibit 11 Bob Townsend FBI 302

Exhibit 12 Mark Solomon FBI 302

Exhibit 13 Scott Dunn FBI 302

Exhibit 14 Mark Jordan Resume

At trial, the Government demonstrated that Mark Jordan provided benefits to Laura Jordan while she was the mayor of Richardson.  The jury was instructed it could convict Mark Jordan under 18 U.S.C § 666 if it found that any of the benefits constituted either bribes *or* gratuities in return for her votes in favor of the Palisades development and the jury was not called upon to distinguish between the two.  Dkt. 310, at 24.  The jury found Mark Jordan not guilty of honest services fraud and conspiracy to commit honest services fraud (Counts 1 and 3), but guilty of paying bribes or gratuities in violation of § 666 and conspiracy to violate § 666 (Counts 5 and 7), of conspiring to defraud the United States through the submission of tax returns by Laura Jordan that failed to report the monetary value of the benefits she received from Mark Jordan and the submission of tax returns by Mark Jordan's partnership that improperly deducted the benefits given to Laura Jordan (Count 8), and of aiding and assisting in the preparation of false tax returns submitted by Mark Jordan's partnership (Counts 11, 12).  According to the Presentence Investigation Report ("PSR"), Dkt. 384, there was no monetary loss to any victim as a result of the § 666 offense conduct or from the submission of Mark Jordan's tax returns; the only monetary loss was a $34,275 tax loss as a result of Laura Jordan's tax returns.  PSR ¶¶ 12, 19.

For purposes of sentencing, this Court must determine whether the government proved that the benefits provided by Mark Jordan to Laura Jordan that had monetary value were bribes or were gratuities. As the evidence at trial demonstrated, Laura Jordan publicly supported the Palisades development before she ever met Mark Jordan, she and the city council cast a vote furthering the project before Mark Jordan provided any monetary benefits to Laura Jordan, and the city council would have favored the development even without Laura Jordan's votes.  Mark Jordan gave Laura Jordan gifts of *de minimis* or unquantifiable monetary value – such as shared hotel rooms – *after*

the first vote related to the Palisades was cast by Laura Jordan and financial assistance only after Laura Jordan's final vote, by which time they were in a romantic relationship.

In light of these facts, the PSR erred in applying § 2C1.1 of the guidelines, which applies to bribes, rather than § 2C1.2, which applies to gratuities.  It also erred in its calculation of the monetary value of the benefits Mark Jordan provided to Laura Jordan and in applying the enhancement under § 2C1.1(b)(1) for the payment of more than one bribe or gratuity.  Lastly, the PSR adjusted the offense level upward based on obstruction of justice by Mark Jordan without a sufficient factual basis.  Applying the proper section of the guidelines to the § 666 offense conduct with an enhancement based on a correct assessment of the monetary value of the gratuities paid, and without applying the factually unsupported obstruction enhancement, Mark Jordan's offense level for the § 666 offense conduct is 15.

The offense level for the tax offense conduct is more than 8 levels lower than the offense level for the § 666 offense conduct.  The PSR sets forth the base offense level of 6 for the tax offense conduct and adds an enhancement of 6 offense levels based on its calculation that the tax loss is $34,275, resulting in a final adjusted offense level of 12 that does not affect the combined offense level.  The PSR is incorrect in attributing a tax loss of $34,275 to Mark Jordan.  Indeed, there should be no tax loss attributed to Mark Jordan.  Accordingly, the final offense level for the tax offense conduct should be 6, which likewise does not impact the combined offense level.  In Criminal History Category I, the final adjusted offense level of 15 results in a sentencing range of 18 to 24 months' imprisonment.

Alternatively, even if the bribery guideline applied to the § 666 offense conduct, the PSR's calculation of the enhancement warranted under § 2C1.1 is fundamentally flawed.  The PSR assumes that if the Palisades were fully developed after ten years of investment, it would have had

a value of $686 million and Mark Jordan's share would have been over $42 million.  Based on this assumed benefit to be received by Mark Jordan, the PSR increases the base offense level of 12 – increased by 4 levels because Laura Jordan was a public official, by 2 levels because the PSR concludes there was more than one bribe, by 2 levels due to an obstruction enhancement – by an additional 22 levels.  The evidence at trial demonstrated, however, that none of Laura Jordan's votes related to the Palisades were outcome determinative and therefore her votes did not result in any financial benefit to be received Mark Jordan.  The project would have been approved with or without Laura Jordan's vote.  Accordingly, if § 2C1.1 were the appropriate section and it were properly applied, the offense level for the § 666 offense conduct would be 18, resulting in a sentencing range of 27 to 33 months.[1]

Mark Jordan is a first-time non-violent offender with a history of service, generosity, and devotion to his family, his friends, his professional colleagues, and the community.  Considering not only the correctly calculated the advisory guidelines sentencing range, but also each of the § 3553(a) factors, Mark Jordan respectfully submits that a downward variance from the range recommended by the sentencing guidelines is warranted to ensure that the sentence if sufficient, but not greater than necessary to effectuate the statutory goals of sentencing.

---

[1] Even if one were to assume that the project would not have been approved without Laura Jordan's votes, the $686 million figure does not represent the profit to Mark Jordan, but rather the PSR's calculation of Mark Jordan's share of the gross value of the developed project.  This is not a reasonable estimate of the benefit to be received by Mark Jordan.  As an initial matter, the PSR miscalculates the share of the benefit of developing the property that would have been received by Mark Jordan.  More significantly, the benefit to be received is based on the net benefit; yet, the PSR uses a figure representing the gross value of the fully developed property and fails to consider and credit against that amount the hundreds of millions it would have cost to develop the property.  The PSR also fails to consider that the development value of the property before the zoning votes, thus rather than measuring the *increase* in the *net* development value as a result of the zoning votes, it merely measures the gross development value of the rezoned property.

# BACKGROUND

## I.     The Palisades Development

For over thirty years, Mark Jordan has worked in real estate, first as an appraiser, and later as a property manager for large office buildings.  Ex. 14 (Jordan Resume).  In 2004, he started his own businesses, JP Realty Partners, LP and Sooner National Property Management, LP, which acquire and manage office buildings with other investors.  *Id.*  At the same time, he started the 2004 Jordan Family Trust with himself as beneficiary, through which revenue from these businesses flowed.  Ex. 6 (Trust Agreement).

In 2011, the 2004 Jordan Family Trust acquired a 6.23% indirect interest in 42 acres of vacant land known as Palisades III, as well as five offices.  PSR ¶ 7; Ex. 7 (JDX 49); L. Good, Vol. 11, at 3096.  Over the next two years, Mark Jordan's brother, Rodman Jordan, led the effort to consider options to develop Palisades III.  L. Good, Vol. 11, at 3096-98.  He worked with architects, including Larry Good, and attended charettes, meetings with community members to hear their views on a potential development.  *Id.* at 3101.

Rodman Jordan also spoke with then-councilmember and mayoral candidate Laura Jordan, who told him she supported the development, including increased density.  JDX 19 (January 2013 memo to Mark Jordan: "I met with Laura Maczka (the Mayoral candidate[] who actively supported our project during the charettes) . . . ."); L. Good, Vol. 11, at 3101-02 ("[I]n October, November of 2012 . . . Laura . . . was supportive[,] . . . [and] an advocate."); *id.* at 3134-35 (Q. "[W]as Laura Jordan . . . instrumental in the success of the Palisades zoning project . . . [b]efore this man was even in her life or known to exist?" A. "Yes.").  In early 2013, Rodman Jordan handed management of the Palisades development to Mark Jordan.  L. Jordan, Vol. 12, at 3375.

Laura Jordan was elected mayor in May 2013.  V. Messer, Vol. 8, at 2260-61.  Subsequently, architect Larry Good submitted the Palisades development plan, which included the

4

vacant land at Palisades III, to the City Planning Commission, and proposed increasing the density to accommodate greater office space, retail, and apartments than the existing zoning. GX 21. After a public hearing in November 2013, the City Planning Commission unanimously recommended the zoning plan for approval by the city council. S. Mitchell, Vol. 3, at 781-86; D. Johnson, Vol. 7, at 2061-71.

On the City Planning Commission's unanimous recommendation, and after a public hearing, 5 members of the city council, including Laura Jordan, voted for rezoning on December 9, 2013, with only two councilmembers opposed. GX 24, at 4. The other councilmembers supported the Palisades because they believed it was the "best use for that property." P. Voelker, Vol. 7, at 1885-86, 1927-29, 1939-40; S. Mitchell, Vol. 3, at 789; Ex. 11 (Townsend 302); Ex. 12 (Solomon 302); Ex. 13 (Dunn 302). The council requested the city staff prepare final documents reflecting changes the council had made to the phasing of the development. D. Johnson, Vol. 7, at 2144-46. Those final changes were ratified in the second rezoning vote on January 27, 2014, also a 5-2 vote supported by Laura Jordan. *Id.*; GX 26, at 6.

As part of discussions leading up to the first rezoning vote, members of the city council told Mark Jordan that he should arrange for the Palisades development to include an adjacent tract of land, consisting of approximately 20 acres, now known as Palisades IV, because they believed it would improve the likelihood the project would succeed. S. Mitchell, Vol. 3, at 807-08; P. Voelker, Vol. 7, at 1935-37 (Q: "That [buying] would be the developer following up on what he was instructed to do by members of the council?" A: "I believe we asked him to do that, yeah.").

On January 23, 2014, Mark Jordan signed a contract for the option to acquire the Palisades IV tract if zoning adjustments he planned to request were obtained.  GX 14 § 4.5.[2]

A proposal for rezoning to allow additional density on Palisades IV was accepted by the City Planning Commission.  P. Simmons, Vol. 6, at 1850, 1857-58.  Shortly thereafter, on June 9, 2014, the city council again voted 5-2 in favor of the Palisades development.  GX 32, at 3.

After discussions with the city manager, Dan Johnson, Mark Jordan on August 25, 2014, sent a letter on behalf of the partnership requesting economic development incentives from the city to support the construction of public infrastructure for the Palisades development.  GX 35; D. Johnson, Vol. 7, at 2110-12.  To demonstrate the benefit to the city of offering these incentives, the letter provided an estimate of the total tax base after developing the site, or a "development value," in the amount of $686,300,000 by 2024.  GX 35; D. Johnson, Vol. 7, at 2111, 2183 (letter described "value enhancement" and "new value").  Prior to a vote on these incentives, JP-Palisades IV exercised its option and acquired the Palisades IV tract.  Ex. 10 (Closing Document).

On September 22, 2014, the city council unanimously voted to authorize the city manager to independently negotiate the economic incentives agreement.  GX 36, at 5.  Laura Jordan's September 22, 2014 vote was the latest in time of the relevant official acts taken by her.  D. Johnson, Vol. 7, at 2145 (Q: "[T]he city council did not get back involved in that negotiation. They didn't have to vote again." A: "Correct.").  The negotiations with the city manager concluded and the agreement was signed in April and May of 2015.  GX 50A.  The agreement provided that the development would receive a tax rebate on any net increase in tax revenue to the city that

---

[2] JP-Palisades IV, LLC, was the party to the option contract.  GX 14.  JP-KBS Richardson Holdings II, LLC held 100% of JP-Palisades IV.  Ex. 8 (JDX 39) § 1.03.  JP-PAL IV MM, LLC held 10% of JP-KBS Richardson Holdings II, LLC.  Ex. 8 (JDX 39) at Ex. A.  Prior to Mark Jordan's divorce, the 2004 Jordan Family Trust held a 13.33% interest in JP-Palisades IV MM, LLC, and therefore held a 1.33% indirect interest in the second tract, not the 6.23% interest indicated in the PSR.  Ex. 9 (JDX 40) at Ex. A; Ex. 7 (JDX 49).

resulted from the development within 25 years, up to the cost necessary to build the public infrastructure. D. Johnson, Vol. 7, at 2112, 2181-84. If the project did not increase the tax revenue for the city, then no rebates would be awarded. *Id.*

## II.     Benefits of monetary value provided by Mark Jordan to Laura Jordan.[3]

### A.     No benefits having monetary value were provided by Mark Jordan before Laura Jordan's first vote related to the Palisades.

At trial, the lead FBI case agent testified that there is no evidence that Laura Jordan received anything of value from Mark Jordan before the first city council vote on December 9, 2013. V. Messer, Vol. 8, at 2322-25 (Q: "[Y]ou have no gifts, no things of value, no trips, no lunches, no dinners, no anything in terms of things of value between Mark Jordan and Laura Maczka before the December vote, right?" A: "We have no evidence of that.").

### B.     No benefits having monetary value were provided by Mark Jordan after the first vote, but before the final vote.

Between the first vote and the second vote to ratify the first (January 27, 2014), the Jordans' affair began. They went to dinner on January 6, 2014, and again on January 7, 2014, after which they went to a hotel that Laura Jordan paid for and had sex for the first time. L. Jordan, Vol. 13, at 3646-47; GX 56. Laura Jordan then paid to fly to a five-room ski lodge where Mark Jordan was hosting an event for his investors. L. Jordan, Vol. 12, at 3419-25; V. Messer, Vol. 8, at 2439-40; S. Heldenfels, Vol. 11, at 3178-79. She shared his room in the lodge with him for one night and returned to a hotel she paid for herself. L. Jordan, Vol. 12, at 3419-25; L. Jordan, Vol. 13, at 3649-52.

---

[3] Mark Jordan has filed a motion for a new trial and, should it not be granted, intends to appeal his convictions. He does not concede that he provided any benefit to Laura Jordan with a corrupt intent, either as a *quid pro quo* bribe or as a reward given after the fact because of her official action. For purposes of this sentencing memorandum, however, he sets forth why the evidence is more consistent with a gratuity than with a bribe.

Between the second city council vote (January 27, 2014), which ratified zoning for the first tract of land, and the third vote (June 9, 2014), which approved zoning for the second tract, Mark Jordan met Laura Jordan on trips she was already taking for work to Austin and San Jose. For the Austin trip, they shared a car he paid for. L. Jordan, Vol. 13, at 3426-31, 3654-59. For the San Jose trip, she stayed one night at a hotel with him after the conclusion of city business, and he paid for a $75 flight upgrade. *Id.*

After the third rezoning vote (June 9, 2014) and before the fourth vote allowing negotiation of an economic development agreement (September 22, 2014), there were three trips – two to Los Angeles, where Mark Jordan had work meetings, and one to Florida, where Laura Jordan was traveling with friends. L. Jordan, Vol. 12, at 3434-38; S. Heldenfels, Vol. 11, at 3171-72. For all three trips, Laura Jordan paid for her flights except for one $75 flight upgrade, and then shared hotel rooms and rental cars with Mark Jordan. L. Jordan, Vol. 12, at 3434-38, 3649.

As noted above, Mark Jordan did not provide any benefits to Laura Jordan before the first city council vote pertaining to the Palisades. Attached as Exhibit 1, is a chart showing the monetary value of all of the benefits provided by Mark Jordan to Laura Jordan after the first vote, but before the fourth and final vote and the monetary value of the benefits provided to Laura Jordan after the final vote, discussed below. As set forth in that chart, and discussed further below, the benefits provided after the first vote and before the final vote had no appreciable monetary value.

The PSR references travel expenses paid by Mark Jordan, but correctly does not characterize them as benefits to Laura Jordan that have monetary value or assign any monetary value to them in calculating the offense level of the § 666 conduct. Laura Jordan shared hotel rooms or rental cars that were used by Mark Jordan and that he paid for. Sharing a room or a car has no quantifiable monetary value and does not constitute reportable income, leaving only about

8

a thousand dollars in meals and flight upgrades, which is *de minimis* in comparison to the benefits having monetary value provided after the last vote. Ex. 1. That remains true even if a monetary value were assigned to the shared travel expenses. Ex. 1.

### C. Benefits having monetary value provided by Mark Jordan only after the fourth and final vote.

After the fourth and final vote (September 22, 2014), on October 19, 2014, when Laura and Mark Jordan were in a romantic relationship, Mark Jordan offered Laura Jordan financial support, giving her $3,800 cash on October 24, 2014. L. Jordan, Vol. 13, at 3445-48, 3685-86; GX 149; Ex. 1; Ex. 2 (summary prepared by IRS of amounts received by Laura Jordan not reported on her tax returns, not introduced at trial ("IRS Summary")). She also deposited $1,409 cash on October 31, $3,900 cash on November 7, $4,840 on November 20, and $450 on November 26. GX 149; Ex. 2 (IRS Summary). The total of these cash deposits is $14,939. Ex. 1. In December 2014, Mark Jordan provided her a check for $40,000. *Id.* Also, after the final vote, Mark Jordan paid $24,030 for new carpet for Laura Jordan's home, which was installed after her husband moved out. GX 219, at 26-27.

In January 2015, the Jordans again travelled and had meals together.[4]

---

[4] Mark Jordan provided Laura Jordan with $1,250 cash on January 4, 2015. GX 149; L. Jordan, Vol. 12, at 3470. However, Mark Jordan was simply reimbursing Laura Jordan for expenses she had previously incurred on his behalf. L. Jordan, Vol. 12, at 3469-70; GX 134. Accordingly, this amount was not a benefit Mark Jordan provided to Laura Jordan. Also, in January 2015, Laura Jordan ordered $74,000 in furniture paid for by Mark Jordan. The evidence at trial was that this furniture was for Mark Jordan's new house. GX 224; S. Manfred, Vol. 6, at 1584-89. Therefore, it likewise was not a benefit to Laura Jordan. Each of these amounts was improperly characterized in the PSR as a benefit provided to Laura Jordan. In March 2015, Laura Jordan began employment at Mark Jordan's company. She was compensated with a $150,000 annual salary and $15,000 signing bonus for her work, before taxes. The alleged § 666 offense conduct ended in February 2015. Accordingly, the PSR was correct in concluding, regardless of whether this was fair market compensation, that none of this compensation was a benefit paid as part of the § 666 offense conduct.

The Jordans married in 2017. They live together, work together, and have integrated their families.

As noted above, Exhibit 1 shows that all of the benefits having monetary value were provided by Mark Jordan to Laura Jordan after the fourth and final vote. These benefits had a total monetary value of $78,969. The benefits, which were given when Laura Jordan had no more say in the future of the Palisades, were unrelated to her votes and were instead due the Jordans' romantic relationship. If, however, the Court were to conclude that they were related to the votes, they were, at most, after-the-fact gratuities, rather than bribes paid in a *quid pro quo* arrangement for upcoming votes.

## III.   Mark Jordan's life of honesty, loyalty, and generosity to his family, church, and community.

Dozens of letters from Mark Jordan's friends, family, neighbors, employees, and other members of his community and his church all attest to his generosity, honesty selflessness, dedication to his faith, and depth of character, and demonstrate that the offense he was convicted of was an aberration in a life otherwise devoted to his family, his church, and the community.[5]

### A.    Mark Jordan is committed to his and Laura Jordan's combined family: "He is my rock, my provider, and inspiration."

Mark Jordan's children describe him a father who "loves and leads his family passionately." Sep. Ltrs. (Alec Jordan, son). They say he is present and involved, and that he coached their soccer and baseball teams and took them to school every day. Sep. Ltrs. (Alec Jordan, son); Jt. Ltrs. (Ethan Jordan, son). But as a parent, Mark Jordan goes well beyond that. He "took . . . to the extreme" "go[ing] the extra mile for [his] kids." *Id.* (Ethan Jordan, son); Sep.

---

[5] This Memorandum specifically cites or quotes from many of these letters. All of the letters were submitted to the Court by email per the Court's May 31, 2022 hearing notice. The PDF containing letters separately on Mark Jordan's behalf is identified as "Sep. Ltrs." and the PDF containing letters on behalf of both of the Jordans is referred to as "Jt. Ltrs."

Ltrs. (Ivy Jordan, daughter) ("He is my rock, my provider, and inspiration, I love him not only for all he does, but who he is.").  As their son Ethan explains, "[M]y dad almost always seemed to sacrifice things to spend time and help us kids while we were growing up. . . .  He would sacrifice his sleep, time, patience, and work for his kids."  Jt. Ltrs. (Ethan Jordan, son).

Mark Jordan has also integrated Laura Jordan's children into his family, and they describe him as a supportive and loving stepfather.  Jt. Ltrs. (Bennett Maczka, stepson) ("Without Mark entering my life when he did, I can tell you I would not be the man I am today.  From the day my relationship with Mark began, I had the role model I needed."); Sep. Ltrs. (Blake Maczka, stepson) ("Ever since I've known Mark, he's treated me as one of my own."); *Id.* (Brooks Maczka, stepson) ("Mark has always made me feel welcome, included, and invited.").

While the government has portrayed Mark and Laura Jordan as having married on legal advice, suggesting that somehow their relationship is a sham, the reality is that Mark Jordan is dedicated to Laura Jordan and they have a wonderful marriage together.  Jt. Ltrs. (Bennett Maczka) ("They are true life partners and rarely do anything without each other . . . ."); Sep. Ltrs. (Candace Snyder, friend) (Mark "deeply loves Laura"); Jt. Ltrs. (David & Eugenia Fersing, friends) ("[T]hey had become soul mates and Mark was and is still madly in love with Laura and Laura with Mark."); *id.* (Janet Hetmer, employee) ("Mark refers to Laura as his 'Sweet Bride' all the time and it so endearing to see how great their personalities blend together and have established a stable home and work environment."); *id.* (John Jordan, brother) ("I can say without reservation that they both love each other and all of their children deeply."); *id.* (Kathy Leming, employee) ("Blending two families together is hard. . . .  The Jordan[s] are doing a great job . . . ."); *id.* (Lil Smith, minister) ("There is no doubt in my being that these two have authentic love for one another . . . ."); *id.* (Mike Buster, minister) ("Their marriage is one of the strongest I have seen in my 40 years of

ministry."); Sep. Ltrs. (Scot Florsheim, business partner) ("Mark is a committed loving husband and is rarely seen without Laura . . . .").

Further, while the dissolution of any marriage is difficult and spurs hurt feelings, even as he began his life with Laura Jordan, he continued to show compassion for his ex-wife Karen Jordan, encouraging his children to continue to have a relationship with their mother, even though they currently all choose to reside with Mark Jordan. *Id.* (Ivy Jordan).

    **B.**    **Mark Jordan is a cherished friend and neighbor who has often helped friends in need: "I am thankful and blessed to be Mark's friend."**

Mark Jordan's friends speak highly of his character and consider themselves fortunate to know him. Sep. Ltrs. (Kenton Getz, friend) ("I am thankful and blessed to be Mark's friend . . . ."); *id.* (Greg Fondren, friend) ("I've come to appreciate Mark's positive and nurturing demeanor."); *id.* (Rich Meuret, friend) ("I count Mark as a dear friend, as well as a great mentor"); *id.* (Rob Snyder, friend) ("Mark has been an enormous blessing to me and to my family."); *id.* (Warren Powell, friend) ("Mark is one of my most trusted friends and I am thankful for the impact and influence he has made on me.").

Mark Jordan has repeatedly stepped up to help friends in need. While the government has portrayed Mark Jordan as greedy, those who know him best know someone who is generous. He has been fortunate enough to experience great financial success, but he has repeatedly shared his resources with those in difficult circumstances. *Id.* (Bo Ward, investor and friend) ("I've seen him give cash to those in need, write checks to people who were down on their luck."). On one occasion, when a father of one of his son's friends fell ill, Mark Jordan paid for the father's surgery, even though the families had had a falling out due to Mark Jordan's affairs. *Id.* (Alec Jordan). The father of another of his children's friends had a heart attack and a stroke, and Mark Jordan gave him money to cover his income so he did not have to work for months while he recovered.

Jt. Ltrs. (Ethan Jordan).  He helped another son's friend when that child's father passed away and could not pay to continue to attend private school.  *Id.* (Ethan Jordan).  When a person at church lost his job, Mark Jordan gave the person's family $5,000 per month for ten months until they had a new job.  *Id.* (Jana Langley, employee).

Mark Jordan has helped other friends and neighbors in other ways.  Sep. Ltrs. (Brent Schwarz, friend) ("Mark with no hesitation and without being asked not only helped with the physical moving but also organized our friends and neighbors to help with the move."); *id.* (Candace Snyder, friend) ("Mark is an extraordinarily generous individual who genuinely enjoys giving to others.  I have witnessed this time and time again over the decades.  Giving generous financial help to someone in need . . . , giving someone who is struggling a job in his company, giving someone some office space to help them get over a 'bad spot' in their career . . . ."); *id.* (Wade & Susan Doshier, investors) ("[W]hen I told Mark that I needed office space, he offered his office for my use. . . . In all of these years, never has he asked for compensation.").

Mark Jordan also has been ready with empathy, compassion, and advice when those around him have faced various challenges.  For example, when the Jordans' housekeeper was at risk for losing her home to foreclosure, Mark Jordan helped her negotiate a resolution that saved her home. Jt. Ltrs. (America Cordaway, housekeeper).  Likewise, when friends were going through divorce, he was there for them.  Sep. Ltrs. (Brad Brooks, investor and friend) ("Mark stepped up as a friend and counselor for me, my wife and my children.").

### C.    Mark Jordan contributes to his church, his community, and charity: "While Mark has given money, the most admirable portion of his generosity concerns his time."

Mark Jordan has been recognized as a caring and giving member of his community and the church that he has attended for thirty years.  Prior to his divorce, he served as a deacon and taught

13

Sunday school at his church for almost two decades, and served in several leadership roles.  Jt. Ltrs. (Mike Buster); Sep. Ltrs. (Brad Brooks, investor and friend); *id.* (Alec Jordan, son).

His son Alec Jordan describes how Mark Jordan made a point of befriending an autistic boy in their church, and of helping the front desk employee at the local gym when others ignored her.  *Id.* (Alec Jordan, son).  In another instance, when Mark Jordan was briefly held in prison after the first trial in this case, he learned a prisoner had been using the same pair of contact lenses for months and, once released, sent him contact lenses.  *Id.* (Brooks Maczka, stepson); Jt. Ltrs. (Tiffany Heldenfels, friend).  And during the 2008 recession, he provided free office space to individuals in the community searching for work.  Sep. Ltrs. (Kelly Rutledge, friend).

Mark Jordan has contributed extensively to charitable and missionary efforts, including:

- Taking, and on some occasions personally funding, over ten missionary trips to Kajo Keji, a community in South Sudan, where he built churches and water wells and served as a preacher.  *Id.* (Alec Jordan, son); Jt. Ltrs. (John Jordan, brother); *Id.* (Mike Buster); *Id.* (Mike Congrove, charity executive); K. Jordan, First Trial Day 4 Tr. 246-47.

- Helping support missionary efforts in South Sudan through an organization known as Power Sudan.  Jt. Ltrs. (Mike Buster)

- Providing support to a mission in Jamaica.  *Id.* (Mike Buster)

- Traveling twice a year to prisons to preach.  Sep. Ltrs. (Alec Jordan, son).

- Donating 10% of his income to the church, amounting to hundreds of thousands in tithes over the years.  Jt. Ltrs. 6 (Mike Buster); Sep. Ltrs. (Alec Jordan, son).

- Donating to the sports ministry Elevate Your Game and to a program providing camp scholarships for inner-city youth.  Jt. Ltrs. (Mike Buster).

### D.      Mark Jordan is a trusted business partner and respected employer: "He is the most generous person I have ever known."

Mark Jordan's many business partners and investors recognize him as a trustworthy and reliable person to work and invest with.  One investor described situations where projects led by Mark Jordan faced "difficulties . . . well beyond his control" where "Mark could have thrown in the towel," but instead "stuck with it, worked with [them], worked with lenders, and protected [investors] instead of abandoning [them].  Sep. Ltrs. (Birken Olson, investor).  Another noted that when projects have fallen short, "Mark [has] take[n] cuts out of his own personal stake to make sure his shareholder was made whole."  *Id.* (Bo Ward, investor and friend).  In one case, an investor passed away, and even though the project was losing money, Mark Jordan bought out the widow's partnership share at premium so that she could make a profit, absorbing the loss.  *Id.* at 54 (Gary Kroll, accountant).

Mark Jordan's local co-investors in the Palisades IV tract likewise continue to see him as an "honorable business partner."  *Id.* (Brad Brooks).  Another investor maintains that Mark Jordan is "honest, transparent, and professional" and continued to do business with Mark Jordan even after this case became public.  *Id.* (Ilan Itzhakov, investor).  Other business partners agree.  *Id.* (Wade & Susan Doshier, investors) ("We both have the utmost respect for Mark and this trial has not caused us to waver in our convictions at all."); *id.* (Scot Florsheim, investor) ("[H]e is honest, candid, and always performed as he said he would. . . . Mark and I became formal business partners in late 2015 and continue to partner together to this day."); *id.* (Steve Heldenfels, banker) (Mark has "unwavering professional integrity"); *id.* (Todd Fecht, client) ("We have done business together both with contracts and on a handshake."); *id.* (Brad Phillips, investor) ("He has always taken care of the investors in his transactions – many times, putting their interests above his own.")

Mark Jordan's employees also consider him a kind and sympathetic employer who treats them more like family than employees.  Jt. Ltrs. (Jana Langley, employee) ("Mark is also my employer but he is so much more than that.  He is the most generous person I have ever known."); *id.* (Janet Hetmer, employee) ("[T]he environment that I walked into was like a family and still is to this day and that is all due to the way Mark Jordan chooses to run his company, just like a family."); Sep. Ltrs. (Jeri Ryals, employee) ("[H]e treated everyone as if they were equal, with respect, and gratitude."); Jt. Ltrs. (Jerry Manning, employee) ("I have watched them care for their staff like no other company has ever done.  They look after them as their own family."); Sep. Ltrs. (Louann Hall, employee) ("Mr. Jordan is a very fair, kind, and generous employer who cares about his employees as more than just employees – we are his extended family.").  For many employees, when they had family or health issues, he encouraged them to take leave and paid their salary without question.  Jt. Ltrs. (Jana Langley); Sep. Ltrs. (Louann Hall); *id.* at 66 (Pam Malone).

## ARGUMENT

**I.      The Applicable Guidelines Range**

**A.      The § 666 offense conduct is covered by the gratuities guideline, § 2C1.2, resulting in an offense level of 15; in the alternative, application of the bribery guideline, § 2C1.1, results in an offense level of 18.**

**1.      The gratuities guideline, § 2C1.2, applies to the § 666 offense conduct and results in an offense level of 15.**

**i.      The gratuities guideline applies to the facts of this case.**

The jury instructions permitted the jury to convict Mark Jordan on either a theory of bribery or gratuities.  As explained in Laura Jordan's sentencing memorandum, at pages 1 to 6, and incorporated here by reference, it therefore falls to the Court to consider the totality of the offense conduct and determine whether the gratuities guideline, § 2C1.2, or the bribery guideline, § 2C1.2, is the "most appropriate" guideline to apply to the offense conduct. The evidence shows that any

money or property given to Laura Jordan by Mark Jordan was *at most* a "gratuity" as opposed to a "bribe." Facts from trial that are more consistent with gratuities rather than bribes include: Laura Jordan supported the Palisades before she knew Mark Jordan; the Palisades would have been approved even without Laura Jordan's support; the passage of the second, third, and fourth votes were not in doubt after the first vote; Laura Jordan received no benefits prior to the first vote; Laura Jordan received no benefits assigned a monetary value in the PSR before the final vote; and there was no evidence of a preconceived *quid pro quo*.

In addition to the evidence offered at trial, Mark Jordan offers the results of a polygraph exam that he took in 2018, which confirms that he did not believe that he was entering into a *quid pro quo* with Laura Jordan. Ex. 5. The examination administered by Eric J. Holden, a highly respected polygrapher and past president of the American Polygraph Association.

Mark Jordan was asked the following questions and provided the following answers:

Relevant Q1:  Did you offer Laura a financial benefit for her vote on the Palisades Central project?
Answer:       No
Relevant Q2:  Did you promise Laura a financial benefit for her vote on the Palisades Central project?
Answer:       No
Relevant Q3:  Did you give Laura anything of value to affect her [sic] influence or [sic] vote on the Palisades Central project?
Answer:       No

Ex. 5, at 2-3. Mr. Holden concluded that Mark Jordan's answers indicated no deception. *Id.* at 3.[6]

The evidence on the whole is consistent with, at most, after-the-fact gratuities in thanks for Laura Jordan's votes, not preconceived bribes. Therefore, § 2C1.2 is the appropriate guideline.

---

[6] Polygraph results are admissible at sentencing hearings, as explained in Laura Jordan's sentencing memorandum, at page 5 n.9 and incorporated here by reference.

ii.   **The offense level is not increased by 2 levels based on multiple bribes or gratuities.**

The PSR increases the offense level by two levels based on multiple bribes pursuant to § 2C1.1(b)(1).  PSR ¶ 25.  Presumably had it applied § 2C1.2, the PSR would have similarly enhanced based on multiple gratuities under § 2C1.2(b)(1).  For the reasons explained in Laura Jordan's Sentencing Memorandum, at pages 7 to 8, and incorporated here by reference, this enhancement does not apply because the benefits provided to Laura Jordan after the first vote were, at most, parts of a single, combined showing of appreciation for a single act – her first vote.

iii.   **No enhancement based on the monetary value of the gratuities is warranted since the monetary value was *de minimis*.**

Section 2C1.2 provides that the base offense level for a gratuities violation is 9 and that the base offense level is increased "by the number of levels from the table in § 2B1.1 . . . corresponding to" the amount of the monetary value of the gratuity, if it is greater than $6,500.  "It is the government that bears the ultimate burden of proving the facts supporting a sentencing enhancement."  *United States v. Ricard*, 922 F.3d 639, 658 (5th Cir. 2019).

The PSR does not articulate a calculation of the amount of the gratuities or bribes.  Instead, the PSR lists benefits provided by Mark Jordan to Laura Jordan between "January 6, 2014, and continuing through February 24, 2015," assigning a monetary value to some, but not all, of these benefits: "some of Laura Jordan's travel expenses in 2014" (no monetary value assigned), "renovations that were performed at her residence between October 31, 2014, and November 30, 2014" ($24,030), "furniture for her between January 11, 2015, and March 29, 2015" ($74,000), cash and checks "[b]etween September 9, 2014, and February 23, 2015" ($58,489).  PSR ¶ 9.

The benefits provided after the final vote were part of the Jordans' growing relationship, and not with rewarding her votes with gratuities.  Thus, those benefits should not be included in

the amount of the gratuities.  Instead, the benefits that could be considered gratuities would be the benefits provided between the first and the final votes, earlier in their relationship.  These benefits had *de minimis* monetary value and would not result in any enhancement under the § 2B1.1 table. The total benefits provided after the first vote but before the final vote as reflected on the summary of benefits prepared by the IRS is $10,243.  As set forth in Exhibit 1, however, this figure is incorrect.  A correct estimate of the total monetary value of the benefits provided before the final vote is $468.[7]

Since there is no enhancement pursuant to § 2B1.1, the adjusted offense level for the § 666 offense conduct 15.

| | |
|---|---:|
| Base offense for a person (Mark Jordan) who is not a public official. § 2C1.2(a)(2). | 9 |
| The recipient (Laura Jordan) was an elected official.  § 2C1.2(b)(3). | + 4 or increase to 15 |
| **Total** | 15 |

---

[7] The attached Exhibit 1, assigns no monetary value to the travel expenses.  The PSR did not do so and the Government has not objected.  Shared hotels and rentals cars, which Mark Jordan was going to pay for even without Laura Jordan's presence, including for business travel, however, came at no added cost to Mark Jordan.  Thus, by sharing them with Laura Jordan, he conveyed no quantifiable value to her.  Ex. 4 (Dellinges Rep.) (offering his expert opinion as a forensic accountant that share hotel rooms and rental cars are not considered to have value considered taxable income).  As set forth in Exhibit 1, the monetary value of travel expenses other than shared hotel rooms and rental cars listed in the IRS summary for the period before the final vote is $468. Even if this amount were included, despite the failure of the PSR to do so or the government to object, the total monetary value of all benefits extended before the final vote would be $5,614.81 ($468 in meals and flight upgrades and $5,146.81 in shared lodging, car rentals, and car service), which would still result in no enhancement under § 2B1.1.

> iv.   **In the alternative, if the Court were to conclude the benefits provided after the final vote were gratuities, the correct amount of those benefits is $78,969.**

If, however, the Court finds that any of the benefits provided after the final vote were gratuities, rather than financial support provided as part of a romantic relationship, the Court should not accept the PSR's calculation of the monetary value of those benefits.

First, the PSR includes $74,000 as the value of furniture the PSR characterizes as furniture that Mark Jordan gave to Laura Jordan.  PSR ¶ 9.  The evidence at trial, however, was that Mark Jordan ordered this furniture for himself.  It was delivered to his home, not to Laura Jordan.  GX 224, at 10; S. Manfred, Vol. 6, at 1584-89.  There was no evidence adduced at trial that this furniture was intended for Laura Jordan, and, indeed, the Government in summarizing at trial the benefits it contended were bribes or gratuities did not include this furniture.  *See* GX 150.  Nor was the furniture included in a summary prepared by the IRS of the alleged gratuities or bribes, evidently relied on by the PSR.  Ex. 2 (IRS Summary).  Thus, the $74,000 should not be included in the amount of the gratuities.

Second, the PSR's list also includes $18,489 in cash the PSR characterizes as cash provided by Mark Jordan to Laura Jordan.  This number aligns with the cash deposits identified by the government in at trial.  GX 149.  This demonstrative exhibit, however, does not support the conclusion that the entire $18,489 in cash Laura Jordan deposited during this period came from Mark Jordan.  The government simply summarized Mark Jordan's ATM withdrawals and Laura Jordan's deposits close in time.  GX 149.  GX 149 did not consider Laura Jordan's other sources of the funds, and Laura Jordan testified that the $2,300 in deposits before October 24, 2014 came from money she had withdrawn from her joint account with her ex-husband or were only to reimburse her for items she had bought for Mark Jordan at his request, such as plumbing supplies and groceries for him.  V. Messer, Vol. 6, at 1781; L. Jordan, Vol. 12, at 3445-48; L. Jordan, Vol.

13, at 3686-87.  The government did not rebut this testimony.  In addition, the deposit of $1,250 on January 4, 2015, was a reimbursement for expenses Laura Jordan incurred on Mark Jordan's behalf, not benefits provided by Mark Jordan to Laura Jordan.  L. Jordan, Vol. 12, at 3469-70; GX 134.  Thus this $3,550 should be excluded, leaving, at most, $14,939 in cash deposits that came from Mark Jordan.

The chart attached at Exhibit 1 corrects for both of these errors in the PSR in calculating the actual monetary value of the benefits provided by Mark Jordan to Laura Jordan as part of the § 666 offense conduct.

As set forth in Exhibit 1, after correcting for the errors above, the benefits identified in the PSR equal $78,969.  As set forth above, each of these benefits were provided in the context of the romantic relationship between Mark Jordan and Laura Jordan and should not be considered gratuities related to Laura Jordan's earlier votes.  But the evidence at trial plainly demonstrated that their relationship grew over time.  The Court could find that for some period of time benefits were provided as gratuities for past votes, but, over time, benefits continued based on the growing romantic relationship.  Accordingly, the Court might find that some of the $78,969 were gratuities.  If the Court were to find that more than $6,500 of this amount were gratuities, the enhancement under § 2B1.1 would be two levels; more than $15,000, the enhancement would be four levels; and if it were to find more than $40,000 up to the entire $78,969, the enhancement would be six levels.  Thus, the total offense level for the gratuities offense conduct would have an offense level of 15, 17, or, at most, 19.

> **2.      In the alternative, if the bribery guideline, § 2C1.1, applies to the § 666 offense conduct, the resulting offense level should be 18.**

The gratuities guideline, § 2C1.2, is the appropriate guideline for the reasons discussed above.  However, if the Court were to apply the bribery guideline, § 2C1.1, it should not rely on

the PSR's § 2C1.1 guideline calculation.  The bribery guideline provides for an increased sentencing level based on "the value of the payment, the benefit received or to be received in return for the payment, the value of anything obtained or to be obtained by a public official or others acting with a public official, or the loss to the government from the offense, whichever is greatest," using the loss table in § 2B1.1 to assign a sentencing level increase corresponding to the dollar amount.  U.S.S.G. § 2C1.1(b)(2).

The PSR correctly observes that the "City of Richardson and its citizens sustained no monetary loss in this case."  PSR ¶ 19.  The government did not object to the PSR's finding of no loss from the bribery counts; nor was there any evidence at trial that could support a finding of loss as a result of the bribes or gratuities.[8]

The PSR identifies bribes paid with a total monetary value of $156,519, *see* Ex. 1, but, as set forth above, none of the benefits provided after the final votes were rewards for the votes, and the PSR provides no quantification of the monetary value for the benefits before the final votes. Accordingly, no enhancement should be applied.  *See supra* pp.18-19.[9]

As for the value of benefits actually received, the PSR does not discuss, much less quantify, any value Mark Jordan actually obtained as a result of the alleged bribes.  The government did not object or provide evidence of any actual benefit obtained by Mark Jordan in return for the benefits he provided Laura Jordan.  As explained below, appraiser Jack Poe confirms that Mark Jordan obtained no monetary benefit as a result of the rezoning.  *See infra* pp.26.

The PSR bases its enhancement pursuant to the § 2B1.1 loss table on its conclusion that the benefit to be received by Mark Jordan as a result of the bribes was more than $42 million and,

---

[8] The only loss, which is only relevant to the tax counts, was to the IRS.  PSR ¶ 18-19.

[9] As set forth above, even if the Court were to find the benefits following the last vote to be bribes, those benefits, at most, had a monetary value of $78,969.  *See supra* pp.10, 20-21; Ex. 1.

on that basis, added 22 levels.  As set forth below, $42 million is not a reasonable estimate of the benefits to be received.

> ### i.     The PSR is incorrect in concluding the benefit to be received by Mark Jordan was more than $42 million.

The PSR bases its enhancement on the "value of . . . the benefit . . . to be received in return for the payment," i.e., the value Mark Jordan was to receive in return for the alleged bribe.  PSR ¶¶ 24.  The PSR calculates that he held a 6.233% share of the $686 million "development value" he estimated in an August 2014 letter to the city manager, or $42,777,079, and that this share represented the value to be received by him in return for the alleged bribes, resulting in a 22-level increase in the § 2B1.1 loss table.  PSR ¶¶ 11, 16, 24.

> #### a.     The development value was not to be received "in return for" the bribes because the votes would have passed without the bribes.

Since none of the votes cast by Laura Jordan were outcome determinative, there was no benefit to be received even assuming Mark Jordan paid *quid pro quo* bribes in return for those votes.

The evidence at trial showed that Mark Jordan could not have expected to receive value in return for the alleged bribes because he already had the support of a majority of council members, including Laura Jordan.  At worst, Mark Jordan wanted to extend benefits to Laura Jordan for her support of the project in the face of angry opposition and personal attacks she faced from her friends and neighbors.

Laura Jordan publicly supported the development, including the Palisades, before she ever met Mark Jordan, and would have voted in favor of it without the alleged bribes. L. Good, Vol. 11, at 3101-02, 3134-35.  Indeed, her first vote for the Palisades in December 2013 preceded any alleged bribes, as the PSR and the lead FBI case agent acknowledge.  PSR ¶ 9 (bribes "[b]eginning

around January 6, 2014 . . ."); V. Messer, Vol. 8, at 2322-25.  Further, Mark Jordan was fully aware of her standing support for the development.  JDX 19.

Also, all four votes would have passed by at least a two-vote margin even if Laura Jordan had opposed them because other councilmembers believed the Palisades was in the best interest of the city and voted for the zoning to allow the project without any knowledge that Mark Jordan had provided benefits to Laura Jordan.  GX 24, at 4 (5-2 support); GX 26, at (5-2 support); GX 32, at 3 (5-2 support); GX 36, at 5 (7-0 support); P. Voelker, Vol. 7, at 1885-86, 1927-29, 1939-40; S. Mitchell, Vol. 3, at 789; Ex. 11 (Townsend 302); Ex. 12 (Solomon 302); Ex. 13 (Dunn 302).  And, as noted in Laura Jordan's sentencing memorandum at pages 4 to 5, after the first vote – before which it is agreed there were no bribes – the subsequent votes were a foregone conclusion.  Under these circumstances, the benefits to be received by Mark Jordan were independent of any bribe; there were no benefit to be received by him in return for a bribe.  *See United States v. Griffin*, 324 F.3d 330, 367 (5th Cir. 2003) (reversing sentence based on a guidelines calculation that included a salary that had been negotiated before any alleged bribe).  There is no evidence that the project would not have proceeded, or that Mark Jordan believed the project would not have proceeded, but for Laura Jordan's votes which were received in in return for bribes.

**b.    The development value reflects lawful development, not unlawful zoning votes, and does not support an increase in the offense level.**

Even if the alleged bribes altered the outcome of the votes (they did not), that would not be enough to show that Mark Jordan was to receive a benefit "in return for" the bribes in the amount of the estimated value of the fully developed property.  Rather, what the vote did was simply change the zoning for the property, giving Mark Jordan and his partners (or anyone to whom they sold the property) the ability to develop the property.  The estimated development value principally reflects the lawful labor to develop the land, not the effect of the unlawfully

obtained votes on the land's value. *Cf. United States v. Nelson*, 732 F.3d 504, 520 (5th Cir. 2013) (rejecting loss calculation where there was "insufficient evidence to adequately differentiate between legitimate funding [that] could have [been] received . . . and benefits that [defendant] intended to stem from this false statement"). If, for example, the defendant defrauded someone by convincing them to trade an acre of vacant land worth $100,000 for a diamond purportedly worth $100,000, which was in fact a worthless piece of glass, the amount of the loss from the fraud and the benefit to the defendant is $100,000. If, after obtaining the land, the defendant spent $1,000,000 building a house on the land and then sold the improved property for $1,200,000, this would in no way change the magnitude of the fraud.

This, of course, does not mean that the changed zoning had no monetary value. It simply means that the estimated fully developed property is not a measure of the monetary value of the changed zoning. Rather, the proper measure is the change in the value of the property that resulted from the fact that it was now zoned differently. *See United States v. Anderson*, 517 F.3d 953, 964 (7th Cir. 2008) ("The intended benefit from the . . . bribe is clear: It is the *market value of the land* Anderson saved from the set-aside." (emphasis added)). If the property was worth $X with the existing zoning and worth $Y with the new zoning, the value received in return for the zoning vote, and therefore in return for the bribe, is $X minus $Y. This is true regardless of whether Mark Jordan and his partners following the zoning change took advantage of the new zoning to develop the property in a way not previously permissible or had immediately turned around and sold the property to someone who was now willing to pay more for it because they had the ability to develop it in a way not previously permitted.

Without evidence of the change, or anticipated change, in the value of the land, which is the correct metric of the value of rezoning, the government cannot meet its burden to establish the

value of the benefit to be received.  *Ricard*, 922 F.3d at 658 ("It is the government that bears the ultimate burden of proving the facts supporting a sentencing enhancement.").   Since the Government has failed to meet its burden to establish the actual monetary value of the zoning votes, no enhancement is appropriate.

While the defendant has no burden to demonstrate the benefit to be received in return for the bribe, for the Court's benefit, Mark Jordan has calculated an amount for the Court to use, in the alternative, should it reject his argument that no enhancement is appropriate given the Government's failure to meet its burden.  Mark Jordan retained an expert appraiser, Jack Poe, to analyze the effect of the zoning votes on the value of the land.  In his expert opinion, a reasonable estimate of the value that resulted from the zoning votes (and therefore would have resulted in return for the bribes if Laura's vote were outcome determinative) is that the land actually decreased in value by $10,000.  Ex. 3 (Poe Rep.) at 4.

Mr. Poe first focuses on the effect of first and second zoning votes on the value of first tract of land Mark Jordan purchased, which is known as Palisades III.  *Id.* at 2-3 & n.1.  He concludes that rezoning did not increase the value of Palisades III because, although it increased the density, the increase in value as a result of the increased density was offset by the decrease in value as a result of the requirement that Mark Jordan give up for seven acres of the land for public use.  *Id.*

With respect to the second tract, Palisades IV, and the related zoning vote, Mr. Poe concludes there was no increase in value because Mark Jordan purchased the land contingent on the rezoning receiving approval from the city council, and so the value of the rezoning was already reflected in the price.  *Id.* at 2-3 n.1; GX 14 § 4.5.  Thus, the zoning votes themselves did not change the value of the land; the value of the land would only be changed by a developer's lawful

labor.  Accordingly, no enhancement based on the benefit to be received in returned for the bribes is warranted.

### c.      The development value is too speculative and thus cannot be used to increase the offense level based on the benefit to be received.

Development value is the wrong measure to apply, and even if it were the right measure, the development value in Mark Jordan's August 2014 letter is too speculative to support a 22-level increase in sentence.  Indeed, the recipient of Mark Jordan's August 2014 letter City Manager Dan Johnson, GX 35, recognized that the $686 million development was highly speculative.  To ensure that the risk fell on the developer and not on the city, he structured the economic development agreement to reimburse the development only if it actually generated additional value and tax revenue.  D. Johnson, Vol. 7, at 2109-12.  The appraiser, Mr. Poe, also notes that due to a weak market for office space, the project was unlikely to be fully developed as proposed.  Ex. 3 (Poe Rep.) at 51-52.

Sentencing enhancements may not be based on "purely speculative" expected benefits or losses.  *Nelson*, 732 F.3d at 520.  In *Nelson*, a mayor was convicted of bribery and sentenced under § 2C1.1 based on the value of the intended loss.  *Id.* at 520-23.  The district court measured intended loss based on statements that the mayor's support for a company, it might obtain $4 million in grants.  *Id.*  The Fifth Circuit reversed, noting that the link between the mayor's support for the company and the grants was contingent on many other steps in the grant-making process, and that there was no way to differentiate potential grants that would be the result of the mayor's support from those that could be legitimately obtained.  *Id.*

The $686 million figure here is similarly speculative because, like the mayor's letter in *Nelson*, the zoning votes here were only an early step in the process of developing the property.  Also, as in *Nelson*, there is no means to distinguish lawful and unlawful value that could be

developed on the property.  The $686 million value was "purely speculative" and reflected only a mere possibility of future value.  *See United States v. Bazemore*, 839 F.3d 379, 389-90 (5th Cir. 2016) (per curiam) ("potential profits" that were "uncertain" and "only a possibility" not a basis for an offset to an enhancement).  The development value therefore is too speculative to use to provide a reasonable estimate the benefit to be received and support a 22-level increase in the offense level.

**d.      The development value does not represent the net value of the benefit to be received.**

Further, the bribery guideline is clear that "[t]he value of 'the benefit received or to be received' means the *net* value of such benefit."  U.S.S.G. § 2C1.1 cmt. 3 (emphasis added).  Calculating value requires that "direct costs must be deducted from the gross value to determine a net value."  *Ricard*, 922 F.3d at 657-58.  For example, in a case where a "$150,000 contract on which $20,000 profit was made was awarded in return for a bribe; the value of the benefit received is $20,000."  U.S.S.G. § 2C1.1 cmt. 3.  And the government holds the "ultimate burden" of proving net value, including direct costs that are deducted – "[a]t most, [defendant's] burden [is] 'to establish that [it] incurred any direct costs.'"  *Ricard*, 922 F.3d at 658 (quoting *United States v. Landers*, 68 F.3d 882, 885 (5th Cir. 1995)).

Common sense dictates that any developer would incur significant cost to develop the land as the August 2014 letter proposes.  Thus, there is no doubt that if the project were to be developed to its greatest potential and ultimately be worth $686 million, that would be the gross value.  To determine the net benefit to be received by Mark Jordan, one would need to reduce this figure by the cost to develop the property to that potential.  The PSR, however, offers no estimate of the cost

28

to develop the property, and thus the Court cannot calculate the *net* benefit to be received by Mark Jordan.[10]

                  **e.**       **Mark Jordan did not have a 6.233% share of the development value, and there is no evidence of what share, if any, he would have had.**

The PSR assumes that Mark Jordan had a 6.233% share of the development value. That assumption is based on the fact that he had a 6.233% share of the *land* known as Palisades III. There is no evidence that Mark Jordan had any equity interest in the *development*. For example, for Mark Jordan to have obtained a 6.233% equity share of the developed property, he would have needed to invest 6.233% of the hundreds of millions of dollars it would have cost to develop the property. There is no evidence that Mark Jordan intended to make an equity investment in the development or even had the financial capacity to do so.[11]

The $42 million figure is based on the speculative gross value of the fully developed property, disregarding the costs to develop the property, and the unwarranted assumption that Mark Jordan would have had a 6.233% equity stake in the developed property. It is not a reasonable estimate of the benefit to be received by Mark Jordan. The PSR does not offer any basis to make such an estimate. Accordingly, no enhancement can be applied based on the benefit to be received.

---

[10] Not only does the PSR ignore the cost to develop the property, it also ignores the fact that the property had value prior to the zoning votes. Thus, a reasonable estimate of the benefit to be received by Mark Jordan would have to deduct from the net benefit he would have received from the rezoned property the net benefit he could have received from developing the property prior to the rezoning. The number of variables and the lack of information make it impossible to develop a reasonable estimate of the net benefit to be received by Mark Jordan as a result of the zoning votes.

[11] The PSR is also incorrect that Mark Jordan held a 6.233% percent stake in the land. The 2004 Jordan Family Trust held a 6.233% indirect stake in the approximately 42 acres known as Palisades III, and a 1.333% indirect stake in the approximately 20 acres known as Palisades IV. *See supra* note 2.

### ii.    Any enhancement under § 2C1.1 would need to be based on the amount of bribes paid.

Since there was no loss, no monetary benefit received by Mark Jordan in return for the bribes made to Laura Jordan, and no reasonable estimate of the benefit to be received by Mark Jordan, any enhancement under § 2C1.1 would need to be based on the amount of bribes paid. As set forth above, the PSR does not quantify the amount of the benefits provided before the final vote, which, in any event, were *de minimis*. Benefits provided after the final vote were not related to the final vote. *See supra* pp.18-19. Thus, no enhancement is warranted based on the amount of the bribes paid.[12]

The offense level if the Court uses the bribery guideline, § 2C1.1 would be 18:

| | |
|---|---:|
| Base offense for a person not a public official. § 2C1.1(a). | 12 |
| Laura Jordan was an elected official. § 2C1.1(b)(3). | + 4 or increase to 18 |
| **Total** | 18 |

### 3.    The obstruction of justice adjustment should not be applied to the § 666 offense conduct.

The PSR concludes that Mark Jordan "directed his company's IT specialist to dispose of all emails after the media reported he and Laura Jordan were being investigated." PSR ¶¶ 20, 28. Specifically, it states that even though this "occurred prior to the start of the investigation of the instant offense," Mark Jordan should receive a 2-level obstruction enhancement under § 3C1.1 because it was "purposefully calculated" and "complicate[d] the ethics investigation by the City of Richardson and ultimately the federal investigation into his matter." PSR Addendum, at vii.

---

[12] As set forth above, to the extent that the Court were to find that any benefits provided after the last vote related to a vote that had already taken place, the monetary value of those benefits would be, at most, $78,969, resulting in an enhancement of, at most, 6 levels.

The PSR overstates the support for the obstruction enhancement.  Mark Jordan did not ask his IT specialist to delete emails.  Instead, he requested that his company's IT specialist implement a standard 30-day document retention policy sometime in 2015.  C. Thomson, Vol. 6, at 1723-24.  There is no evidence that the instruction was given after the public disclosure of the FBI investigation in May 2015.  *Id.* at 1723 (Q: "[W]hen did he request that the emails from his account be only retained for 30 days?" A: "I don't recall. . . .  [I]t was on or around 2015." Q: "Do you remember a time frame within the year of 2015?" A: "I don't recall."); V. Messer, Vol. 8, at 2225.

Prior to May 2015, the only investigation Mark Jordan had reason to know about was the private civil investigation by the city regarding potential conflicts of interest, an investigation that had no subpoena power to obtain documents from Mark Jordan.  PSR Addendum, at vii; D. Johnson, Vol. 7, at 2119-20.  Even if Mark Jordan had intended to somehow interfere with this city investigation, it would not be covered by the obstruction enhancement.  As the Fifth Circuit explained in *United States v. Chivers*, 488 F. App'x 782, 789 (5th Cir. 2012) (per curiam) (citations omitted):

> committing perjury during a private civil proceeding initiated prior to a government-led investigation may support an obstruction enhancement, but only if the private investigation had some existing or expected connection to the later government inquiry and the perjury was 'purposefully calculated . . . to thwart [that] investigation or prosecution of the offense of conviction.' It is not enough to show that the obstructive conduct simply impeded a civil investigation that later turns out to relate (or lead) to a government investigation and an offense of conviction.

There is no evidentiary basis upon which to conclude that Mark Jordan implemented the document retention policy aware of the FBI investigation, intending to thwart that investigation.  This enhancement does not apply.

**B.     The tax guideline, § 2T1.4, does not affect the combined offense level.**

The PSR treats the two tax counts and the related conspiracy count (the tax offense conduct) as a separate group from the § 666 and related conspiracy counts, and calculates the offense level for the tax group using § 2T1.4. PSR ¶¶ 23, 30-35. The base level for the tax offense conduct is 6. The PSR does not find that the government incurred any tax loss as a result of Mark Jordan's tax returns. PSR Addendum, at viii. Rather, the entire tax loss, $34,275, is based on Laura Jordan's failure to report the benefits she received from Mark Jordan on her tax returns, which the PSR likewise attributes to Mark Jordan as a result of the tax conspiracy count. After enhancing the offense level by 6 levels for the tax offense conduct based on this tax loss, the PSR concludes that the tax offense conduct does not affect the combined offense level because the offense level for the tax offense conduct falls 9 or more levels below the offense level of the PSR's bribery offense level.

As set forth above, the adjusted offense level for the § 666 gratuity offense conduce is 15. Thus, if the PSR were correct that the tax loss was $34,275 and the adjusted offense level for the tax offense conduct is 12, the tax offense counts might have an impact on the adjusted offense level.[13]

The PSR's tax loss calculation, however, is incorrect. The tax loss summary calculated by the IRS on which the PSR relied included both lawfully-obtained income and unlawful benefits that were unreported on Laura Jordan's tax returns. Ex. 2 (IRS summary). The lawfully-obtained income is not part of the alleged tax conspiracy and thus cannot be attributed to Mark Jordan. The unlawful benefits are gratuities, *see supra* pp.16-18, which are non-taxable gifts. Ex. 4 (Dellinges

---

[13] For the reasons set forth in Laura Jordan's sentencing memorandum, at pages 10 to 11 and incorporated here by reference, however, regardless of the tax loss, there is no impact on the combined offense level because the tax offense conduct and the § 666 offense conduct should be treated as a single group.

Rep.); Stipulation, Vol. 13, at 3722.  Therefore, there is no tax loss attributed to Mark Jordan and

no enhancement applies.  The tax offense conduct has an offense level of 6.  Because 6 is "9 or

more levels less" serious than either 15 or 18 (the offense levels that Mark Jordan contends should

be applicable under § 2C1.1 or § 2C1.2), there is no increase in the combined offense level under

the grouping rules.  U.S.S.G. § 3D1.4(c).

      **C.**     **The final adjusted offense level is 15.**

     As set forth above, the final adjusted offense level is 15.  This offense level corresponds to

a sentence of 18 to 24 months for a first-time offender like Mark Jordan who is in Criminal History

Category I, U.S.S.G. Ch. 5, Pt. A, and a fine between $7,500 and $75,000, U.S.S.G. § 5E1.2.[14]

      **D.**     **In the alternative, since a sentence under the bribery guideline enhanced based on the value of the benefit to be received would substantially overstate the seriousness of the offense, a downward departure would be warranted if the bribery offense level were to be enhanced based on the development value.**

     In the comments to the loss table relied on by both the bribery and gratuities guidelines, it

is recognized that the loss table can "substantially overstate[] the seriousness of the offense."

U.S.S.G. § 2B1.1 cmt. 21(C).  Any calculation of the benefit to be received based on the potential

future development value of the project ($42 million according to the PSR) is exponentially greater

than the loss to any victim (zero), the benefits with quantifiable monetary value provided to the

public official (zero or, at most $78,969), or any actual gain to Mark Jordan (none has been

quantified).  *See, e.g.*, *United States v. Kalili*, 100 F. App'x 903, 906 (4th Cir. 2004) (per curiam)

---

[14] The PSR states that under 18 U.S.C. § 3571(d), an alternative fine equal to twice the pecuniary gain or loss applies to the § 666 conduct.  The PSR concludes that Mark Jordan's pecuniary gain was twice the $42 million, and that under § 5E1.2(c)(4), that larger fine governs notwithstanding the guidelines range.  The PSR's analysis is incorrect.  First, there is no evidence of actual pecuniary gain or loss related to the § 666 conduct.  Second, even if the intended gain were the relevant number, for the reasons discussed above, the PSR's calculation of $42 million is not a reasonable estimate of intended gain.  Accordingly, there is no basis to base the alternative fine provision on the $42 million figure.

(approving of downward departure from 17-level increase based on $800,000 intended loss where defendant "did not significantly profit . . . before they were caught.").

A downward departure would be particularly appropriate if the offense level were based on the development value because the projected development was merely a projection not based on "economic reality." The Palisades was highly unlikely to ever be fully developed to its greatest possible potential given market conditions.

> Where sentencing is based largely or solely on intended loss, a downward departure may be warranted under the 'economic reality' principle. The underlying theory behind this principle is that 'where a defendant devises an ambitious scheme obviously doomed to fail and which causes little or no actual loss, it may be unfair to sentence based on the intended (but highly improbable) loss determination from the [§ 2B1.1] table.'

*United States v. McBride*, 362 F.3d 360, 375 (6th Cir. 2004) (citations omitted).

In addition, this downward departure is justified based on the fact that any benefit to be received would result from multiple causes, not merely from the offense conduct. In the context of a measurement of loss under the loss table, courts have found a downward departure justified where the loss was caused by "contributing factors" such as an "economic downturn, market collapse, negligence by others, and other events beyond defendant's control." *United States v. Keller*, No. 04-cr-233, 2005 WL 6192897, at *5 (N.D. Tex. Oct. 17, 2005). Here, by analogy, any benefit would necessarily result from "multiple causes" besides the alleged bribes, such as a transition to a market favorable to fully developing the property, the lawful work to build the improvements on the land, and the work to market those improvements to tenants.

The use of the development value to enhance the offense level would seriously overstate the seriousness of the offense; accordingly, should the Court use the development value, Mark Jordan requests a downward departure. Specifically, a downward departure to an offense level of 18, the offense level based on the amount of the bribes, would be warranted. *See supra* p.30.

34

### E.    Restitution is not applicable.

The PSR correctly concludes that restitution is not mandatory and that "[r]estitution is not applicable in this case," but nonetheless says that restitution "may be ordered in this case" and recommends requiring as a condition of supervised release the payment of $34,275 in restitution to the IRS for the tax loss resulting from Laura Jordan's false tax return.   PSR ¶¶ 79-80, Addendum, at ix & Supervision Conditions Recommendations.  For the reasons described above, however, there is no tax loss attributable to Mark Jordan.  *See supra* pp.32-33.  Accordingly, no restitution should be ordered.[15]

## II.    The § 3553(a) factors demonstrate that a variance from the advisory guidelines is warranted.

The correct guidelines range of 18 to 24 months (and all the more so the 360 months to life range under the PSR's guidelines calculation, which would result in a sentence to the statutory maximum of 26 years) is "greater than necessary" to comply with the purposes of punishment in light of the sentencing factors set out in 18 U.S.C. § 3553(a).

### A.    History and characteristics of Mark Jordan

The Court should place great weight on the heartfelt descriptions of Mark Jordan from those who know him best, as set forth above and in the attached letters.  *See supra* pp.10-16.  His children, including his stepchildren, consider him their "rock," devoted to giving them his time and care even under the trying circumstances of a divorce and this case.  And his family, friends, members of the community, business partners, and employees note many examples of his generosity to anyone who needed help.  His lifetime of service and kindness should be weighed

---

[15] To the extent the Court considers imposing restitution, despite the PSR's conclusion it is not applicable, a conclusion to which the government did not object, $34,275 is not the correct amount.  The amount of monetary benefits received by Laura Jordan as part of the § 666 offense conduct and not reported by her on her tax return was $78,969. *See supra* pp.10, 20-21; Ex. 1.  Applying the presumptive tax rate of 28% (*see* § 2T1.1(c)(1)(A)), results in a tax loss $22,111.

against the offense conduct in setting a sentence.  "Th[e] elementary principle of weighing the good with the bad, which is basic to all the great religions, moral philosophies, and systems of justice, was plainly part of what Congress had in mind when it directed courts to consider, as a necessary sentencing factor, 'the history and characteristics of the defendant.'"  *United States v. Adelson*, 441 F. Supp. 2d 506, 514 (S.D.N.Y. 2006), *aff'd*, 301 F. App'x 93 (2d Cir. 2008).

**B.     The nature and circumstances of the offense**

There is no question that the offense of conviction is a serious one.  Mark Jordan should have recognized that by providing benefits to Laura Jordan, he was putting her in a situation where she had a conflict of interest that undermined the integrity of the city government.  Even the appearance of impropriety undermines faith in the in our democratic institutions.

Yet, as the PSR recognizes, the offense conduct resulted in no financial harm to the City of Richardson.  PSR ¶¶ 18-19.  The Palisades zoning measures would have passed because a majority of the unconflicted members of the city council believed them to be in the city's best interests.  The project, these council members believed, would have benefitted the City of Richardson by increasing its tax revenues and bringing more businesses and housing to the city.  Thus, while the offense is serious, it is a non-violent offense resulting in no economic loss to the victim.

**C.     The need for the sentence to effectuate the statutory goals of sentencing**

The Court is required to ensure the sentence matches the seriousness of the offense and provides just punishment, provides for sufficient deterrence, and protects the public from further crimes.

As discussed above, while there is no doubt the offense was serious in that it eroded the public trust, it caused no harm to the city, and in fact was expected by all involved to benefit the city.  This is not a case where the public fisc was in jeopardy.  There is no need to provide specific

deterrence to Mark Jordan. There is no reason to believe that Mark Jordan, who is 55 years old, prior to this offense having had zero criminal history, and has complied with his conditions of release for over five years, has any intention of repeating this one-time aberration in his professional and personal life, or that the unique circumstances of this case will ever arise again.

Mark Jordan has already suffered a number of collateral consequences from this case that would deter any future illegal conduct. His previously unblemished personal and business reputations have suffered, personal and embarrassing details of his private life were aired in the most public fashion, and he will be a convicted felon for the remainder of his life. *See United States v. Brewer*, 978 F. Supp. 2d 710, 712 (W.D. Tex. 2013) (in varying down to a sentence of probation in a case in which the *Guidelines Manual* called for lengthy prison sentences for husband and wife co-defendants, the court observed: "[T]hey will live out their lives as convicted federal felons."). Facing a federal criminal trial once is a traumatic, anxious, and terrifying prospect. Mark Jordan has gone through this process twice and has spent five years with the Damocles sword of this prosecution and the prospect of a felony conviction and a prison sentence hanging over his head. There is little doubt that he will never return to the criminal justice system. Further, courts recognize that a longer sentence does not necessarily serve as a greater deterrence to others. *See*, *e.g.*, Daniel S. Nagin, *Deterrence in the Twenty-First Century*, Vol. 42, No. 1, Crime and Justice in America (August 2013), at 199-263 (concluding that social science research shows that: "The evidence in support of the deterrent effect of the certainty of punishment is far more consistent than that for the severity of punishment."); *see also Brewer*, 978 F. Supp. 2d at 715 ("While the Court recognizes the importance of deterrence, it is also realistic about its limits, especially in the realm of white collar crime, where the powers of greed and ambition are often stronger than any deterrent effect.").

**D.      The need to avoid unwarranted sentencing disparities**

The Court must ensure that Mark Jordan's sentence is not unjustifiably different than the sentences imposed on others prosecuted for similar conduct.  *See* 18 U.S.C. § 3553(a)(6).  As discussed in Laura Jordan's sentencing memorandum, at pages 26 to 29, and incorporated here by reference, a review of data from the Sentencing Commission and of other bribery and economic crime sentences reveal that significant downward variances are common, recognizing the guidelines in economic crime cases often reach unwarranted results.  Mark Jordan's guideline range is driven largely by the enhancement under § 2B1.1, a section of the guidelines that is not empirically based, has been roundly criticized, and often disregarded by sentencing courts.  In other words, extending a downward variance to Mark Jordan would not introduce unwarranted sentencing disparities, but failing to grant a variance, particularly if the Court were to calculate the offense level at anything approaching the offense level calculated by the PSR, would itself introduce unwarranted disparities.

**E.      A downward variance is warranted to ensure that the sentence is not greater than necessary to effectuate the statutory goals of sentencing.**

Mark Jordan respectfully seeks a downward variance.  A below-guidelines sentence would reflect the "history and characteristics" of Mark Jordan, who has no record of criminal conduct, and to the contrary, is widely known as a generous, kind, and honest member of the community who contributes extensively to charity and to the wellbeing of those around him, including friends, family, and people he does not know.  These characteristics demonstrate that the offense here was a misstep, not part of a consistent pattern of behavior.  A sentence below the applicable advisory guidelines range would reflect that this was an aberration in his life.

A downward variance would also reflect the "circumstances of the offense" and the seriousness of the offense.  On the one hand, the offense impacted public confidence in the city's

government.  On the other hand, it resulted in no financial loss to the community and the result – the Palisades development – was supported by community leaders independent of the offense conduct.  Those circumstances, while they do not excuse the conduct, mitigate its severity.

A sentence in the applicable advisory guidelines range is not necessary in order to impose a sentence that serves as "adequate deterrence."  With respect to specific deterrence of Mark Jordan, as discussed above, this conduct was out of step with his otherwise superb record of honesty, and there is no reason to expect he will ever choose to (or have the opportunity to) repeat it, especially given the severe collateral consequences the prosecution has had on his life.  He has been adequately deterred.  For the same reason, there is no need for any greater sentence to "protect the public" from Mark Jordan.

A non-guidelines sentence can sufficiently deter others doing business with local governments from engaging in this conduct.  A felony conviction by itself has the potential to prevent an individual from ever conducting business with the government, or even other private businesses.  A non-guidelines sentence can demonstrate to the community that any corruption in local government will result in real consequences and accountability.

A downward variance from the guidelines would avoid unwarranted sentence disparities. The guidelines range is primarily the result of enhancements based on the § 2B1.1 loss table, which courts have recognized are unsupported by empirical evidence yields unreasonable results.  As a result, courts have regularly granted downward variances of 50% or more in economic crimes, including bribery offenses, and including some cases that granted a variance to probation.  *See* Laura Jordan's Sentencing Memorandum at pp.26-29.



## CONCLUSION

Mark Jordan recognizes and regrets that his conduct harmed public confidence in city government.  But that conduct must be considered in context.  It, at most, consisted of providing gifts to Laura Jordan, nearly all after her final vote, gifts that therefore constituted at worst gratuities, did not impact the outcome of the votes at issue, or cause economic harm to the city. The offense conduct must also be considered in the context of Mark Jordan's entire life, a life unblemished by any criminal history and lived with love and generosity for his family, his friends, his business partners and employees, and his community.  Mark Jordan respectfully requests the Court grant a consider a downward variance to a sentence that is sufficient, but not greater than necessary to effectuate the statutory goals of sentencing.

Dated: July 28, 2022                     Respectfully submitted,

**KRAMER LEVIN ROBBINS RUSSELL**

*/s/ Barry J. Pollack*
Barry J. Pollack (*pro hac vice*)
Ralph C. Mayrell (*pro hac vice*)
2000 K Street N.W. 4th Floor
Washington, D.C. 20006
202-775-4500
bpollack@kramerlevin.com
rmayrell@kramerlevin.com

**JONES WALKER, LLP**

/s/ *Dan L. Cogdell*
Dan L. Cogdell
811 Main Street, Suite 2900
Houston, Texas 77002
Office: 713-437-1869
Facsimile: 713-437-1810
dcodgell@joneswalker.com

**TERRI MOORE LAW**

/s/ *Terri Moore*
Terri Moore
300 Burnett Street, Suite 160
Fort Worth, Texas 76102
817-698-0000
moore@terrimoorelaw.com

*Attorneys for Mark Jordan*

**CERTIFICATE OF SERVICE**

On July 28, 2022, the foregoing was filed and distributed to all counsel of record through the Court's ECF system and via email.

/s/ *Barry J. Pollack*

**LOCAL RULE 7(a)(7)(B) STATEMENT REGARDING SEALING**

Pursuant to the local rules governing sealing of documents in this Court, this document has been submitted under seal along with a sealed motion to seal. *See* Local Civ. R. 7(a)(7)(B); Local Crim. R. 49(c)(3). A redacted version was filed publicly.

/s/ *Barry J. Pollack*