# United States District Court

### EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| v. | § | |
| | § | Civil Action No. 4:18-CR-00087 |
| LAURA JORDAN (1) | § | Judge Mazzant |
| a/k/a Laura Maczka | § | |
| | § | |
| MARK JORDAN (2) | § | |
| | § | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Pending before the Court are the Government's Motion for Findings and Conclusions Regarding Disclosure of Recorded Calls (Dkt. #335); Defendants' Post-Verdict Motion to Dismiss, or in the Alternative, for Judgment of Acquittal or for New Trial (Dkt. #347); Defendants' Post-Verdict Motion to Dismiss, or in the Alternative, for Judgment of Acquittal or for New Trial (Dkt. #348); Defendants' Post-Verdict Motion to Dismiss, or in the Alternative, for Judgment of Acquittal or for New Trial (Dkt. #352); and Defendants' Motion to Stay this Court's Ruling on Their Rule 33 Motion for a New Trial and to Postpone Sentencing Hearing (Dkt. #389). After consideration of the parties' arguments and of the evidence, the Court finds each of the motions should be **DENIED**.

## BACKGROUND

### I.      The Main Characters

Defendant Laura Jordan, previously Laura Maczka ("Laura"), served as Mayor of the City of Richardson, Texas ("Richardson" or the "City") from May 2013 to April 2015. Laura was married to Michael Maczka ("Michael"), but the two separated in October 2014 and divorced on January 8, 2015. Defendant Mark Jordan ("Mark") is a commercial real estate developer and owner

of Sooner National Property Management ("Sooner") and Sooner Management, among other entities. Through Sooner, Mark owns a portion of the Palisades Property in Richardson (the "Palisades"). Mark was married to Karen Jordan ("Karen") until the two separated in August 2014 and divorced in August 2016. During his marriage to Karen, Mark had an affair with at least two women. One of these women was Sarah Catherine Norris ("Sarah") who formerly worked as Mark's business partner and held a 50% partnership interest in Sooner Management. The other woman was Laura, the former Mayor of Richardson. After a federal investigation developed against Laura and Mark for activities detailed below, Laura and Mark married each other.

## II.     The Political Scene

Laura platformed part of her mayoral campaign on a stance against zoning for or building new apartments near neighborhoods. Laura and her friends went door-to-door on the campaign trail and consistently confirmed Laura's negative stance on apartments as well as her particular aversion to development of the Palisades, which sits adjacent to the Canyon Creek and Prairie Creek neighborhoods (Tr. 482–92; 1230–32). One of Laura's closest friends testified that the neighborhood "worked very hard to get [Laura] elected" with the understanding that "she was not going to allow that development [sic] go in near the neighborhood" (Tr. 1279). As owner of the Palisades, Mark had hopes of developing apartment complexes on the property, which, in turn, would increase apartment complex presence near the Canyon Creek and Prairie Creek neighborhoods (Tr. 488). But the property was not zoned for apartments (Tr. 1392). On November 5, 2013, Mark formally requested that the City Plan Commission rezone the Palisades so he could realize this goal (Dkt. #233 at p. 8).

Laura's role as mayor required her to vote with the Richardson City Council (the "City Council") on whether to approve zoning projects, among other matters. On December 9, 2013,

Laura and the City Council convened to vote on the zoning changes proposed by Mark. Hundreds of community members, specifically those residing in Canyon Creek and Prairie Creek, had expressed serious disapproval of Mark's proposal to rezone the Palisades (Tr. 364). In their view, a decision to rezone would directly contradict Laura's campaign platform (Tr. 361–64). Despite the public outcry and Laura's campaign promises, the City Council—and specifically Laura— voted in favor of the rezoning, thereby allowing Mark to begin the Palisades development (Tr. 365).

On January 27, 2014, Laura and the City Council voted once again to rezone the Palisades for apartment development. Then on June 9, 2014, Laura and the City Council voted to increase the number of apartments that Mark could develop on the Palisades from 600 to 1,090. Finally, on September 22, 2014, Laura and the City Council voted to allow the City Manager to negotiate with Mark on terms for a reimbursement deal. The final terms of the deal indicated that Mark would improve segments of the Palisades in exchange for a $47 million reimbursement from the City.

## III.    The Personal Relationships

Behind these political scenes, Laura and Mark had begun an affair. Prior to the rezoning votes, Mark and Laura had privately emailed about the Palisades. Laura sent many of these emails from her personal account. On multiple occasions, Laura forwarded directly to Mark emails from Prairie Creek and Canyon Creek residents regarding the upcoming vote to rezone. Evidence of an intimate and personal relationship between Laura and Mark first arose in an email from November 11, 2013. In this email, Laura forwarded a constituent's questions to Mark regarding the Palisades. On November 14, 2013, Mark responded at 4:30am, directing Laura to "[s]ee [his] answer below in RED. Happens to be my favorite color. . . . Don't forward this to anyone. Just put it in your words." That same day, Laura responded, "Ok… Truly LOL on that one! You're fairly clever at

4:31 am. I'll read these responses and will obviously put in my own words. Since we've already discussed the fact that I have some interesting vocabulary words and it's fairly obvious when other people are writing for me . . . ." (Tr. 897–1088).

On November 21, 2013, Laura sent an email to Mark, writing, ". . . good thing I had such a fun afternoon yesterday. Because last night the [P]rairie [C]reek mob hit me hard! You were probably enjoying barbeque and chillaxing. I was taking bullets for you! (smiley face emoji)" (Tr. 897–971). Karen, Mark's ex-wife, found these emails and confronted Mark about whether he was having an affair with Laura, which Mark denied. According to Karen, Mark stated he was flirting with Laura only to get what he wanted. (Tr. 897–971).

The emails continued, and the content confirms that Mark and Laura were meeting in person. A private investigator hired by Sarah snapped photos of Laura and Mark together in public.[1] They were seen sitting closely at restaurants and meeting in parking lots (Tr. 447–60). It wasn't until early January 2014 that Mark confessed to Karen he had engaged in intimate conduct with Laura. This confession came only after Karen had tracked Mark's iPad to Laura's house at around two o'clock in the morning and then confronted him. According to Karen, during this confrontation, Mark admitted to kissing Laura, but insisted that he was not attracted to her (Tr. 897–932).

Despite Mark's apparent lack of attraction to Laura, the couple took many extravagant trips together—Mark footing much of the bill. Direct and circumstantial[2] evidence suggests that in 2014, Mark and Laura went to Salt Lake City, Austin, San Jose, Los Angeles, Laguna Bench, and

---

[1] *See infra* p. 6.

[2] For example, on March 11, 2015, Laura flew from Dallas-Fort Worth to Durango, Colorado (Tr. 612–39). A few days later, Laura flew from Montrose, Colorado to Dallas-Fort Worth on a flight funded by Mark. While there was no testimony on Mark's flight records, the record from Laura's flight reflected that a party of two flew together under Mark's member number.

Fort Walton. In 2015, direct and circumstantial evidence suggests Laura and Mark went to Salt Lake City, Las Vegas, Colorado, Beverly Hills, Atlanta, and Tampa. Evidence from these trips shows Mark often upgraded Laura's plane tickets to business class and spent thousands of dollars on hotel rooms at these locations. All the while, Laura concealed the true nature of these vacations from her friends, passing off her frequent travel as "mayor trips" and insisting she was not traveling with Mark (Tr. 1251).

The expenditures did not end at the trips. Evidence also shows that Mark bought furniture and funded a home renovation for Laura in October 2014. Mark told the home renovator that the project was for a friend but asked the renovator to keep news of the project "on the down-low" (Tr. 1098). Laura lied to friends, family, and her then-husband about the price tag, claiming her father was paying for the renovations. Though Mark had apparently told Karen he was no longer seeing Laura (Tr. 897–932), Mark continued funding this project, never even asking for a quote and instructing the renovator to do "whatever [Laura] wants done" (Tr. 1096–126). When Karen learned of the remodel, she confronted Mark, asking why he was funding a renovation of Laura's home (Tr. 897–932). Again, denying a continued relationship with Laura, Mark responded, "because, Karen, we owe her. We owe her a lot. She's made us a lot of money" (Tr. 897–932).[3]

On top of trips and home renovations, Laura also received a job offer from Sooner. She accepted the position and began in March 2015, replacing a leasing agent who left the company having reached the ceiling of his salary range at $70,000. Laura, who came with less experience and no real estate license, received a $15,000 signing bonus and a $150,000 salary. Not once did Laura ever disclose to any City Council member or the Richardson constituents that she had a personal relationship with Mark, the developer of the Palisades.

---

[3] When Karen later learned of Mark's continued affair with Laura, she went to the media, releasing to a reporter hard copies of the many email chains between Mark and Laura.

As mentioned, Laura was not the first woman with whom Mark carried on an affair. In 2013, Mark and his former business partner, Sarah, began seeing each other while she was in the process of divorcing her husband. Mark took Sarah on trips and bought her gifts. The relationship was, in Sarah's eyes, "very serious" but it ended nonetheless (Tr. 1621). Sarah described Mark in the aftermath of the relationship as "threatening" (Tr. 1625). Mark indicated to Sarah that the Sooner Management partnership would be at risk if Sarah divorced her husband. According to Sarah, Mark worked with an attorney to "write up an agreement to give [Sarah's] 50 percent partnership to [Mark] if [she] actually got a divorce" (Tr. 1625). Sarah refused to sign, and Mark's vitriol seemed to subside. Sarah's discomfort, however, persisted.

Still working as Mark's Sooner Management business partner, Sarah hired a private investigator in January 2014 to confirm whether Mark was having an affair with Laura. Privy to Mark's accounting, Sarah had seen out-of-the-ordinary credit card statements and emails between Mark and Laura. Sarah worried about her business connections to Mark if he, as a developer, was having an improper affair with a politician. The private investigator confirmed the relationship, finding specifically that Mark and Laura were communicating through a burner phone. This surprised Sarah, who had never communicated through a burner phone when she and Mark had been together romantically. When Sarah confronted Mark about the expenses tied to Laura, Mark (ironically) insisted it was none of Sarah's business. At that point, and "knowing what [she] kn[e]w," Sarah wanted nothing to do with Mark and Laura (Tr. 1657). On June 27, 2014, Mark called Sarah and admitted to having an affair with Laura. In October 2014, Sarah could no longer deal with Mark's "improprieties" and "what was going on with Laura" (Tr. 1665). She resigned from Sooner Management and contacted the FBI.

6

## IV.     The Prosecution

After Sarah's phone call, the FBI launched an investigation into Mark and Laura. Through its investigation, the Government formed a prosecution theory that Laura, as mayor, guaranteed favorable votes on apartment development projects in exchange for cash, sex, and luxury hotel stays, among other items and services from Mark. The Government asserts that, during her tenure as mayor, Laura received from Mark over $131,722.53 in total benefits—the $150,000 Sooner salary not included. The Government charged Mark and Laura (collectively and hereinafter, the "Jordans") each with Conspiracy to Commit Honest Services Wire Fraud under 18 U.S.C. § 1349; Honest Services Wire Fraud under 18 U.S.C. §§ 1343 and 1346; Conspiracy under 18 U.S.C. § 371; and Bribery Concerning Program Receiving Federal Funds under 18 U.S.C. §§ 666(a)(1)(B) and 666(a)(2).

## V.     The First Trial

The first trial lasted nearly a month. At the trial's close, the Court instructed the jury to "decide the case for yourself," and "not give up your honest beliefs as to the weight or effect of the evidence solely because of the opinion of your fellow jurors, or for the mere purpose of returning a verdict." (Dkt. #153 at p. 26). Juror No. 11 had a particularly difficult time arriving at her decision, fearing that her vote would cause a mistrial. Shortly after Juror No. 11 expressed her serious reservations to the Court, the jury reached a unanimous verdict. The jury found the Jordans guilty on nearly all counts.

The Court later learned that a Court Security Officer (the "Officer") had spoken to Juror No. 11 prior to the verdict. Finding her in tears, which he seemingly attributed to her role as a dissenting voter, the Officer told Juror No. 11 to put her emotions aside, not worry about the sentence the Jordans might face, and decide the case solely on whether she believed they were

guilty or not. Further, the Officer told Juror No. 11 "that she should not be concerned about any punishment the defendants may receive" (Dkt. #169 at p. 2). If "she did not believe the defendants were guilty, she should vote not guilty" (Dkt. #169 at p. 2). The Court informed the parties of both conversations within twenty-four hours, filed a memorandum on the docket containing separate statements from the Court's law clerks on these events, and made the Officer available for examination, on request. Defense counsel declined the Court's offer and ultimately moved for a new trial (Dkt. #174), which this Court granted on May 2, 2019 (Dkt. #191). The Government appealed this decision, but on May 1, 2020, the Fifth Circuit affirmed.

## VI.    The Tax Charges

The Government brought no tax charges in the first trial. Though it had pursued adding possible tax counts against the Jordans prior to the commencement of the first trial—and before the grand jury returned the original indictment in May 2018—the United States Attorney's Office (the "USAO") decided it would not pursue the tax charges further. The Government asserts that doing so would have required approvals from the Department of Justice that would simply have taken too long.

When the Jordans filed a motion for new trial, the Government recognized "a realistic possibility that the Jordans' convictions would be overturned" and anticipated "that any [new] trial setting would likely be distant []especially since whichever party lost on the motion for new trial would likely appeal[]" (Dkt. #363 at p. 40). Thus, awaiting the outcome, the Government "re-approached the IRS about the possible pursuit of tax charges" (Dkt. #363 at p. 40).

As mentioned, this Court granted the Jordans' motion for new trial on May 2, 2019. Discussions about potential resolutions and plea deals ensued but were unsuccessful. On May 24, 2019, the Government relayed to Defense counsel that it was the Government's "intent to present

to the grand jury a superseding indictment including tax fraud counts related to both defendants" (Dkt. #363 at p. 42). On May 28, 2019, the Government appealed the Court's order granting a new trial. On May 1, 2020, a panel of the Fifth Circuit affirmed the Court's order and potential settlement conversations resumed. Again, these were unsuccessful. The grand jury returned the second superseding indictment adding the tax charges on December 9, 2020. Both sides made final efforts to enter Rule 11(c)(1)(C) plea agreements but to no avail.

## VII.  The Second Trial

The second trial commenced in July 2021 and brought further troubles. At trial, the Government examined FBI Special Agent Messer ("Agent Messer") as part of its case-in-chief. During the Defense's cross examination of Agent Messer, it became clear to both the Government and the Defense that the FBI had failed to turn over to the USAO a recorded phone call between Mark and Sarah (Tr. 2415–18). When presentation of the evidence concluded for the day, the Court instructed Agent Messer to find the recorded phone call and ensure no other evidence existed that the Defense had not received (Tr. 2416).

The following day, the parties reported to the Court that Agent Messer, while searching for the aforementioned recorded call, uncovered an additional recorded call between Mark and Sarah that the FBI had also failed to turn over to the USAO (Tr. 2462). The first call was made on September 28, 2015 and lasted approximately fifteen minutes; the second call was made on October 5, 2015 and lasted approximately two minutes (Tr. 2470, 2491). Sarah, under the direction of FBI Agent Walton ("Agent Walton"), intentionally recorded both calls using the FBI's system and software (Tr. 2476). The parties played both recordings for the Court outside the presence of the jury (Tr. 2466–512).

Having heard the conversations between Mark and Sarah, the Court determined that the tapes "clearly include[d] *Brady* material" and then recessed the trial for the remainder of that Friday, July 16, 2021 to provide the Defense with time to incorporate the late-disclosed recordings into its cross examination of Agent Messer and its case-in-chief (Tr. 2516–26). The Government also gave the Defense the opportunity to examine the Government's discovery files at the USAO over the weekend (Tr. 2516–26). The Court denied the Defense's request for a mistrial because the Government had not intentionally suppressed the evidence and the Defense had yet to begin its case-in-chief (Tr. 2506–17). Notably, the Defense stated on the record that it did not believe the Government had engaged in any misconduct, and Agent Messer testified that the USAO did not have either recorded call in its possession until July 15, 2021—the same day the Defense received them (Tr. 2472).

When trial resumed on Monday, July 19, 2021, the Defense used the recorded phone calls in its cross examination of Agent Messer, and the Government used them in its re-direct of Agent Messer (Tr. 2536–637). The Defense then used the recorded phone calls in its case-in-chief—specifically, during its examination of Sarah—and referenced them in its closing arguments (Tr. 2648–865, 3804–38). The jury found the Jordans each guilty of Conspiracy to Commit Bribery Concerning a Local Government Receiving Federal Funds; Bribery Concerning a Local Government Receiving Federal Funds; Conspiracy to Defraud the United States; and two counts of Aiding or Assisting in Preparation of False Documents Under Internal Revenue Laws. The jury found the Jordans not guilty of Conspiracy to Commit Honest Services Wire Fraud; and not guilty of Honest Services Wire Fraud (Dkts. #157–58).

## VIII.   The Current Procedural Posture

On September 16, 2021, the Government filed a Motion for Findings and Conclusions

Regarding Disclosure of Recorded Calls (Dkt. #335), urging this Court to hold that the Government did not violate *Brady* during the second trial. On September 30, 2021, the Jordans responded (Dkt. #341). On October 14, 2021, the Jordans filed three post-verdict motions: Defendants' Post-Verdict Motion to Dismiss, or in the Alternative, for Judgment of Acquittal or for New Trial (Dkt. #347); Defendants' Post-Verdict Motion to Dismiss, or in the Alternative, for Judgment of Acquittal or for New Trial (Dkt. #348); and Defendants' Post-Verdict Motion to Dismiss, or in the Alternative, for Judgment of Acquittal or for New Trial (Dkt. #352). The Government filed an omnibus response on December 20, 2021 (Dkt. #363). The Jordans replied on January 17, 2022 (Dkt. #373). The Jordans' sentencing is set for August 4, 2022.

However, on July 20, 2022, the Jordans filed a Motion to Stay this Court's Ruling on Their Rule 33 Motion for a New Trial and to Postpone Sentencing Hearing (Dkt. #389) in light of the Fifth Circuit's reconsideration of its order denying bail pending appeal in *United States v. Hamilton*, No. 21-22257 (Case No. 3:19-cr-83 N.D. Tex.). After oral arguments in *Hamilton*, the Fifth Circuit revisited the aforementioned order and decided to grant the defendant-appellant's request, finding that he had raised "significant questions of first impression in this circuit: namely, whether § 666 covers mere gratuities or unofficial acts, and if so, whether his conviction is constitutional in light of certain Supreme Court decisions." *Id.* The Government responded to this motion on July 27, 2022 (Dkt. #391). For all the reasons discussed below, the Court denies each of the motions under consideration here and will sentence the Jordans on August 4, 2022 as scheduled.

## LEGAL STANDARD

A defendant may bring a motion for acquittal under Federal Rule of Criminal Procedure 29. A Rule 29 motion for judgment of acquittal "challenges the sufficiency of the evidence to

convict." *United States v. Medina*, 161 F.3d 867, 872 (5th Cir. 1998). The issue is "whether, viewing the evidence in the light most favorable to the verdict, a rational [finder of fact] could have found the essential elements of the offense charged beyond a reasonable doubt." *United States v. Boyd*, 773  F.3d 637, 644 (5th Cir. 2014) (first citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); then citing *United States v. Miller*, 588 F.3d 897, 907 (5th Cir. 2009)). "The standard does not require that the evidence exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt, provided a reasonable trier of fact could find that the evidence establishes guilt beyond a reasonable doubt." *United States v. Loe*, 262 F.3d 427, 432 (5th Cir. 2001). The factfinder is "free to choose among reasonable constructions of the evidence," and "it retains the sole authority to weigh any conflicting evidence and to evaluate the credibility of the witnesses." *Id.* (quotations and citations omitted).

Additionally, a defendant may bring a motion for new trial under Federal Rule of Criminal Procedure 33. Rule 33 provides that, on request, "the court may vacate any judgment and grant a new trial if the interest of justice so requires." FED. R. CRIM. P. 33(a). "The decision to grant or deny a motion for new trial or remittitur rests in the sound discretion of the trial judge." *Eiland v. Westinghouse Elec. Corp.*, 58 F.3d 176, 183 (5th Cir. 1995). "In this Circuit, the generally accepted standard is that a new trial ordinarily should not be granted 'unless there would be a miscarriage of justice or the weight of evidence preponderates against the verdict.'" *United States v. Wright*, 634 F.3d 770, 775 (5th Cir. 2011) (quoting *United States v. Wall*, 389 F.3d 457, 466 (5th Cir. 2004)). "Generally, motions for new trial are disfavored and must be reviewed with great caution." *United States v. Smith*, 804 F.3d 724, 734 (5th Cir. 2015). The court will not grant a new trial except in "extraordinary circumstances." *United States v. Tarango*, 396 F.3d 666, 672 (5th Cir. 2005); *United States v. Scroggins*, 379 F.3d 233, 253 (5th Cir. 2004). As such, a new trial is proper

only where the defendant's "substantial rights" have been harmed—either based on a single error or the cumulative effect of multiple errors. *United States v. Bowen*, 799 F.3d 336, 349 (5th Cir. 2015).

**ANALYSIS**

The Jordans argue the verdict against them cannot stand and that they should be acquitted or granted a new trial for several reasons:

1. 18 U.S.C. § 666 cannot constitutionally be applied to them;
2. The Government did not prove a quid pro quo bribery which § 666(a)(1)(B) and § 666(a)(2) require;
3. The Government did not prove the requisite receipt of federal benefits under § 666(b);
4. The Government did not prove that Laura was a city agent under § 666(a)(1) and (a)(2);
5. The Court improperly instructed the jury on the § 666 charges;
6. The tardily disclosed recorded phone calls constituted a *Brady* violation that requires a new trial;
7. The Court erred in admitting evidence of ethics training that Laura received as a City Council member;
8. The Government's addition of tax counts to the indictment constituted vindictive prosecution; and
9. The Government's evidence was insufficient to sustain a guilty verdict on each tax count.

The Court first takes up whether there was a *Brady* violation that necessitates a new trial. Second, the Court will address the Jordans' legal contentions against the bribery charges under § 666. Third, the Court will determine whether it improperly instructed the jury in any respect. Fourth, the Court will assess whether the Government engaged in vindictive prosecution. Finally, the Court will analyze whether the Government sufficiently proved its case on the tax counts.

## I.     Brady Violation

As mentioned, the Government has filed a Motion for Findings and Conclusions Regarding Disclosure of Recorded Calls (Dkt. #335), and the Jordans responded. The Jordans also partially base one of their post-verdict motions on the alleged *Brady* violation, urging this Court to grant a new trial on that ground. Because the Court can find no legal basis for issuing findings of fact and

conclusions of law in this context—and the Government provides none—the Court will assess this argument pursuant to the Jordans' motion.

Though previously relayed, the Court reemphasizes the follow facts. The Government disclosed Government Exhibits 298 and 299 to the Defense during the Government's case-in-chief. Both the Government and the Defense agree that the timing of the Government's disclosure of Government Exhibits 298 and 299 was the result of mistake and not bad faith or intentional misconduct. The Government disclosed to Defense counsel Government Exhibit 298C, which is a partial written summary of Government Exhibit 298, in advance of trial. The Government's disclosure of Government Exhibits 298 and 299 occurred during the Jordans' cross-examination of Agent Messer and before the Jordans' case-in-chief, which included the examination of Sarah. After the Government disclosed Government Exhibits 298 and 299 to Defense counsel, the Court recessed the trial for three days to afford the Jordans the opportunity to review the calls and to prepare to use the evidence in trial. Further, the Jordans and the Government played Government Exhibits 298 and 299 for the jury. The Court discusses the legal relevance of these facts below.

By way of background, "[t]here is no general constitutional right to discovery in a criminal case." *Weatherford v. Bursey*, 429 U.S. 545, 559 (1977); *accord United States v. Barrentine*, 591 F.2d 1069, 1077 (5th Cir. 1979). "Rather, discovery in criminal cases is narrowly limited and is largely governed by the Federal Rules of Criminal Procedure." *United States v. Ware*, No. 9:18-CR-43, 2019 WL 2268959 (E.D. Tex. May 24, 2019) (citing *United States v. Fischel*, 686 F.2d 1082, 1090 (5th Cir. 1982)). "Rule 16 is a discovery rule designed to protect defendants by compelling the prosecution to turn over to the defense evidence material to the charges at issue." *Yates v. United States*, 574 U.S. 528, 539 (2015); *see* FED. R. CRIM. P. 16. Specifically, Rule 16(a)(1)(E) requires the disclosure of all documents and other tangible items "within the

government's possession, custody, or control" that (i) are material to preparing the defense; (ii) the government intends to use in its case-in-chief at trial; or (iii) were obtained from or belong to the defendant. FED. R. CRIM. P. 16(a)(1)(E).

In addition to Rule 16 obligations, "[u]nder *Brady* and its progeny, due process requires that the prosecution disclose evidence that is both favorable to the defendant and material to guilt or punishment." *Floyd v. Vannoy*, 894 F.3d 143, 161–62 (5th Cir. 2019) (citing *Brady v. Maryland*, 373 U.S. 83, 87 (1963)). "The Fifth Circuit has stated, '*Brady* is not a discovery rule, but a rule of fairness and minimum prosecutorial obligations.'" *United States v. Serfling*, 504 F.3d 672, 678–79 (7th Cir. 2007) (quoting *United States v. Beasley*, 576 F.2d 626, 630 (5th Cir. 1978)). Thus, "[t]he duty to disclose 'exists irrespective of a request from the defense' and applies to 'all evidence known not just to the prosecutors, but to others acting on the government's behalf in the case, including the police.'" *United States v. George*, 2019 WL 4982324 (E.D. La. Oct. 8, 2019) (citing *Floyd*, 894 F.3d at 161–62).

"To establish a *Brady* violation, a defendant must show: (1) the evidence at issue was favorable to the accused, either because it was exculpatory or impeaching; (2) the evidence was suppressed by the prosecution; and (3) the evidence was material." *United States v. Dvorin*, 817 F.3d 438, 450 (5th Cir. 2016). Notably, the Fifth Circuit has consistently held that evidence turned over to the defense during trial "is not considered to have been suppressed." *Powell v. Quarterman*, 536 F.3d 325, 335 (5th Cir. 2008) (citing *e.g.*, *United States v. Williams*, 132 F.3d 1055, 1060 (5th Cir. 1998); *Lawrence v. Lensing*, 42 F.3d 255, 257 (5th Cir. 1994); *United States v. McKinney*, 758 F.2d 1036, 1049–50 (5th Cir. 1985)). Rather, in such a situation, the district court looks "to whether [the defendant] was prejudiced by the tardy disclosure." *Williams*, 132 F.3d at 1060. The Fifth Circuit has "held that a defendant is not prejudiced if the evidence is received in time for its

effective use at trial." *Powell*, 536 F.3d at 335 (citing *United States v. Walters*, 351 F.3d 159, 169 (5th Cir. 2003)).

The Government urges that it did not suppress any evidence and, therefore, did not violate *Brady* and its progeny (Dkt. #335 at p. 5). The Jordans contend that this Court already found a *Brady* violation and should not "rescind that finding" (Dkt. #341 at p. 21).

The Court first addresses the Jordans' contention that the Court previously found a *Brady* violation. Although the Court did refer to the late disclosure of the recorded calls as a *Brady* violation, "the term '*Brady* violation' is sometimes used to refer to any breach of the broad obligation to disclose exculpatory evidence—that is, to any suppression of so-called '*Brady* material.'" *Strickler v. Green*, 527 U.S. 263, 281 (1999). But, "strictly speaking, there is never a real '*Brady* violation' unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict." *Id.* The Court could not have known at the time whether the evidence would have produced a different verdict because no verdict had been reached. Indeed, the Jordans had not yet begun their case-in-chief. Accordingly, the Court found only that the recorded phone calls included *Brady* material because the content was favorable to the accused. The Court now reaches the question as to whether there was a *Brady* violation.

As previously stated on the record, the Court finds the evidence was exculpatory because it contained statements favorable to the accused (Tr. 2516–26). Specifically, the recorded conversations include statements by Mark denying any wrongdoing, comparing his relationships between Sarah and Laura, and disparaging his ex-wife in regard to her motives and mental state (Tr. 2466–515). The Government does not dispute that this evidence was, at least partially, favorable to the defense (*see* Tr. 2464).

16

The Court also finds that the evidence was not suppressed. As noted, evidence turned over to the defense during trial "is not considered to have been suppressed" so long as the defendant received the evidence in time "for its effective use at trial." *Powell*, 536 F.3d at 335. The Jordans argue that Agent Walton did in fact suppress the evidence and that the Defense was prejudiced by the tardiness (Dkt. #341 at pp. 20–21). Specifically, the Jordans claim they would have carried out markedly different trial tactics had they timely received the two recorded calls: they would have placed a greater focus on Agent Walton; used "a more forceful approach to Karen Jordan as a witness"; and adjusted their opening statement (Dkt. #341 at pp. 20–21). The Government argues that, under Fifth Circuit precedent "evidence that is turned over to the defense *during* trial . . . has never been considered suppressed" (Dkt. #335 at p. 4 (quoting *United States v. Swenson*, 894 F.3d 677, 683 (5th Cir. 2018))).

Because the Jordans effectively used both recorded calls, the tardy disclosure of this evidence did not prejudice them. At the time the recordings were discovered and turned over, the Jordans had yet to begin their case-in-chief. They had not even completed their cross examination of Agent Messer. After the parties played the recordings for the Court, the Court recessed the trial for the remainder of Friday, July 16, 2021. When the trial resumed the following Monday, the Jordans played the recordings for the jury as part of their continued cross examination of Agent Messer (Tr. 2565–637). Importantly, the Jordans also chose not to examine Sarah during the Government's case-in-chief, instead saving her examination for later in the trial (Tr. 2447). When the Jordans called Sarah to the stand again, the recorded calls had already been discovered. This allowed the Jordans to fully examine Sarah with the benefit of the recorded phone calls, which the Jordans in fact used (Tr. 2648–973).

It is not enough for the Jordans to claim they would have changed some trial tactics had

the Government timely turned over the recorded calls. "Mere speculation that a trial might have gone differently is insufficient to show the requisite prejudice from a tardy disclosure." *Swenson*, 894 F.3d at 683 (citing *United States v. Stanford*, 823 F.3d 814, 841 (5th Cir. 2016) (asserting it is "unwise to infer the existence of *Brady* material based upon speculation alone")). Because the Jordans had the opportunity to effectively use the recorded calls during trial, no prejudice occurred. *Id.* Accordingly, the Court finds that the tardy disclosure of the recorded calls was not a *Brady* violation and no "miscarriage of justice" occurred. *See Wright*, 634 F.3d at 775. The Court, therefore, finds no basis for upsetting the verdict under the Rule 33 standard.

## II.    Bribery Charges Under 18 U.S.C. § 666

The Jordans challenge their convictions under § 666 for six reasons. First, they assert that § 666 cannot be constitutionally applied to them; second, that § 666(a)(1)(B) and § 666(a)(2) require proof of a quid pro quo bribery, which the evidence did not support and the Court did not properly instruct; third, that the Government did not prove the requisite receipt of federal benefits under § 666(b); fourth, that the Government did not prove Laura was a city agent under § 666(a)(1) and (a)(2); fifth, that the Court improperly instructed the jury on "corrupt" intent; and sixth, that the Court improperly instructed the jury that sex is a "thing of value." The Court discusses each argument in turn.

### A.  Application of 18 U.S.C. § 666

The Jordans broadly claim that this case presents "issues of entirely local concern that have no federal interest at stake" (Dkt. #347 at p. 4). Therefore, the Jordans argue that, in this case, the application of 18 U.S.C. § 666 unconstitutionally exceeds Congress' authority in that it effectively "turns [§] 666 into an all-purpose federal bribery statute" (Dkt. #347 at p. 4). The Government responds that this defense is both meritless and untimely—if the Jordans wished to attack the

indictment for failure to state an offense, they must have done so prior to trial. The Jordans reply that they do not challenge the indictment but rather the "sufficiency of the facts proven at trial" (Dkt. #373 at p. 6). The characterization of the argument is meaningful. If the Jordans wish to attack the constitutionality of the § 666 bribery statute, the sun may have already set. *See* FED. R. CRIM. P. 12. However, if the Jordans challenge only the sufficiency of the evidence on this count, the argument is not waived and the Court will analyze the sufficiency of the evidence under the previously discussed standard.

The crux of the Jordans' argument on this point is that a conviction under § 666 must relate to federal interests; otherwise the conviction unconstitutionally "upset[s] the proper federal balance" under the Spending Clause (Dkt. #373 at p. 3). But the elements of § 666 do not require the connection to federal funds that the Jordans insist upon. Section 666(a)(1)(B) requires that the Government have proved beyond a reasonable doubt: (1) Laura was an agent of Richardson; (2) Richardson received more than $10,000 in federal assistance in a one-year period; (3) Laura corruptly accepted or agreed to accept anything of value from Mark with the intent to be influenced or rewarded in connection with any business, transaction, or series of transactions of Richardson; and (4) the business, transaction, or series of transactions involved anything of value of $5,000 or more (Dkt. #310 at p. 21). Similarly, under § 666(a)(2), the Government must have proved beyond a reasonable doubt: (1) Laura was an agent of Richardson; (2) Richardson received more than $10,000 in federal assistance in a one-year period; (3) Mark corruptly gave, offered, or agreed to give a thing or things of value to Laura with the intent to influence or reward her in connection with any business, transaction, or series of transactions of Richardson; and (4) the business, transaction, or series of transactions involved anything of value of $5,000 or more (Dkt. #310 at p. 24).

19

Under these elements, the Government need not show a connection between the federal dollars that Richardson actually received and the things of value that Laura accepted from Mark or the business transactions undertaken by the City. Put differently, there is no nexus between the second and third elements because "the conduct prohibited by section 666 need not actually affect the federal funds received by the agency." *United States v. Moeller,* 987 F.2d 1134, 1137 (5th Cir. 1993); *Salinas v. United States*, 522 U.S. 52, 60 (1997) ("The text of § 666(a)(1)(B) . . . does not require the Government to prove federal funds were involved in the bribery transaction."). Rather, the nexus exists within the third element itself, i.e., between the acceptance of the thing of value and the business, transaction, or series of transactions of Richardson. *See Moeller*, 987 F.3d at 1137 ("[T]here must be some nexus between the criminal conduct and the agency receiving federal assistance"); *see also United States v. Whitfield*, 590 F.3d 325, 345 (5th Cir. 2009).

To avoid confronting the waiver of their constitutional argument, the Jordans cloak their dissatisfaction with the "expansive, unqualified" statutory language of § 666 as a sufficiency of the evidence argument. *Salinas*, 522 U.S. at 56. They shift attention away from the statutory elements by focusing on how the statute applies to them in this case, but the application argument is an attack on the operation of the statute—not the sufficiency of the evidence. To be sure, the Jordans argue that the prosecution here concerned "a city's regulation of land use regarding property within its confines, through the exercise of its regulatory zoning power and taxation powers, a well-established and delegable sovereign power of the State," which renders the application of § 666 unconstitutional in this case (Dkt. #347 at pp. 8–9).

The Jordans get one thing right: the prosecution did, partially, concern a regulation of local land use—that is the city transaction portion of the third element under § 666. But that characterization only scratches the surface of this case. *See United States v. Richard*, 775 F.3d 287,

293 (5th Cir. 2014) (concluding that the defendant-appellant's "invocation of the state's interest in education, standing alone, fail[ed] to demonstrate that § 666 is unconstitutional as applied to him"). The prosecution also concerned a city that received more than $10,000 in federal assistance each year[4]—that is the second element—and an alleged bribery pertaining to the city's transaction. The city's transactions under the third element need not relate to the federal assistance under the second element. *See, e.g.*, *Moeller*, 987 F.2d at 1137; *Salinas*, 522 U.S. at 60. Accordingly, the Court will construe the Jordans' argument as a constitutional attack on § 666(a)(1)(B).

The Court must now consider whether the Jordans waived this constitutional argument. The Government asserts they did because Rule 12(b)(3) requires that a motion to dismiss for failure to state an offense must be filed prior to trial. FED. R. CRIM. P. 12(b)(3)(B)(v). In support of this contention, the Government cites to case law suggesting that "a constitutional challenge to a criminal charge, or to the statute on which is rests, is a claim that the charge 'fail[s] to state an offense'" (Dkt. #363 at p. 3 (quoting *Al Bahul v. United States*, 767 F.3d 1, 79–80 (D.C. Cir. 2014))). The Jordans do not respond substantively to this argument.

Whether this defense should have been raised specifically in a motion to dismiss for "failure to state an offense" is immaterial. As the Government recognizes, "the claim still had to be raised before trial because it was 'then reasonably available' and could 'be determined without a trial on the merits'" (Dkt. #363 at p. 4 (quoting FED R. CRIM. P. 12(b)(3))).[5] Since February 26, 2019, the Jordans have been on notice that the Government sought to convict them for § 666 bribery—specifically, that Laura, as mayor, guaranteed favorable votes on apartment development

---

[4] While the Jordans do not contest that Richardson received more than $10,000 in federal assistance each year during the relevant time period, they do argue that the statute requires more than this general showing. The Court discusses this argument *infra* pp. 30–33.

[5] *See* FED. R. CRIM. P. 12, 2014 Adv. Comm. Notes (Rule 12(b)(3) provides a "nonexclusive" list of defects to be raised before trial).

projects in exchange for cash, sex, and luxury hotel stays, among other items and services from Mark. The Jordans had the allegations in the indictment and the statute readily available to them prior to the first trial, much less the second. Further, the Jordans did not need a trial on the merits to make this argument because the Government never intended or needed to prove that the funds Richardson receives from the federal Government are directly tied to the alleged bribes. Put simply, the argument is late.

The Court may still consider an untimely defense when a defendant "shows good cause," FED R. CRIM. P. 12(d), but the Jordans cannot make this showing, nor do they attempt. As mentioned, the Jordans had the allegations in the indictment and the statute readily available to them as early as May 2018. And the Jordans demonstrated the ability to file pretrial motions with other arguments and defenses. Indeed, the Jordans filed a motion to dismiss prior to the first trial (Dkt. #61) and three motions to dismiss prior to the second (Dkts. #249–51). At no point in these motions did the Jordans assert the defense that the § 666 bribery statute is unconstitutional as applied to them. For these reasons, the Court finds the Jordans have not shown good cause that would allow the Court to consider their untimely constitutional argument.

Even if the Court were to consider the merits of the Jordans' constitutional argument, this Court's hands would be tied. The Jordans aver that the Spending Clause does not permit "Congress to reach conduct with no effect on local funds" but that § 666's statutory scheme allows for just that, thereby disturbing the Tenth Amendment. Though the Supreme Court has long wrestled with interpreting the proper scope of the wire fraud statutes,[6] the Court has never supplanted a nexus in the § 666 bribery statute where none exists. In fact, the Supreme Court has explicitly rejected this

---

[6] *See McNally v. United States*, 483 U.S. 350 (1987); *Salinas*, 522 U.S. at 60; *Sabri v. United States*, 541 U.S. 600 (2004); *Sorich v. United States*, 555 U.S. 1204 (2009) (Scalia, J., dissenting) (denying petition for certiorari); *Skilling v. United States*, 561 U.S. 358 (2010); *McDonnell v. United States*, 579 U.S. 550 (2016); *Kelly v. United States*, 140 S. Ct. 1565 (2020).

argument. In *Sabri v. United States*, 541 U.S. 600 (2004), the Court considered "whether 18 U.S.C. § 666(a)(2), proscribing bribery of state, local, and tribal officials of entities that receive at least $10,000 in federal funds, is a valid exercise of congressional authority under Article I of the Constitution." In no unequivocal terms, the Court "h[e]ld that it is." *Id.* at 602.[7]

The Jordans recognize *Sabri*'s broad holding but distinguish it as a rejection of a facial attack on § 666 that does not foreclose an as-applied attack. As a general matter, there is certainly a meaningful distinction between a facial and an as-applied attack on a statute. But the distinction makes no difference in this context. Again, whatever name the Jordans ascribe to their defense— be it a sufficiency of the evidence argument or an as-applied constitutional attack—the substance of what the Jordans argue is directed at the construction of § 666. In the Jordans' view, there simply must be a nexus between the "conduct prohibited by section 666" and "the federal funds received by the agency." *Moeller,* 987 F.2d at 1137. Under current Supreme Court and Fifth Circuit precedent, there is not. "[C]orruption does not have to be that limited to affect the federal interest." *Sabri*, 541 U.S. at 606. At bottom, "[i]t is [] enough that the statutes condition the offense on a threshold amount of federal dollars defining the federal interest." *Id.*

In a last-ditch effort to salvage this argument, the Jordans contend that the conduct at issue in this case actually implicated "no funds" whatsoever because "[t]he City of Richardson and its citizens sustained no monetary loss in this case" (Dkt. #373 at pp. 4–5 (quoting Dkt. #358 ¶ 20)). Therefore, according to the Jordans, § 666 cannot be constitutionally applied to them. This argument again attempts to contravene the statute.

As previously discussed, the Government had four elements to prove under both § 666(a)(1)(B) and § 666(a)(2). Only the latter two elements are relevant here: that Laura corruptly

---

[7] The Court recognizes that the Jordans assert at least a portion of this argument to preserve it for appeal (Dkt. #347 at p. 9, n.7).

accepted or agreed to accept anything of value from any person with the intent to be influenced or rewarded in connection with any business, transaction, or series of transactions of Richardson[8] and that the business, transaction, or series of transactions involved anything of value of $5,000 or more (Dkt. #310 at p. 21). These elements do not require an implication of "funds." The language, rather, is "anything of value," which is "broad in scope" and not restricted in "application to transactions involving money, goods, or services." *United States v. Marmolejo*, 89 F.3d 1185, 1191 (5th Cir. 1996), *aff'd sub nom.*, *Salinas*, 522 U.S. 52. The statute does not even "require that the organization, government, or agency or the person giving the agent the bribe, valued the transaction at $5,000 or more." *Id.*

Under the proper reading of the statute, the Jordans' sufficiency of the evidence argument is irrelevant. To be sure, the Jordans do not claim that the Government failed to prove a series of transactions involving anything of value of $5,000 or more. Nor can they. They submit that "[G]overnment did not prove that the vote on the economic development agreement misused [G]overnment funds" (Dkt. #373 at p. 6). With this theory, the Jordans would have the Court rewrite the statute. But only Congress can do that.

For all these reasons, the Court rejects the Jordans' argument that the application of § 666 in this case is unconstitutional.

### B. Bribery Under § 666

Next, the Jordans assert that their convictions under § 666 cannot stand because the bribery statutes require the Government to prove a quid pro quo bribery, and, in this case, the Government proved only that the Jordans engaged in "after-the-fact gratuities" (Dkt. #347 at p. 10). The

---

[8] And under § 666(a)(2), that Mark corruptly gave, offered, or agreed to give a thing or things of value to Laura with the intent to influence or reward her in connection with any business, transaction, or series of transactions of Richardson (Dkt. # 310 at p. 24).

Government responds that this argument is "way late," as well as "legally and factually flawed" (Dkt. #363 at p. 10).

Importantly, the Jordans notified the Court of a development in the Fifth Circuit that warrants consideration in this case. The Fifth Circuit recently heard oral arguments in *United States v. Hamilton*, No. 21-22257 (Case No. 3:19-cr-83 N.D. Tex.), and subsequently revisited its order denying bail pending appeal. The panel found that the defendant-appellant had raised "significant questions of first impression in this circuit: namely, whether § 666 covers mere gratuities or unofficial acts, and if so, whether his conviction is constitutional in light of certain Supreme Court decisions." *Id.* Accordingly, the Fifth Circuit granted the defendant-appellant's request for bail. The Jordans contend that a ruling in favor of Hamilton "will require this Court to grant a new trial to the Jordans on Counts Five, Six, and Seven," (Dkt. #389 at p. 2), creating reason for a stay of this matter. For the reasons discussed below, the Court finds that § 666 covers both quid quo bribery and gratuities, but in any case, concludes that the Government proved a quid pro quo. Accordingly, the Court will deny the request for a stay of this matter and deny acquittal or a new trial on these grounds.

### 1.  Scope of § 666

The Jordans argue that § 666 requires "proof beyond a reasonable doubt of quid pro quo bribery" but claim the Government "only proved offer and receipt of a 'reward'" (Dkt. #347 at p. 10). The Government responds that "[t]he Court should reject th[is] invitation" and "stay true to the statutory language" of § 666, which criminalizes both quid pro quo bribery and gratuities (Dkt. #363 at pp. 10, 12).

"Courts in applying criminal laws generally must follow the plain and unambiguous meaning of the statutory language. '[O]nly the most extraordinary showing of contrary intentions'

in the legislative history will justify departure from that language." *Marmolejo*, 89 F.3d at 1188 (quoting *United States v. Albertini*, 472 U.S. 675, 680 (1985) (citations omitted)). As mentioned, § 666(a)(1)(B) requires that the Government have proved beyond a reasonable doubt that Laura corruptly accepted or agreed to accept anything of value from any person with the intent to be influenced or rewarded in connection with any business, transaction, or series of transactions of Richardson. Under § 666(a)(2), the Government must have proved that Mark corruptly gave, offered, or agreed to give a thing or things of value to Laura with the intent to influence or reward her in connection with any business, transaction, or series of transactions of Richardson.

Given this language, the majority of circuit courts "have interpreted § 666 to impose criminal liability for both kinds of crime proscribed by [18 U.S.C.] § 201: bribery and illegal gratuities."[9] *United States v. Ganim*, 510 F.3d 134, 150 (2d Cir. 2007); *see also, e.g.*, *United States v. McNair*, 605 F.3d 1152 (11th Cir. 2010); *United States v. Abbey*, 560 F.3d 513, 520 (6th Cir. 2009) (finding "the statute does not require the government to prove . . . a specific act" associated with the bribe because "the text says nothing of a quid pro quo requirement to sustain a conviction, express or otherwise"); *United States v. Zimmerman*, 509 F.3d 920 (8th Cir. 2007) (concluding that under § 666(a)(1)(B) "[t]he government [] was not required to prove any quid pro quo"); *United States v. Hawkins*, 777 F.3d 880 (7th Cir. 2015) (Easterbrook, J.) ("[Section] 666 forbids taking gratuities as well as taking bribes."); *United States v. Jennings*, 160 F.3d 1006, 1013–14 (4th Cir. 1998) (finding "all that must be shown is that payments were made with the intent of securing a specific type of official action or favor in return. For example, payments may be made with the intent to retain the official's services on an 'as needed' basis, so that whenever the

---

[9] 18 U.S.C. § 201 is the federal bribery statute that criminalizes conduct involving federal officials.

opportunity presents itself the official will take specific action on the payor's behalf").[10] "[F]or bribery there must be a quid pro quo—a specific intent to give or receive something of value in exchange for an official act." *United States v. Sun-Diamond Growers of Cal.*, 526 U.S. 398, 404–05 (1999).[11] However, "[a]n illegal gratuity . . . may constitute merely a reward for some future act that the public official will take (and may already have determined to take), or for a past act that he has already taken." *Id.* at 405.

Given the statutory text, the Second Circuit has held that both bribery and gratuities must be implicated by § 666, given "that a payment made to 'influence' connotes bribery, whereas a payment made to 'reward' connotes an illegal gratuity." *Ganim*, 510 F.3d at 150 (citing *United States v. Bonito*, 57 F.3d 167 (2d Cir. 1995)). The Eleventh Circuit has held the same, highlighting that neither subsection of § 666 "contain[s] the Latin phrase quid pro quo" nor "language such as 'in exchange for an official act' or 'in return for an official act.'" *McNair*, 605 F.3d at 1187. Indeed, "nothing in the plain language of § 666(a)(1)(B) nor § 666(a)(2) requires that a specific payment be solicited, received, or given in exchange for a specific official act." *Id.* at 1187–88.

The Jordans aver that the Supreme Court's curb of the wire fraud statutes suggests the § 666 bribery statutes must also be tailored in scope. This argument falls short for two reasons. First, striking illegal gratuities from the scope of the statute's implications "would permit a person to pay a significant sum to a County employee intending the payment to produce a future, as yet unidentified favor without violating § 666." *Id.* at 1188. This result is inconsistent with the

---

[10] The First Circuit sits alone in its interpretation, taking the "statutory context" of § 666 into account "before looking at its specific language." *United States v. Fernandez*, 722 F.3d 1, 20 (1st Cir. 2013). This analysis led the court to conclude that "gratuities are not criminalized under § 666." *Id.* at 26.

[11] In *Sun-Diamond*, the Supreme Court held that § 201 requires proof of a quid pro quo. But that case's "heightened quid pro quo standard is inapplicable to . . . § 666," *Abbey*, 560 F.3d at 521, given the "significant differences in the text" of each statute. *McNair*, 605 F.3d at 1190. Specifically, § 666 does not "contain[] the 'official act' language that the *Sun-Diamond* Court found 'pregnant with the requirement that some particular official act be identified and proved.'" *Abbey*, 560 F.3d at 521 (quoting *Sun-Diamond*, 526 U.S. at 406).

statutory text and Congress' broad intent "in enacting § 666"—that is, "to safeguard 'the integrity of federal funds by assuring the integrity of the organizations or agencies that receive them.'" *Marmolejo*, 89 F.3d at 1192 (quoting *United States v. Westmoreland*, 841 F.2d 572, 576 (5th Cir.), *cert. denied*, 488 U.S. 820 (1988)).

Second, "[t]he requirement of a 'corrupt' intent in § 666" on its own "narrows the conduct that violates § 666," *McNair*, 605 F.3d at 1188, in a way that differentiates the bribery statutes from the wire and mail fraud statutes. *See also, e.g.*, *Abbey*, 560 F.3d at 521 ("[T]he [Supreme] Court's concern with not criminalizing legal gratuities is not relevant here because § 666 contains [] a corrupt intent requirement."); *Hawkins*, 777 F.3d at 882 ("The mail-fraud statute is not as detailed as § 666"). Put differently, "by requiring that the Government prove the existence of a corrupt exchange, the bribery statutes obviate[] the need to demonstrate a direct link between the payments and a particular official act." *Whitfield*, 590 F.3d at 352 (discussing the Second Circuit's holding in *Ganim*, 510 F.3d at 167–47).

The Fifth Circuit's holding in *Whitfield* suggests that the word "corrupt" in § 201 may carry with it the requirement of a quid pro quo. *See* 590 F.3d 325 at 353 ("[T]he jury's finding that there was a corrupt agreement necessarily entailed a finding of an exchange of things of value."). But *Whitfield* did not hold that a quid pro quo bribe is required under § 666. *See id.* As mentioned, the language of § 201 and § 666 differ dramatically. To apply the same treatment to the word "corruptly" in § 666 as that applied in § 201 would "effectively remov[e] the statute's prohibition of taking money as a 'reward.'" *Hawkins*, 777 F.3d at 882.[12] Even in the absence of a quid pro quo requirement, inclusion of the word "corruptly" creates "a triple safeguard against criminalizing

---

[12] In their reply brief, the Jordans contend that *Hawkins* is irrelevant because it "fails to acknowledge that Congress amended [§] 666 to remove the gratuity provision" (Dkt. #373 at p. 8). But Congress has never amended § 666 to remove the word "reward."

innocent acts." *Id.* With this construction, the Jordans "could be convicted only if (a) [Laura] intended to be influenced (that is, to perform some quid pro quo) or rewarded; (b) [Mark] intended to influence or reward [Laura], and (c) [Laura] knew [Mark's] intent." *Id.* For all these reasons, the Court finds that § 666 does not require proof beyond a reasonable doubt of a quid pro quo; the statute also criminalizes corrupt gratuities.

### 2. Sufficiency of the Evidence and Jury Instructions

Along these lines, the Jordans contend that the Government did not prove the requisite quid pro quo and that the jury instructions improperly allowed the jury to convict for mere gratuities. But even if § 666 did not extend to gratuities, the Government presented evidence that established beyond a reasonable doubt the Jordans' "specific intent to give or receive something of value in exchange for an official act." *Sun-Diamond*, 526 U.S. at 404–05. As an initial matter, the Court properly instructed the jury under § 666. The Court's instructions simply reproduced the Fifth Circuit's pattern instructions, which track the statutory language of § 666. *See United States v. Harris*, 740 F.3d 956, 965 (5th Cir. 2014) (holding the district court did not err in submitting jury instructions that tracked the statutory language). Nonetheless, should the Fifth Circuit later conclude that its own instructions were legally erroneous, the Court finds "beyond a reasonable doubt that the jury verdict would have been the same absent the error." *United States v. Cessa*, 785 F.3d 165, 186 (5th Cir. 2015) (internal citations and quotations omitted); *see also Ganim*, 510 F.3d at 151 (finding it "unlikely that including the word ['reward'] had any effect at all, much less one affecting the outcome of the district court proceedings" (internal citations omitted)).

This was a bribery case. From the outset, the Government centered its theory of prosecution on quid pro quo bribery, and the Defense sought to hold the Government to proving a quid pro quo beyond a reasonable doubt. In *voir dire*, the Defense told the jury panel that, in this case, the

Government "specifically . . . ha[d] to prove . . . there was a quid pro quo" (Tr. 206). The Defense explicitly stated to the panel:

> You heard that fancy word, meaning in exchange for an official act. If you're the mayor, in exchange for your official act I am giving you something and I am receiving in exchange of your official act, your vote. They have to prove bribery. Not just that I gave you a gift. . . . the giver has to give the gift with the specific intent to—a corrupt intent to get your vote. The receiver has to say, I will thank you for that gift, I appreciate that, and I'm going to take it, and I'm going to—in exchange, I'm going to give you my vote. Okay. It has to be that person's intent to receive it corruptly in exchange for their vote"

(Tr. 206–07). In their opening statements, the Defense repeated that the Government "ha[d] to prove quid pro quo, in exchange for. That Laura accepted something from Mark [] in exchange for her vote, and they have to prove that beyond a reasonable doubt, and there wasn't a legitimate reason for her vote" (Tr. 321). The Defense further opined to the jury that "[t]here must be an agreement to exchange something of value for an official act" (Tr. 333).

Closing arguments regurgitated these themes. The Government described how Laura's conduct "shattered" people's "hopes," "expectations," and "trust" as she "took trip after trip after trip, she made deposit after deposit after deposit, she told lie after lie after lie in exchange for vote after vote after vote" (Tr. 3739). Never once did the Government assert that the jury need only find a gratuity, nor did the Court use the word "gratuity" in its instructions (Dkt. #310). In fact, nowhere in the 4,000 page trial transcript does the concept of "gratuities" ever appear. To be sure, the Supreme Court has explained that "[a]n illegal gratuity . . . may constitute merely a reward for some future act that the public official will take (and may already have determined to take), or for a past act that he has already taken." *Sun-Diamond*, 526 U.S. at 405. But this Court never instructed the jury on the meaning of the term "reward" as included in § 666's statutory text or the Fifth Circuit's pattern instructions. The Court, therefore "cannot conclude that the charge as given permitted the jury to convict on a gratuities theory," as the "jury would not have understood

the word 'reward' to have any particular legal meaning beyond that ascribed to it in the instructions." *Ganim*, 510 F.3d at 151.

Moreover, the Defense argued the "real issue" to the jury in its closing argument: "Was there a bribe? Let's talk quid pro quo . . .  quid pro quo is required. . . . That's what they ha[d] to prove, and that's why they f[e]ll short in this case" (Tr. 3779–85). The jury, however, disagreed with Defense that the Government's case fell short, finding both the Jordans guilty under § 666.

The evidence at trial supports this verdict and supports that the jury found a quid pro quo. Laura platformed her mayoral campaign on a stance against zoning for or building new apartments near neighborhoods.[13] Laura received support from constituents partially because of her "no to apartments" platform. Laura became acquainted with Mark, the Palisades developer, some time in close proximity to the first zoning vote. Mark and Laura sent private emails about Mark's zoning proposal and constituents' disapproval of the proposed rezone. Laura forwarded emails to Mark from dissenting constituents, and Mark directed the substance of Laura's responses to such emails. Prior to the first zoning vote, the jury heard evidence that Laura "was taking bullets for" Mark when "the [P]rairie [C]reek mob" vocally opposed the potential rezoning of the Palisades. In total, 126 individuals expressed their opposition to the rezoning, while only nine supported the changes. On December 9, 2013, notwithstanding her campaign platform and the public outcry, Laura voted in favor of rezoning the Palisades to support the development of 600 apartments (Tr. 897–971).

While the Jordans argue that the most favorable reading of the evidence only "demonstrate[s] gratuities given to Laura [] after her votes, with no promised exchange beforehand," this assertion ignores the subsequent City Council votes pertaining to the Palisades (Dkt. #347 at pp. 13–14). The jury heard evidence that, in January 2014, Mark began showering

---

[13] The Jordans object to this fact as it is described in the Presentence Investigation Reports (Dkts. #382, 384), but the evidence at trial supports this statement, including witness testimony and one of Laura's campaign brochures.

Laura with things of value, all while he continued pressing the City to vote in favor of expansive development. On January 14, 2014, Laura and Mark took a weekend trip to a ski resort in Utah during which Mark charged over $7,000 to his Sooner company card. On January 27, 2014, Laura voted in favor of an amended zoning change to the Palisades. In April 2014, Mark and Laura went to Los Angeles and stayed at the CordeValle, where they checked in as "Mr. and Mrs. Mark Jordan" (Dkt. #313, Exhibit 68). The next month, during a meeting with City officials, Mark requested an increase of permissible apartments from 600 units to 1,400 units within the Palisades. On June 9, 2014, the City Council convened to vote on the matter. Only one individual supported the zoning change while 651 individuals expressed their opposition to increasing the number of apartments. Despite the Richardson constituents' clear message, Laura and the City Council voted to increase permissible apartment units on the Palisades from 600 to 1,090.

Between June 25, 2014 and September 18, 2014, Mark and Laura went back to Los Angeles, as well as to Laguna Beach and Destin. Mark charged the hotel stays and certain other costs as business expenses. On September 22, 2014, the City Council, including Laura, unanimously voted to allow the City Manager to negotiate and execute an Economic Development Incentive Agreement ("EDIA") with JP Realty Partners regarding the Palisades. Mark and the City Manager executed the EDIA on April 29, 2015, and May 7, 2015, respectively. The terms of the EDIA allowed for the project to receive $47 million in reimbursements for construction and infrastructure expenses and a 25-year 50 percent tax rebate for infrastructure costs.

On March 2, 2015, some weeks prior to the execution of the EDIA and while Laura was mayor, Mark offered Laura a leasing agent position with Sooner that included a signing bonus of $15,000, an annual salary of $150,000, and discretionary and year-end bonuses. The former leasing agent, whose position Laura accepted on March 15, 2015, was licensed by the State of Texas Real

Estate Commission and earned a yearly salary of $70,000. Laura, on the other hand, did not have a real estate license, education, or experience relevant to leasing commercial property. Moreover, between September 9, 2014, and February 23, 2015, Mark made $25,900 in cash withdrawals from his bank account and wrote Laura a check for $40,000. Between September 9, 2014, and February 24, 2015, Laura deposited a total of $58,489 into the bank accounts that she kept private from Michael during their marriage, which lasted until January 2015. The jury also heard evidence that Sooner funded Laura's $24,030 home remodeling, which commenced in October 2015. Indeed, the jury heard evidence that Mark told his then-wife, Karen, that he was funding the remodel of Laura's house because they "owe[d] her a lot. She'[d] made [them] a lot of money" (Tr. 932).

At trial, the jury also heard evidence that Laura intentionally deleted incriminating emails between she and Mark which served to disguise the nature of their relationship and would have impacted any investigation into unethical or criminal behavior. The jury also heard testimony that Laura's and Mark's lawyers advised the two to marry after the FBI launched its investigation.

The most basic view of the evidence establishes that Mark and Laura began secretly communicating about the Palisades, the zoning votes, and the Richardson constituents before the first vote to rezone on December 9, 2013; that Laura, in handling the outcry from her constituents took bullets "for" Mark; that Mark began providing things of value to Laura in January 2014; that Laura voted in favor of the Palisades development on two subsequent occasions; that Mark continued providing things of value to Laura; that Laura subsequently voted to allow the City Manager to negotiate a reimbursement for the Palisades development; and that Mark believed he and Karen owed Laura a lot because Laura had made them a lot of money. If this were not enough, the evidence also proved that, throughout this entire time period, Mark and Laura directly lied to their spouses, their close friends, and their colleagues about their relationship and their money, and

they also concealed the conflict of interest from the people and the local government of Richardson.

Such ample evidence established beyond a reasonable doubt "a specific intent to give or receive something of value in exchange for an official act." *Sun-Diamond*, 526 U.S. at 404–05. Accordingly, the jury found a quid pro quo. Further, this trial revolved around whether there was a quid pro quo between the Jordans with no mention of gratuities at any point. Thus, to the extent that the jury, as instructed, could have convicted the Jordans without finding a quid pro quo, the Court concludes that "the jury verdict would have been the same" even with a specific quid pro quo instruction. *Cessa*, 785 F.3d at 186. Consequently, the Court finds that the Government sufficiently proved quid pro quo bribery under §§ 666(a)(1)(B) and (a)(2). Further, because the Jordans have not shown that the jury instructions adversely affected any of their "substantial rights," *Wall*, 389 F.3d at 466, the Court finds no "miscarriage of justice" occurred. *See Wright*, 634 F.3d at 775. In sum, the Court finds no basis for upsetting the verdict under the standards of Rule 29 or Rule 33.

### C.  Receipt of Federal Benefits Under § 666(b)

Next, the Jordans argue that the Government failed to prove the requisite receipt of federal benefits under § 666(b). Specifically, the Jordans contend that the statute requires more than just a general showing of assistance exceeding $10,000 in a one-year period; rather, the statute requires "benefits" directly connected with "a federal program involving a grant, contract, subsidy, loan, guarantee, insurance, or other form of [f]ederal assistance" (Dkt. #347 at p. 17). The Government responds that this argument is not only too late, but also meritless.

Liability under § 666 "is predicated upon a showing that the defrauded organization 'receive[d], in any one period, benefits in excess of $10,000 under a Federal program' . . . in the

form of 'a grant, contract, subsidy, loan, guarantee, insurance, or other form of Federal assistance.'" *Fischer v. United States*, 529 U.S. 667, 676 (2000); *see also Richard*, 775 F.3d at 293; *Sabri*, 541 U.S. 600. The Jordans argue that *Fischer* tightened the requirements for proving the "benefits" under § 666—that is, "an examination must be undertaken of the program's structure, operation, and purpose" and the "inquiry should examine the conditions under which the organization receives the federal payments." *Fischer*, 529 U.S. at 681.

In the years immediately following *Fischer*, some courts understood its reasoning to require a type of nexus between the conduct criminalized in § 666 and the federal funds. *See United States v. Suarez*, 263 F.3d 468, 489 (6th Cir. 2001) ("The best reading of the *Fischer* and *Salinas* cases seems to be that the Supreme Court does not want" § 666 to become "a generalized "anti-corruption statute under the spending power" (internal citations omitted)). But just four years after *Fischer*, the Supreme Court explicitly determined that no such nexus was required because "proscribing bribery of state, local, and tribal officials of entities that receive at least $10,000 in federal funds, is a valid exercise of congressional authority." *Sabri*, 541 U.S. at 602. Cases holding otherwise were, thus, abrogated. *See, e.g.*, *United States v. Zwick*, 199 F.3d 672 (3d Cir. 1999); *United States v. Santopietro*, 166 F.3d 88 (2d Cir. 1999).

The legal interpretation of "benefits" directly impacts the scope of § 666 as a whole. *See, e.g.*, *United States v. Keen*, 676 F.3d 981, 990 (11th Cir. 2012) (describing that the Supreme Court's "recognition of [Congress'] ambitious objective . . . has led the Court repeatedly to reject statutory constructions aimed at narrowing § 666's scope, in favor of a broad reading"). Notably, however, the Jordans do not frame their argument regarding "benefits" as a jurisdictional or constitutional attack on the scope of § 666. Instead, the Jordans pursue a sufficiency of the evidence argument, which fails for the following reasons.

First, the Jordans did not object to the jury instructions regarding the definition of the word "benefit."[14] The Court instructed the jury that the Government had to prove beyond a reasonable doubt "[t]hat the City of Richardson was a local government that received in any one-year period, benefits in excess of $10,000 under a federal program involving a grant, contract, subsidy, or other form of federal assistance" (Dkt. #310 at p. 21). Further, the Court instructed "[i]t is not necessary to prove that the defendant's conduct directly affected the federal funds received by the agency under the federal program" but that "there must be some connection between the criminal conduct and the local government receiving federal assistance" (Dkt. #310 at p. 22). The Jordans cannot now move the goal post by insisting that the Government must have proved something the jury was not instructed to find.

Second, the jury did not need to find any more than it was instructed to convict under § 666. The Court's instructions simply reproduced the Fifth Circuit's pattern instructions, which properly required the jury to find only what § 666 explicitly demands and Supreme Court jurisprudence calls for. FIFTH CIRCUIT PATTERN INSTRUCTIONS (CRIMINAL CASES) 2.33B, 2.33C (2019). As the Government notes, *Fischer* did not create additional fact requirements that a jury must always consider to find beyond a reasonable doubt that the entity in question received federal benefits in excess of $10,000. To be sure, "*Fischer* turned on . . . whether to characterize certain forms of federal aid as 'benefits.'" *Suarez*, 263 F.3d at 490. The federal aid at issue in *Fischer* was assistance provided to organizations participating in a particular Medicare program. The petitioner in *Fischer* argued "that the Medicare program provide[d] benefits to the elderly and disabled but not to the

---

[14] The Jordans, in their objections to the jury instructions, "acknowledge[d] the Fifth Circuit caselaw which provides that the 'in excess of $10,000 requirement' is satisfied by proof that the municipality received that amount under a Federal program in any one-year period" but "to preserve the issue for any further review, the Defendants submit[ted] that a connection or tie must be shown between the alleged criminal conduct and a local program receiving the federal funds" (Dkt. #308 ¶ 8).

health care organizations," thereby disqualifying the funds from the reach of § 666. *Fischer*, 529 U.S. at 676. Because of this specific argument, "[t]he nature and purposes of the Medicare program g[a]ve [the Court] essential instruction in resolving" whether funds that are designed to benefit Medicare recipients also "benefit" the Medicare provider. *Id.* at 671.

Here, the Jordans do not contend that Richardson received no federal benefit during a one-year period, so an inquiry into the type of assistance the federal government gave to Richardson is irrelevant. The Government had to prove beyond a reasonable doubt only "[t]hat the City of Richardson was a local government that received in any one-year period, benefits in excess of $10,000 under a federal program involving a grant, contract, subsidy, or other form of federal assistance" (Dkt. #310 at p. 21). It did. The Jordans even provide the relevant evidence in their motion: The City's director of finance testified that Richardson received $985,000, $931,000, and $337,000 in federal assistance for fiscal years 2013, 2014, and 2015 respectively (Dkt. #347 at pp. 14–15 (quoting Tr. 440–45)). With this evidence alone, the jury's findings were reasonable. Accordingly, the Court will not acquit the Jordans or grant a new trial on this ground.

### D.  Agent Under § 666

The Court instructed the jury that, under § 666, it had to find that Laura "was an agent of the City of Richardson," and that the term agent "means a person authorized to act on behalf of another person, or a government and, in the case of an organization or government, includes a servant, employee, or representative" (Dkt. #310 at pp. 21–22, 24–25). The Jordans argue that the Government was required, yet failed, to establish that Laura, as mayor, was an agent of Richardson that had authority to act with respect to funds (Dkt. #347 at p. 18). Specifically, the Jordans submit that the Government "presented no evidence that Laura [] could sign contracts, hire or fire employees, or exercise broad authority over the [C]ity or its funds" (Dkt. #373 at p. 12).

As an initial matter, the Jordans did not object to the definition of "agent" in the jury instructions. The definition in the instructions is not dependent upon a connection between the person authorized to act and control over "funds." Again, the Jordans cannot now insist that the Government have proved something the jury was not instructed to find.

Even if the Jordans had timely objected to the instructions, Supreme Court precedent strongly suggests that § 666 does not require the requisite "agent" have direct or indirect authority over "funds." The Fifth Court held in *United States v. Phillips* that "[w]ithout an agency relationship to the recipient of federal funds, § 666 does not reach the misconduct of local officials." 219 F.3d 404, 413 (5th Cir. 2000). This holding rests on the same reasoning applied in *Foley* and *Zwick*—the cases abrogated by *Sabri*. As discussed, *Sabri* affirmed that no nexus is required between the conduct prohibited by § 666 and the federal funds received by the agency. Rather, the nexus exists between the conduct prohibited by § 666 and the agency that receives federal funds.

Further, post-*Sabri,* courts have rejected the very argument that the Jordans proffer here, as "[n]either the statutory language nor constitutional principles lead to such a restricted understanding of the provision." *Fernandez*, 722 F.3d at 10; *see also Keen*, 676 F.3d at 989–90 ("Nowhere does the statutory text either mention or imply an additional qualifying requirement that the person be authorized to act specifically with respect to the entity's funds."). Even the Fifth Circuit has declined to apply *Phillips* in more recent cases. *See Whitfield*, 590 F.3d at 345 ("[S]o long as there is a nexus between the criminal conduct and the agency, the lack of a direct connection between the [] funds under the [defendants'] control and the federal funds in question does not preclude them from being considered agents . . . for the purposes of [§] 666.").

Relatedly, the Court rejects any contention that, to be considered an agent, Laura must have exercised authority over city funds. This argument mirrors the Jordans' assertion previously rejected by this Court: that § 666 cannot be constitutionally applied to them because  the conduct at issue in this case actually implicated "no funds" whatsoever. For the same reasons previously discussed, this argument fails. *See supra*, pp. 23–24. Consequently, the Court finds that § 666 "merely requires that the individual be 'authorized to act on behalf of another person or government.'" *Fernandez*, 722 F.3d at 10 (quoting § 666(d)(1)).

Therefore, only one question remains on this point: whether the Government proved that Laura was authorized to act on behalf of Richardson. The jury instructions specifically provided that, in the case of a government, an "agent" includes a servant, employee, or representative. This instruction not only reproduced the Fifth Circuit's pattern instructions but is a direct quote from the statutory text. FIFTH CIRCUIT PATTERN INSTRUCTIONS (CRIMINAL CASES) 2.33B, 2.33C (2019); § 666(d)(1). By its terms, the statute necessarily includes a mayor—who is elected as a representative—in the definition of "agent." To hold otherwise would create "tension with the plain language of the statute." *United States v. Ollison*, 555 F.3d 152, 160 (5th Cir. 2009) (analyzing who qualifies as an "agent" under § 666). Thus, by presenting evidence that Laura was elected mayor of Richardson and represented the City during the relevant time period, the Government sufficiently proved that Laura was an agent of Richardson.

### E.  Jury Instructions § 666

Finally, the Jordans argue that the Court improperly instructed the jury on the elements of § 666 in two ways: (1) by qualifying the definition of "corruptly"; and (2) by including that "sex" constitutes a "thing of value."

"District courts enjoy substantial latitude in formulating a jury charge." *United States v. Webster*, 162 F.3d 308, 321–22 (5th Cir. 1998). "It is well-settled that a district court does not err by giving a charge that tracks this Circuit's pattern jury instructions and that is a correct statement of the law." *United States v. Turner*, 960 F.2d 461, 464 (5th Cir. 1992). In reviewing jury instructions, the Fifth Circuit "consider[s] whether the [challenged] instruction, taken as a whole, is a correct statement of the law and whether it clearly instructs jurors as to the principles of law applicable to the factual issues confronting them." *United States v. Ebron*, 683 F.3d 105, 151–52 (5th Cir. 2012) (citing *Whitfield*, 590 F.3d at 347). With this framework, the Court discusses each argument.

### 1.   The Instruction on "Corruptly"

On Counts Six and Seven, the Court instructed the jury that:

> An act is "corruptly" done if it is done intentionally with an unlawful purpose. The fact that an act is motivated, in part, by friendship or a romantic interest is no defense. Actions taken with a dual motive constitute bribery so long as one of the motives is to influence or reward the public official. It is no legal defense that the official acts were good for the community or were acts that the public official would have or should have taken without the bribe. On the other hand, if actions were entirely motivated by legitimate reasons, like romantic interest, then they do not constitute bribery

(Dkt. #310 at pp. 22–23, 25). The Jordans contend that this instruction qualified the requisite "corrupt" intent, thereby shifting the burden of proof to the Jordans.

The Court previously rejected this argument when the Jordans raised objections to the jury instructions, as the instruction taken as a whole is a correct statement of the law. The Fifth Circuit pattern instructions only include the first sentence of this Court's instructions: that an act is "corruptly" done if it is done intentionally with an unlawful purpose. 2.33B, 2.33C (2019). The additional instructions are derived from case law in this circuit and in others. The Fifth Circuit has found consistent with precedent instructions that state "[i]t is not a defense to claim that a public

official would have lawfully performed the official action in question even without having accepted a thing of value." *United States v. Nagin*, 810 F.3d 348, 351 (5th Cir. 2016); *United States v. Grace*, 568 Fed. App'x 344, 349–50 (5th Cir. 2014), *as revised* (May 22, 2014) (affirming jury instruction on the grounds that "[i]t is enough that [defendant] took the money with the knowledge that it was intended to influence him, even if he would have written the Letters without the payment").

Other circuit courts have found similarly. Reviewing instructions pursuant to a § 666 charge, the Third Circuit indicated that "the [d]istrict [c]ourt thoroughly explained the mens rea required for a 'corrupt intent'" by instructing the jury to "remember that it is the defendant's intent, at least in part, to be influenced or rewarded, which is important." *United States v. Plaskett*, 355 Fed. App'x 639, 643–44 (3d Cir. 2009); *see also McNair*, 605 F.3d at 1193 ("An act is done 'corruptly' if it is performed voluntarily, deliberately, and dishonestly, for the purpose of either accomplishing an unlawful end or result or of accomplishing some otherwise lawful end or lawful result by an unlawful method or means."). Further, the Court's instructions align with a well-settled principle regarding specific-intent crimes like bribery: a defendant "may properly be convicted if his intent to commit the crime was *any* of his objectives." *United States v. Technodyne LLC*, 753 F.3d 368, 385 (2d Cir. 2014) (citing *Anderson v. United States*, 417 U.S. 211, 226 (1974) (emphasis added)). This is so even if that objective is only "a minor one." *Ingram v. United States*, 360 U.S. 672, 679–80 (1959).

The Court's instructions did not shift any burden to the Jordans. The instructions required the jury to find beyond a reasonable doubt that the Jordans acted with the necessary mens rea. The instructions also provided important guidance consistent with precedent. Without the additional instructions, for example, the jury might have considered whether lawful explanations outweighed

the Jordans' unlawful intent. Such a possibility actually places an improper burden on the Government to disprove all possible objectives at play in establishing corrupt intent. That is not the law.

Importantly, the Jordans were free to argue that they had only lawful explanations for their conduct, and the jury instructions permitted the jury to consider such. Indeed, the Court instructed that "actions [] entirely motivated by legitimate reasons, like romantic interest, . . . do not constitute bribery" (Dkt. #310 at pp. 23, 25). This instruction did not place an improper burden on the Jordans; rather, the instruction ensured the jury hold the Government to its burden of proving corrupt intent. To be sure, if the Jordans had presented *zero* evidence, the instructions on this element would have still allowed for the jury to find the Jordans actions were entirely motivated by legitimate reasons that could not support a guilty verdict under § 666. Because the Court properly instructed the jury on this element, the Court finds no basis to acquit or to grant the Jordans a new trial on this ground.

### 2. The Instruction on Sex as a Thing of Value

The Court instructed the jury that "'value' means the face, par, market value, or cost price, either wholesale or retail, whichever is greater" and that "'[a]nything of value' includes intangible items, such as furnishing sexual services" (Dkt. #310 at pp. 22, 25). The Jordans contend that "'sex as a bribe' . . . is indefinite and far-fetched" and "an inadequate stand-alone basis for conviction" (Dkt. #348 at p. 5).

The Court's instruction correctly stated the law. The Fifth Circuit has found that "intangibles," including sexual services, constitute a "thing of value" under § 666 and can be used to support the $5,000 value threshold the statute requires. *See Marmolejo*, 89 F.3d at 1192–94. Moreover, "sex" did not stand alone as the only "thing of value" for the jury to consider. As the

42

Government recognizes, the sexual relations between Mark and Laura were not the primary focus of the evidence put on at trial. Indeed, the Government presented evidence that Mark treated Laura to extravagant vacations, remodeled her home, and gave her a job offer with a six-figure salary for a position she was unqualified to fill. In total, Laura received from Mark over $131,722.53 in benefits, the $150,000 salary not included. The jury could reasonably have determined all these benefits established that Mark corruptly gave, offered, or agreed to give a thing or things of value to Laura and that Laura corruptly accepted or agreed to accept anything of value from Mark.

Because the Court properly instructed the jury on this element, the Court finds no basis to acquit or to grant the Jordans a new trial on this ground.

### III.     Limiting Instruction

The Jordans next assert that the Court erred in admitting evidence of ethics training that Laura received without giving a contemporaneous limiting instruction. At trial, the Government began probing Laura about her ethics training on cross examination. The Defense objected on relevancy grounds (Tr. 3596). The Court overruled the objection but, in that moment, instructed the jury that "of course, an ethical violation, if there is one, is not a crime. But I'm allowing the [G]overnment to probe this area" (Tr. 3596). The Defense then asked for a limiting instruction. In response, the Court stated, in the presence of the jury: "Well, I think I—I think I just said that, but I'll repeat it again—is, of course, I have given the [G]overnment the ability to probe any issues of ethical violations. An ethical violation is not a crime" (Tr. 3597).

The Court's final instructions included the Jordans' requested limiting instruction:

> You also heard testimony from witnesses on their personal views of ethical responsibilities. An individual's views of ethical responsibilities are not necessarily the same as legal responsibilities. You may consider testimony about ethical responsibilities for the limited purpose of helping you determine, if it does, the defendants' state of mind. You may not consider such testimony for any other purpose whatsoever

(Dkt. #310 at p. 10). The Jordans deem these instructions insufficient, arguing the Court should have given this exact instruction at the time the evidence was received at trial. The Court disagrees. While the semantics between the Court's instruction and the Jordans' requested instruction may differ, there is no substantive difference between the two. The Court sufficiently instructed the jury that an ethical violation is not a crime at the time the evidence was offered. And in any case, the final instructions were sufficient to prevent the jury from assigning an improper role to the evidence of Laura's ethical responsibilities. Accordingly, the Court finds no basis to acquit or to grant the Jordans a new trial on this ground.

## IV.    Vindictive Prosecution

Next, the Jordans ask the Court to dismiss Counts Eight through Twelve because the Government's addition of these charges constituted vindictive prosecution. "To punish a person because he has done what the law plainly allows him to do is a due process violation 'of the most basic sort.'" *United States v. Goodwin*, 457 U.S. 368, 372 (1982) (quoting *Bordenkircher v. Hayes*, 434 U.S. 357, 363 (1978)). "Thus, a prosecutor may not increase the charge against a defendant solely as a penalty for invoking a right, such as pursuing an appeal." *United States v. Saltzman*, 537 F.3d 353, 359 (5th Cir. 2008). "The defendant has the burden of proving, by a preponderance of the evidence, prosecutorial vindictiveness." *Id.* When a defendant meets this burden, the court will apply a "presumption of vindictiveness" that the Government must overcome by showing "objective evidence in the record justifying the increased sentence." *Id.*

Here, the Jordans argue that the Government added the tax charges in retaliation for the Jordans' successful motion for new trial (affirmed by the Fifth Circuit) and engaged in "unreasonably hostil[e]" conduct that "follow[ed] an earlier pattern of overzealous investigation and prosecution" (Dkt. #352 at p. 3). Based on these assertions, the Jordans submit that the

44

Government's conduct is "presumptively vindictive," and, accordingly, it is the Government's burden to present evidence of an "objective event" that justified the subsequent addition of these tax counts (Dkt. #352 at p. 4). The Government responds that the vindictive prosecution claim is untimely and meritless. In reply, the Jordans concede that their argument is late, but, nonetheless, claim the argument is not waived—just that "the plain error standard applies" (Dkt. #373 at p. 14).

As an initial matter, the Court is unsure what to make of the Jordans' suggestion that a plain error standard applies. While the Fifth Circuit will review an "unpreserved claim of prosecutorial vindictiveness for plain error," *United States v. Salazar*, 764 Fed. App'x 424, 425 (5th Cir. 2019), there is no decision for this Court to review. Instead, the Court will consider whether the Jordans show "good cause" for failing to raise vindictive prosecution before trial. *See* FED. R. CRIM. P. 12(b)(3) and 12(c) (including "selective or vindictive prosecution" in the non-exhaustive list of "motions that must be made before trial"). Because the claim was reasonably available to the Jordans prior to the second trial, the Court finds the Jordans cannot show good cause.

As mentioned, the Government added tax charges against the Jordans prior to the second trial. Even the Jordans recognize this decision did not come out of thin air. The Government had pursued adding possible tax counts against the Jordans prior to the commencement of the first trial and before the grand jury returned the original indictment in May 2018. But the USAO decided it would not pursue the tax charges further because approvals from the Department of Justice would have taken too long.

When the Jordans filed a motion for new trial, the Government recognized "a realistic possibility that the Jordans' convictions would be overturned" and anticipated "that any [new] trial setting would likely be distant []especially since whichever party lost on the motion for new trial

would likely appeal[]" (Dkt. #363 at p. 40). Awaiting the outcome, the Government "re-approached the IRS about the possible pursuit of tax charges" (Dkt. #363 at p. 40). This Court granted the Jordans' motion for new trial on May 2, 2019. Discussions about potential resolutions and plea deals ensued but were unsuccessful. On May 24, 2019, the Government relayed to Defense counsel that it was the Government's "intent to present to the grand jury a superseding indictment including tax fraud counts related to both defendants" (Dkt. #363 at 42). On May 28, 2019, the Government appealed the Court's order granting a new trial. On May 1, 2020, a panel of the Fifth Circuit affirmed the Court's decision. Potential settlement conversations resumed, but to no avail. The grand jury returned the second superseding indictment adding the tax charges on December 9, 2020.

Since December 9, 2020, the Jordans have had all the tools at their disposal to bring a vindictive prosecution claim. But the Jordans made no mention of prosecutorial vindictiveness until October 14, 2021—nearly three months after the jury rendered a verdict against the Jordans and a year and a half after they had all the relevant information to make such a claim. For these reasons, the Court finds that the Jordans forfeited any claim of vindictive prosecution in this matter. Consequently, the Court declines to consider the merits of this argument and denies the Jordans' motion to dismiss on this ground.

## V.      Sufficiency and Weight of the Evidence: Tax Charges

In their final post-trial motion, the Jordans request that the Court enter a judgment of acquittal under Rule 29 because the Government did not present sufficient evidence to uphold the verdict. In the alternative, the Jordans request a new trial under Rule 33 because the evidence related to the tax charges (Counts Eight through Twelve) "weighs against conviction" (Dkt. 373 at p. 27).

As previously iterated, a review of the sufficiency of the evidence assesses "whether, viewing the evidence in the light most favorable to the verdict, a rational [finder of fact] could have found the essential elements of the offense charged beyond a reasonable doubt." *Boyd*, 773 F.3d at 644 (first citing *Jackson*, 443 U.S. at 319; then citing *Miller*, 588 F.3d at 907). "The standard does not require that the evidence exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt, provided a reasonable trier of fact could find that the evidence establishes guilt beyond a reasonable doubt." *Loe*, 262 F.3d at 432.

However, Rule 33 grants the Court discretion to weigh the evidence in determining whether the "interests of justice" warrant a new trial:

> Setting aside a jury's guilty verdict . . . may be appropriate under circumstances where the evidence brought forth at trial . . . tangentially support[s] a guilty verdict, but in actuality, preponderates sufficiently heavily against the verdict such that a miscarriage of justice may have occurred.

*United States v. Herrera*, 559 F.3d 296, 302 (5th Cir. 2009) (internal citations and quotations omitted)). This discretion is accompanied with parameters. It is not the Court's role to "entirely usurp the jury's function." *Id.* (quoting *Tarango*, 396 F.3d at 672). To do so would strip "meaning [from] the concept of 'miscarriage of justice.'" *Wall*, 389 F.3d at 466. Rather, the Court weighs the evidence as a "thirteenth juror," *Herrera*, 559 F.3d at 303, under the backdrop that the authority to grant a new trial "be invoked only in exceptional cases." *United States v. Robertson*, 110 F.3d 1113, 1118 n.11 (5th Cir. 1997) (quoting *United States v. Sinclair*, 438 F.2d 50, 51 n.1 (5th Cir. 1971)); *see also, e.g.*, *Smith*, 804 F.3d at 734 (indicating the district court should review a motion for new trial "with great caution"); *Tarango*, 396 F.3d at 672 (stating the court should not grant a new trial except in "extraordinary circumstances"); *Scroggins*, 379 F.3d at 253 (same).

Under these standards, the Court will review the evidence related to the tax charges and, accordingly, determine whether sufficient evidence supports the convictions or, in the alternative, whether the interests of justice warrant a new trial.

As an initial matter, a theme exists in this portion of the Jordans' post-trial motions: blatant disregard of the circumstantial evidence presented to the jury at trial. In the Jordans' view, nothing short of a smoking gun is sufficient to sustain a conviction. But Fifth Circuit "case law makes clear that the standard of review for sufficiency of circumstantial evidence is the same as it normally would be for direct evidence." *United States v. Moreno-Gonzalez*, 662 F.3d 369, 372 (5th Cir. 2011) (citing *United States v. Lage*, 183 F.3d 374, 382 (5th Cir. 1999)). Further, in weighing the evidence, the Court may consider both direct and circumstantial evidence and draw reasonable inferences therefrom. *See United States v. Cardenas*, 9 F.3d 1139, 1156 (5th Cir. 1993); *Richardson*, 848 F.2d at 511; *United States v. Lorence*, 706 F.2d 512, 518 (5th Cir. 1983)). Applying the applicable legal standards and considering both direct and circumstantial evidence, the Court finds that neither acquittal nor a new trial is appropriate in this case.

The Government presented evidence that Laura did not report certain transfers as income on her 2014 and 2015 tax returns. In her 2014 tax return, Laura did not report as income a $40,000 check from Mark, the $24,000 home renovation that Mark funded, or the approximately $16,000 in cash she deposited into her bank accounts that she had opened without her then-husband's knowledge (Tr. 1407; 1503–28). In her 2015 tax return, Laura did not report as income $1,500 in cash payments from Mark or a $5,250 check made out to her, which was drawn from Sooner's account and recorded on the business' general ledger as a legal expense reimbursement (Tr. 1503–28). Neither did she report a check from Sooner worth $10,000 that Sooner recorded on its ledger as commission.

Laura's ex-husband, Michael, testified that he and Laura were responsible for gathering financial records to send to their accountant (Tr. 1406–08). Moreover, Laura's accountant for fiscal year 2015 testified that it was Laura's responsibility to provide him with "accurate information" for him to prepare her tax return (Tr. 1456). Under penalty of perjury, Laura signed her tax report, confirming that she was the taxpayer, she had reviewed what the accountant had prepared, and she certified that it was all true, thereby stripping Laura of the opportunity to later say she "didn't know what was in the tax report" (Tr. 1458–59).

At trial, an IRS agent provided explanation regarding "bribes" and how they are treated for tax purposes. The agent testified that anyone receiving a bribe must report it as income and no one giving a bribe may take it as a deduction (Tr. 1506–07). With the caveat that only the jury could determine whether the transactions were "bribes," the agent testified that, if they were bribes, these transactions should have been reported as income in Laura's tax return (Tr. 1510–11). She further explained that "gifts" to an individual in excess of $14,000 must be reported as income (Tr. 1522). Accordingly, the agent testified that, even if the jury did not find that the transactions between Mark and Laura were "bribes," Laura was responsible for reporting anything over $14,000 as income on her tax reports in 2014 and 2015. Laura did not report any of these transfers as income (Tr. 1510–11).

Mark's accountant for tax years 2014 and 2015 testified that Mark, in his capacity as a general partner for Sooner, signed under penalty of perjury that he was the taxpayer on behalf of the partnership, he had reviewed what the accountant had prepared, and he certified that it was all true (Tr. 1461–62). Mark's accountant also testified that an expense is not deductible "[i]f an owner of a business runs an expense through his company that's personal, as opposed to related to his business" (Tr. 1472). Further, the IRS agent testified that "[a] business expense is a deduction that

you get to take as you are earning the income for the business" as compared to a personal expense, which has nothing "to do with the operation of the business or how it's getting money" (Tr. 1519).

The Government presented evidence that Mark paid for hotel stays and flights using his Sooner business card, representing the excessive costs as business expenses on the company's general ledger (Tr. 1516–30). Mark deducted these trips, in their entirety, as business expenses in his 2014 tax report. (Tr. 1516–30). As just one example, Mark charged over $7,000 to his Sooner business card in January 2014 when he and Laura went to a ski resort in Utah. In addition to deducting all of his trips with Laura as business expenses, in his 2015 tax report, Mark also deducted as a business expense the $24,030 spent on the renovation of Laura's home (Tr. 1451–79). As mentioned, Mark had told the renovator that the home project was for a friend but asked the renovator to keep news of the project "on the down-low" (Tr. 1098). And Laura lied to multiple people in her close circle that her father was paying for the renovations (Tr. 1204–06; 1245; 1403).

At some point in late 2016 or early 2017, Mark unexpectedly called his accountant inquiring about the manner in which the home renovation was categorized in his 2015 tax report (Tr. 1451–79). When Mark learned it was filed as a business expense, Mark clarified that the expense should be revised to represent personal expenditure (Tr. 1451–79). But Mark's purported ignorance conflicted with earlier testimony from trial. In a call recorded on October 8, 2015, the home renovator spoke with Mark about Mark's classification of the costly home renovation as a business expense. On this call, the home renovator relayed to Mark "you remember I told you you could get in trouble," and Mark responded "yeah" (Tr. 1116). To be sure, the jury heard evidence that Mark, knowing he could get in trouble, never corrected the billing of the project (Tr. 1116–17) and, in fact, directed the home renovator to "make up [a] job" through which to bill

Sooner for Laura's home renovation (Tr. 1119–20). Despite all of this, Mark still deducted the home renovation as a business expense in his tax report.

Importantly, the IRS agent testified as to what IRS investigators look for when "determining whether or not a taxpayer acts willfully" (Tr. 1520). She indicated they "try to determine what kind of knowledge [the taxpayer] has, their sophistication, education level, what would they have reason to know, if they've had training in particular areas" and whether they engaged in "concealment" of "bank account[s] or books and records" (Tr. 1520).

### A. Convictions Under 26 U.S.C. § 7606(2)

The Jordans challenge their convictions under 26 U.S.C. § 7206(2), which criminalizes willfully aiding or assisting in the preparation of a document, under the internal revenue laws, which is false or fraudulent as to any material matter. The elements of this offense require the Government to prove (1) the defendant aided and advised in the preparation of a United States income tax return; (2) this return falsely underreported amounts of income; (3) the defendant knew the statement in the return was false; (4) the false statement was material; and (5) the defendant aided in the preparation of this false statement willfully, that is, with intent to violate a known legal duty. The Jordans assert that the Government did not sufficiently prove falsity, knowledge, willfulness, or materiality on Counts Nine through Twelve. In the alternative, the Jordans argue that the weight of the evidence falls in favor of a new trial.

#### 1. Falsity

The evidence supports a finding that the Jordans' 2014 and 2015 tax returns falsely underreported amounts of income. The IRS agent testified that "[a] business expense is a deduction that you get to take as you are earning the income for the business" as compared to a personal expense, which has nothing "to do with the operation of the business or how it's getting money"

(Tr. 1519). The Government presented evidence that Mark paid for hotel stays and flights using his Sooner business card, representing the excessive costs as business expenses on the company's general ledger. Mark deducted these trips, including a $7,000 ski trip with Laura, as business expenses in his 2014 tax return. A rational jury could have found that Mark's $7,000 trip with his mistress to a ski resort in Utah was not a business trip. In addition to deducting all of his trips with Laura as business expenses, Mark also deducted as a business expense the $24,030 spent on the renovation of Laura's home in his 2015 return despite knowing he could "get in trouble" for falsely writing the expenses off as "carpet stock" for business purposes.

The Government presented evidence that federal tax laws require anyone receiving a bribe to report it as income and preventing anyone who gives a bribe from deducting it. Further, the Government presented evidence that tax laws dictate "gifts" to an individual in excess of $14,000 must be reported as income. Accordingly, even if the jury did not find that the transactions between the Jordans were "bribes," Laura was responsible for reporting anything over $14,000 as income on her tax reports in 2014 and 2015. Laura did not report any of the transfers from Mark as income.

Viewing the evidence in the light most favorable to the verdict, a rational jury could have found that this conduct was evidence of falsity. Further, the Court finds that the weight of the evidence supports a finding of falsity.

### 2. Knowledge

The evidence supports a finding that both Laura and Mark knew their 2014 and 2015 tax reports were false. First, the Jordans are both highly educated and experienced in their respective areas. Mark's accountant testified that Mark was a sharp businessman, and Laura's ex-husband testified that she took a strong leadership role in all of her organizational involvement. Second,

both Mark and Laura were responsible for submitting truthful and complete information regarding income and expenses to their accountants for tax purposes.

As mentioned, the Government presented evidence that Mark paid for hotel stays and flights using his Sooner business card, representing the excessive costs as business expenses on the company's general ledger. Mark deducted these trips, including a $7,000 ski trip with Laura, as business expenses in his 2014 tax return. A rational jury could have found that Mark, a remarkably successful businessman, knew this trip was not a business trip, and, therefore, should not deducted the expenses from his 2014 taxes. In addition to deducting all of his trips with Laura as business expenses, Mark also deducted as a business expense the $24,030 spent on the renovation of Laura's home in his 2015 report.

And as mentioned, Laura was, at the very least, responsible for reporting anything over $14,000 as income on her tax reports in 2014 and 2015. Laura did not report any of the transfers from Mark as income. A rational jury could find that a woman who served as mayor of a city with over 100,000 residents knew that the thousands of dollars Mark transferred to her could not be unaccounted for on her 2014 and 2015 tax reports.

Viewing the evidence in the light most favorable to the verdict, a rational jury could have found that this conduct was evidence of knowledge. Further, the Court finds that the weight of the evidence supports a finding of knowledge.

### 3. Willfulness

The evidence supports a finding that both Laura and Mark aided in the preparation of this false statement with intent to violate a known legal duty. As the Government proved, Laura and Mark both aided in the preparation of their tax reports. They were responsible for supplying their

accountants with truthful and complete information regarding income and expenses so that their accountants could accurately prepare the 2014 and 2015 tax reports.

But neither Mark nor Laura supplied truthful or complete information to their accountants. Mark recorded multiple false entries on Sooner's general ledger. Mark directed the home renovator to disguise the funding of Laura's home renovation as an expense for "carpet stock" at one of Mark's commercial properties. Mark and Laura consistently lied to their friends, families, and colleagues about money, bank accounts, and expenses. Laura told her friends on several occasions that she was at "mayor conferences" when she was actually with Mark at a swanky hotel in a different city. When her then-husband inquired about preparing their 2014 joint tax return, Laura lied about the cost and source of the payment for the home renovations.

A rational jury could have ruled out that these discrepancies were honest mistakes, especially given the substantial amount of money involved. Excluding the trips Mark funded, the most conservative calculation of Laura's *unreported* income from 2014 and 2015 totaled $68,330. If the jury found that the transfers were bribes, Laura's unreported income totaled $96,330, which is more than half of her total reported income of $185,599 from these two years. The evidence suggests that Laura knew she had a legal duty to report such excessive income, especially given her signature under penalty of perjury on her tax report.

Viewing the evidence in the light most favorable to the verdict, a rational jury could have found that this conduct was evidence of willfulness. Further, the Court finds that the weight of the evidence supports a finding of willfulness.

### 4. Materiality

As the Court instructed the jury, "[a] statement is 'material' if it has a natural tendency to influence, or is capable of influencing, the [IRS] in investigating or auditing a tax return or in

verifying or monitoring the reporting of income by a taxpayer" (Dkt. #310 at pp. 30–33). A rational jury could have found, and the weight of the evidence supports, that the false statements were material.

The false statements in the Jordans' tax reports were certainly capable of influencing the IRS in verifying the tax reports. As stated, Laura's reports between the two fiscal years underreported income by an amount between $68,330 and $96,330. Further, Mark's reports improperly deducted personal expenses (or, if the jury so found, bribes) as business expenses. Viewing the evidence in the light most favorable to the verdict, a rational jury could have found that these statements influenced or were capable of influencing the IRS in its verification processes, and therefore, they were material. Further, the weight of the evidence supports a finding that the false statements were material.

For all these reasons, the Court finds that the Government sufficiently proved Counts Nine through Twelve, and, accordingly, the Court will not acquit the Jordans. Further, the Court finds that the weight of the evidence supports each of the guilty verdicts such that no miscarriage of justice occurred. Thus, the interests of justice do not warrant a new trial on this ground.

### B.  Conspiracy Under 18 U.S.C. § 371

The Jordans challenge their conviction on Count Eight for Conspiring to Defraud the United States under 18 U.S.C. § 371. To prove this conspiracy beyond a reasonable doubt, the Government had to show that a defendant and at least one other person made an agreement to defraud the Government or one of its agencies by obstructing the accurate calculation and collection of income tax (Dkt. #310 at p. 27). It is well established that an agreement to be part of a conspiracy need not be explicit and "may be inferred from a 'concert of action.'" *United States v. Mann*, 161 F.3d 840, 847 (5th Cir. 1998).

A rational jury could have found that the Jordans agreed to conceal the many transfers from Mark to Laura for tax purposes. The direct evidence establishes that Mark and Laura began a romantic relationship in 2013 but lied about the nature of their relationship for a significant period of time. At minimum, the direct evidence shows that Mark concealed his funding Laura's home renovation and knew the concealment was problematic. Laura lied to multiple people in her close circle about how the renovations were being funded. Further, direct evidence shows that Laura deposited thousands of dollars into a Wells Fargo account that her then-husband knew nothing about. Finally, the Government presented direct evidence that both Laura and Mark improperly reported or failed to report transactions for their 2014 and 2015 tax filings and that it was their responsibility to turn over information on these transactions to their accountants.

Viewing the evidence in the light most favorable to the verdict, a rational jury could have found that this conduct was evidence of an agreement between the Jordans to defraud the IRS.

## CONCLUSION

The people of Richardson, Texas elected Laura Maczka Jordan as mayor, entrusting her to serve with integrity and deliver on her promises. But Laura Maczka Jordan abused her position of power, and Mark Jordan profited from it. This betrayal of the public trust was a crime punishable under the law. Neither Mark Jordan nor Laura Maczka Jordan is exempt from facing this punishment. For all the foregoing reasons, the Court will sustain the convictions against the Jordans for Counts Five through Twelve.

It is therefore **ORDERED** that the Government's Motion for Findings and Conclusions Regarding Disclosure of Recorded Calls (Dkt. #335) is **DENIED**.

It is further **ORDERED** that Defendants' Post-Verdict Motion to Dismiss, or in the Alternative, for Judgment of Acquittal or for New Trial (Dkt. #347) is **DENIED**.

It is further **ORDERED** that Defendants' Post-Verdict Motion to Dismiss, or in the Alternative, for Judgment of Acquittal or for New Trial (Dkt. #348) is **DENIED**.

It is further **ORDERED** that Defendants' Post-Verdict Motion to Dismiss, or in the Alternative, for Judgment of Acquittal or for New Trial (Dkt. #352) is **DENIED**.

It is further **ORDERED** that Defendants' Motion to Stay this Court's Ruling on Their Rule 33 Motion for a New Trial and to Postpone Sentencing Hearing (Dkt. #389) is **DENIED**.

**IT IS SO ORDERED**.

**SIGNED this 3rd day of August, 2022.**

AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE