# United States District Court
### EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, § | |
| § | |
| v. § | No. 4:18-cr-87 |
| § | Judge Mazzant |
| LAURA JORDAN & § | |
| MARK JORDAN § | |

## MEMORANDUM OPINION AND ORDER

Pending before the Court is the Motion Of Laura And Mark Jordan For A New Trial Based On Newly Discovered Evidence, Motion For Discovery & Motion For An Evidentiary Hearing (Dkt. #438). Having considered the Motions, the relevant pleadings, and the pertinent caselaw, the Court finds that the Motions should be **DENIED**.

### BACKGROUND

The facts of this case are more fully set out in the Court's Memorandum Opinion and Order dated August 3, 2022 (Dkt. #403 at pp. 1–11). The Court will recount necessary facts as a refresher.

### I.    The Main Characters

Defendant Laura Jordan, previously Laura Maczka ("Laura"), served as Mayor of the City of Richardson, Texas ("Richardson" or the "City") from May 2013 to April 2015 (Dkt. #403 at p. 1). Laura was married to Michael Maczka ("Michael"), but the two separated in October 2014 and divorced on January 8, 2015 (Dkt. #403 at p. 1). Defendant Mark Jordan ("Mark") is a commercial real estate developer and owner of Sooner National Property Management ("Sooner") and Sooner Management, among other entities (Dkt. #403 at pp. 1–2). Through Sooner, Mark owns a portion of the Palisades Property in Richardson (the "Palisades") (Dkt. #403

at pp. 1–2). Mark was married to Karen Jordan ("Karen") until the two separated in August 2014 and divorced in August 2016 (Dkt. #403 at p. 2). During his marriage to Karen, Mark had an affair with at least two women (Dkt. #403 at p. 2). One of these women was Sarah Catherine Alford[1] ("Sarah Catherine") who formerly worked as Mark's business partner and held a 50% partnership interest in Sooner Management (Dkt. #403 at p. 2). The other woman was Laura, the former Mayor of Richardson (Dkt. #403 at p. 2). After a federal investigation developed against Laura and Mark for activities detailed below, Laura and Mark (collectively the "Jordans" or "Defendants") married each other (Dkt. #403 at p. 2).

## II. The First Trial

The first trial lasted nearly a month. At the trial's close, the Court instructed the jury to "decide the case for yourself," and "not give up your honest beliefs as to the weight or effect of the evidence solely because of the opinion of your fellow jurors, or for the mere purpose of returning a verdict." (Dkt. #153 at p. 26). Juror No. 11 had a particularly difficult time arriving at her decision, fearing that her vote would cause a mistrial (Dkt. #403 at p. 7). Shortly after Juror No. 11 expressed her serious reservations to the Court, the jury reached a unanimous verdict (Dkt. #403 at p. 7). The jury found the Jordans guilty on nearly all counts (Dkt. #403 at p. 7). The Court later learned that a Court Security Officer (the "Officer") had spoken to Juror No. 11 prior to the verdict (Dkt. #403 at p. 7). Finding her in tears, which he seemingly attributed to her role as a dissenting voter, the Officer told Juror No. 11 to put her emotions aside, not worry about the sentence the Jordans might face, and decide the case solely on whether she believed they were

---

[1] During the trial, this witness's name was Sarah Catherine Norris (*See, e.g.*, Dkt. #326 at p. 24). In their Motions, Defendants refer to this witness by her married name, Sarah Catherine Alford (Dkt. #438 at p. 2 n.3). The Court will also refer to the witness by her married name.

guilty or not (Dkt. #403 at pp. 7–8). Further, the Officer told Juror No. 11 "that she should not be concerned about any punishment the defendants may receive" (Dkt. #169 at p. 2). If "she did not believe the defendants were guilty, she should vote not guilty" (Dkt. #169 at p. 2). The Court informed the parties of both conversations within twenty-four hours, filed a memorandum on the docket containing separate statements from the Court's law clerks on these events, and made the Officer available for examination, on request (Dkt. #403 at p. 8). Defense counsel declined the Court's offer and ultimately moved for a new trial (Dkt. #174), which this Court granted on May 2, 2019 (Dkt. #191). The Government appealed this decision, but on May 1, 2020, the Fifth Circuit affirmed. *United States v. Jordan*, 958 F.3d 331, 333 (5th Cir. 2020).

### III. The Second Trial

The second trial commenced in July 2021 and brought further troubles (Dkt. #403 at p. 9). At trial, the Government examined FBI Special Agent Messer ("Agent Messer") as part of its case-in-chief (Dkt. #403 at p. 9). During the Defense's cross examination of Agent Messer, it became clear to both the Government and the Defense that the FBI had failed to turn over to the United States Attorney's Office ("USAO") a recorded phone call between Mark and Sarah Catherine (Dkt. #403 at p. 9). When presentation of the evidence concluded for the day, the Court instructed Agent Messer to find the recorded phone call and ensure no other evidence existed that the Defense had not received (Dkt. #403 at p. 9). The following day, the parties reported to the Court that Agent Messer, while searching for the aforementioned recorded call, uncovered an additional recorded call between Mark and Sarah Catherine that the FBI had also failed to turn over to the USAO (Dkt. #403 at p. 9). The first call was made on September 28, 2015 and lasted approximately fifteen minutes; the second call was made on October 5, 2015 and lasted approximately two minutes (Dkt. #403 at p. 9). Sarah Catherine, under the direction of FBI Agent

3

Walton ("Agent Walton"), intentionally recorded both calls using the FBI's system and software (Dkt. #403 at p. 9). The parties played both recordings for the Court outside the presence of the jury (Dkt. #403 at p. 9).

Having heard the conversations between Mark and Sarah Catherine, the Court determined that the tapes "clearly include[d] *Brady* material" and then recessed the trial for the remainder of that Friday, July 16, 2021 to provide the Defense with time to incorporate the late-disclosed recordings into its cross examination of Agent Messer and its case-in-chief (Dkt. #403 at p. 10). The Government also gave the Defense the opportunity to examine the Government's discovery files at the USAO over the weekend (Dkt. #403 at p. 10). The Court denied the Defense's request for a mistrial because the Government had not intentionally suppressed the evidence and the Defense had yet to begin its case-in-chief (Dkt. #403 at p. 10). Notably, the Defense stated on the record that it did not believe the Government had engaged in any misconduct, and Agent Messer testified that the USAO did not have either recorded call in its possession until July 15, 2021—the same day the Defense received them (Dkt. #403 at p. 10). When trial resumed on Monday, July 19, 2021, the Defense used the recorded phone calls in its cross examination of Agent Messer, and the Government used them in its re-direct of Agent Messer (Dkt. #403 at p. 10). The Defense then used the recorded phone calls in its case-in-chief—specifically, during its examination of Sarah Catherine—and referenced them in its closing arguments (Dkt. #403 at p. 10). The Government also questioned Sarah Catherine about certain credit card statements which implicated Mark's illicit activities and his relationship with Laura (Dkt. #328 at p. 81–89). At the conclusion of trial, the jury found the Jordans each guilty of Conspiracy to Commit Bribery Concerning a Local Government Receiving Federal Funds; Bribery Concerning a Local Government Receiving

Federal Funds; Conspiracy to Defraud the United States; and two counts of Aiding or Assisting in Preparation of False Documents Under Internal Revenue Laws (Dkt. #403 at p. 10). The jury found the Jordans not guilty of Conspiracy to Commit Honest Services Wire Fraud; and not guilty of Honest Services Wire Fraud (Dkts. #157–58).

### IV.  The Fifth Circuit's Second Decision

Defendants appealed their convictions for bribery and tax fraud, "asserting that the bribes were merely gratuities and the district court failed to properly instruct the jury." *United States v. Jordan*, No. 22-40519, 2023 WL 6878907, at *1–4 (5th Cir. Oct. 18, 2023). The Fifth Circuit affirmed the bribery convictions, but vacated Defendants' convictions on the tax conspiracy count. *Id.* at 13. Once the Court had jurisdiction again, Defendants filed these Motions on October 31, 2023 (Dkt. #438 at p. 1). Through them, the Jordans allege they are entitled to a new trial based on new evidence (*See* Dkt. #438).

### V.  The Alleged New Evidence

#### A.  The Emails Forwarded on June 2, 2023

On June 2, 2023, an Assistant United States Attorney ("AUSA"), who served as a trial prosecutor in this case, forwarded three emails to Defendants' counsel (Dkt. #438-1). The emails were from Sarah Catherine and her husband, Ty Alford ("Ty") (Dkt. #438-1). The first email was from Sarah Catherine. On February 3, 2023, she sent an email to two AUSAs in which "she complained about a pending civil lawsuit filed in Texas circuit court against her related to her theft of money from companies owned in part by Mark Jordan" (Dkt. #438 at pp. 2–3). Following Sara Catherine's email, Ty sent an email to the AUSAs on March 1, 2023 (Dkt. #438-1 at p. 2–3). In it, Ty expressed frustration at the AUSAs because they did not respond to Sarah Catherine's prior email (*See* Dkt. #438-1 at pp. 2–3). On April 16, 2023, Ty Alford sent another email to the AUSAs

5

(Dkt. #438-1 at p. 1). In it, he again expressed his dismay at the lack of communication from the AUSAs (Dkt. #438-1 at p. 1). Ty also stated that he and Sarah Catherine were expecting "harassment from Jordan and his people" (Dkt. #438-1 at p. 1). Accordingly, Ty informed the AUSAs that he had devised an offer that Ty would make to Mark Jordan in a hope to end the harassment (Dkt. #438-1 at p. 1). Ty stated that "[t]he deal [would] be simple: [Ty would] turn over evidence to [Mark Jordan] that could materially alter the [government's] case against him that [Ty was] personally in possession of, and in exchange, [Mark Jordan] [would] agree contractually that he and his band of conspirators leave [Sarah Catherine] alone forever" (Dkt. #438-1 at p. 1).

After receiving these emails, counsel for Laura Jordan contacted one of the AUSAs and requested the email Ty referred to in his email (Dkt. #438 at p. 4). On July 20, 2023, the AUSA then forwarded the referenced email to Defendants (Dkt. #438-3 at p. 1).

### B.     The Email Forwarded on July 20, 2023

On October 4, 2022, Sarah Catherine sent an email to two AUSAs (Dkt. #438-3 at p. 1). In it, she complained about "harassment" from Mark Jordan and individuals under his control (Dkt. #438-3 at p. 1). She expressed irritation at a civil lawsuit filed against her in Collin County, Texas "by Mark Jordan's 'money man' Brad Phillips" (Dkt. #438-3 at p. 1). She found this especially troubling because she stated that she did not want to be a witness against the Jordans, "but was forced to" be one (Dkt. #438-3 at p. 1). Further, she asked "where is there any protection of someone who was a federal witness and who was told the day she started as a confidential information that she would be protected[?]" (Dkt. #438-3 at p. 1).

## VI. Procedural History

On October 31, 2023, Defendants filed these Motions (Dkt. #438). The alleged new evidence included the following: (1) emails the Government forwarded to the Defendants on June 2, 2023, which contained conversations with Sarah Catherine, Ty, and the Government (Dkt. #438-1); (2) an email from defense counsel to the Government on July 19, 2023, requesting an email referenced in Sarah Catherine's prior email (Dkt. #438-2); (3) the email defense counsel requested which Sarah Catherine sent to two AUSAs on October 4, 2022 (Dkt. #438-3); (4) a declaration from Stephen Scheets, a private investigator with more than 20 years of experience as a Special Agent with the Internal Revenue Service (Dkt. #438-4); (5) a variety of tax documents belonging to Sarah Catherine and Ty as well as letters from the Internal Revenue Service (Dkt. #438-5; Dkt. #438-6; Dkt. #438-7; Dkt. #438-8; Dkt. #438-9; Dkt. #438-10); and (6) a declaration by Dr. George Papcun, an expert on editing and alteration of recordings (Dkt. #438-11).

The Government filed its Response on November 14, 2023 (Dkt. #441). Then, on November 17, 2023, Defendants filed their Reply (Dkt. #442).

## LEGAL STANDARD

### I. Rule 33, Generally

Rule 33 provides that, on request, "the court may vacate any judgment and grant a new trial if the interest of justice so requires." FED. R. CRIM. P. 33(a). The decision to grant or deny a motion for new trial pursuant to Rule 33 is well within the Court's discretion. *See, e.g.*, *United States v. Wall*, 389 F.3d 457, 465 (5th Cir. 2004) (citing *United States v. O'Keefe*, 128 F.3d 885, 893 (5th Cir. 1997)).

"Generally, motions for new trial are disfavored and must be reviewed with great caution." *United States v. Smith*, 804 F.3d 724, 734 (5th Cir. 2015) (quoting *United States v. Piazza*, 647 F.3d

7

559, 565 (5th Cir. 2011)). The Court typically "should not grant a motion for new trial unless there would be a miscarriage of justice . . . ." *Wall*, 389 F.3d at 466 (citation omitted). As such, a new trial is proper only where the defendant's "substantial rights" have been harmed—either based on a single error or the cumulative effect of multiple errors. *United States v. Bowen*, 799 F.3d 336, 349 (5th Cir. 2015). Further, in the Fifth Circuit, "[a] motion for a new trial can ordinarily be ruled upon without conducting an evidentiary hearing." *United States v. Mahmood*, 820 F.3d 177, 190 (5th Cir. 2016) (quoting *United States v. Simmons*, 714 F.2d 29, 30 (5th Cir. 1983)). "Where evidentiary hearings are ordered, it is because of certain unique situations typically involving allegations of jury tampering, prosecutorial misconduct, or third party confession." *Id.* (quoting *United States v. Hamilton*, 559 F.2d 1370, 1373 (5th Cir. 1977)). Crucially, allegations of prosecutorial misconduct do not "compel such a hearing." *United States v. MMR Corp.*, 954 F.2d 1040, 1046 (5th Cir. 1992).

## II.    Rule 33 and the *Berry* Rule

Generally, the Fifth Circuit applies the *Berry* rule to assess the merits of a Rule 33 motion based on newly discovered evidence. *United States v. Mack*, No. 23-30077, 2023 WL 5665758, at *1 (5th Cir. 2023) (citing *United States v. Turner*, 674 F.3d 420, 429 (5th Cir. 2012)). Under *Berry*, the defendant must prove the following:

> (1) the evidence is newly discovered and was unknown to the defendant at the time of trial; (2) the failure to detect the evidence was not due to a lack of diligence by the defendant; (3) the evidence is not merely cumulative or impeaching; (4) the evidence is material; and (5) the evidence if introduced at a new trial would probably produce an acquittal . . . If the defendant fails to demonstrate any one of the these factors, the motion for new trial should be denied.

*Wall*, 389 F.3d at 467.

In certain circumstances, such as when the Defendant asserts that the Government suppressed evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963),[2] or the Government failed to correct false testimony in violation of *Napue v. Illinois*, 360 U.S. 264 (1959), the Defendant must satisfy different elements to prevail on a motion for a new trial. *United States v. Brumfield*, 89 F.4th 506, 514–15, 519 (5th Cir. 2023).

### III.    Rule 33 and a *Brady* Claim

"To prevail on a *Brady* claim, 'a defendant must show: (1) the evidence at issue was favorable to the accused, either because it was exculpatory or impeaching; (2) the evidence was suppressed by the prosecution; and (3) the evidence was material.'" *Brumfield*, 89 F.4th at 513 (quoting *United States v. Swenson*, 894 F. 3d 677, 683 (5th Cir. 2018)). For evidence to be material, "there must be 'a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Id.* at 513–14 (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)). Notably, "[a] 'reasonable probability' is established when the failure to disclose the suppressed evidence 'could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.'" *Id.* at 514 (quoting *United States v. Runyan*, 290 F.3d 223, 247 (5th Cir. 2002)); *see also United States v. Perry*, 35 F.4th 293, 347 (5th Cir. 2022) (noting that the *Brady* claim analysis consists of elements instead of factors that must each be evaluated).

---

[2] *Giglio v. United States*, 405 U.S. 150 (1972) "applies *Brady* to evidence affecting the credibility of key government witnesses." *United States v. Dvorin*, 817 F.3d 438, 450 (5th Cir. 2016). Accordingly, to succeed on a *Giglio* claim, Defendants must satisfy the elements of a *Brady* claim. *See United States v. Brumfield*, 89 F.4th 506, 511, 519 (5th Cir. 2023).

9

## IV. Rule 33 and a *Napue* Violation

"To establish a *Napue* violation [the defendant] must prove: (1) the witness testified falsely; (2) the government knew the testimony was false; and (3) the testimony was material." *Id.* at 519 (citation omitted). Crucially, "even assuming that the prosecution presented (or failed to correct) false testimony, the critical factor is materiality." *Id.* at 519 (quoting *United States v. Stanford*, 823 F.3d 814, 839 (5th Cir. 2016)). The Supreme Court has "defined materiality in terms of a reasonable probability of a different outcome, which results when nondisclosure places the case in a different light so as to undermine the confidence in the verdict." *Id.* (cleaned up).

## ANALYSIS

### I. The Request For An Evidentiary Hearing and Discovery

After a careful review of the Motions and the record, the Court determines that it does not require an evidentiary hearing or further discovery to decide the Motions. Accordingly, the Court will decide Defendants' claims based upon the Motions and the record before it. *Mahmood*, 820 F.3d at 190; *MMR Corp.*, 954 F.2d at 1046.

### II. The Proper Standard

Before proceeding to the merits of Defendants' arguments, the Court must determine which standard to apply to the Motions. The Government only applied the *Berry* elements in its Response (Dkt. #441 at pp. 2–8). In their Reply, Defendants argue that the *Berry* elements do not apply to all their claims because they allege a *Brady* claim and a *Napue* violation (Dkt. #442 at pp. 3–5). In fact, all three standards are necessary in this case. Accordingly, the Court will apply the *Berry* elements to the claim involving the undercover recording, the *Brady* standard to assess the alleged new evidence contained in the emails from Sarah Catherine and Ty to the Government, and the *Napue* standard to assess the alleged perjured testimony by Sarah Catherine. *Brumfield*, 89

10

F.4th at 514–15, 519 (noting the elements to establish *Brady* claim and *Napue* violation); *see also Turner*, 674 F.3d at 429 (noting the elements necessary to obtain new trial based on new evidence).

**III.    The *Berry* Elements and the Undercover Recordings**

Defendants argue they are entitled to a new trial because "the undercover recordings done by the FBI and . . . Sarah Catherine Alford . . . appear to have been altered from their original form" and the Government did not disclose this alleged alteration to the Defendants (Dkt. #438 at pp. 14–15). The Court disagrees. Defendants cannot satisfy the second *Berry* element—the failure to detect the evidence was not due to a lack of diligence by the Defendants. *Wall*, 389 F.3d at 467. Here, the Government notes—and Defendants do not contest—that it "initially produced discovery to the defense, including the recordings at issue, in May 2018. In anticipation of the second trial, the Government reproduced this discovery to the [D]efense in May 2021" (Dkt. #441 at p. 9 n.4). Further, at trial on July 13, 2021, the Government introduced Exhibits #204 and #209 without any objection by Defendants (Dkt. #328 at pp. 115, 149). To begin with, the Court is not convinced by Defendants' expert, Dr. George Papcun, who alleges that the recordings have been altered (*See* Dkt. #438-11). Importantly, Dr. Papcun's page and a half declaration is threadbare and conclusory. He also only provides two sentences to support his conclusion that the recordings have been altered. He argues that the "differences in waveforms" and "changes in the spectral background" as well as his analysis of the video component led him to conclude the recordings were altered (Dkt. #438-11 at pp. 9–10). The Court disagrees that this is evidence of alterations to the recordings.  However, assuming *arguendo* that the recordings were altered, the failure to detect the alterations in the recordings would be due to Defendants' "lack of diligence." *Wall*, 389 F.3d at 467.  Defendants should have detected this alleged alteration during discovery and raised the issue before trial or when the Government first attempted to enter the exhibits at trial. But this did

11

not happen (*See* Dkt. #328 at pp. 115, 149). As such, Defendants cannot satisfy the second *Berry* element and their claim for a new trial on this basis fails. The Court will now assess Defendants' *Brady* claim.

## IV.     The *Brady* Claim—The Emails and Defense Expert Stephen Scheets

Defendants fail to prove their *Brady* claim. "To prevail on a *Brady* claim, 'a defendant must show: (1) the evidence at issue was favorable to the accused, either because it was exculpatory or impeaching; (2) the evidence was suppressed by the prosecution; and (3) the evidence was material.'" *Brumfield*, 89 F.4th at 513 (quoting *Swenson*, 894 F.3d at 683). For evidence to be material, "there must be 'a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Id.* at 513–14 (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)). Defendants fail to satisfy each element. *Perry*, 35 F.4th at 347 (noting that the *Brady* claim analysis consists of elements).

Defendants argue that the "combination of Ms. Alford's 2023 emails to the trial prosecutors and Mr. Scheets' declaration demonstrate the *strong likelihood* that Ms. Alford's promised 'protection' included a promise by someone on the prosecution team that she would not face civil or criminal liability for tax evasion" (Dkt. #438 at p. 10) (emphasis added). The crux of Defendants' argument is that these emails and the Scheets declaration demonstrate "the failure of the government to disclose an agreement not to prosecute a key government witness" (Dkt. #438 at p. 12). The Court is unpersuaded because Defendants' allegations are not evidence that an agreement not to prosecute exists. As such, these allegations cannot constitute evidence that is favorable to the Defense, because it is exculpatory or impeaching. *See Brumfield*, 89 F.4th at 513. For the same reason, these allegations are not "material evidence" within the meaning of *Brady*. *See id.* After carefully examining the emails attached to the Motions and the docket, the Court is

convinced that Sarah Catherine was operating under an incorrect assumption—that by testifying at trial against the Jordans, she would be protected from civil liability in a suit brought against her by the Jordans (*See* Dkt. #438-1; Dkt. #438-3). First, there is no evidence that the Government ever made a protective offer to Sarah Catherine or Ty. Second, this misconception about being protected against civil liability in an unrelated state court proceeding is not the same thing as an agreement by the Government not to prosecute Sarah Catherine for tax evasion. The only things these emails suggest is that Sarah Catherine expected the Government to assist her in this civil lawsuit. Accordingly, Defendants cannot rely on these emails and the Scheets declaration to argue the existence of an agreement by the Government not to prosecute. More importantly, Defendants do not provide the Court with evidence that the Government made a promise not to prosecute Sarah Catherine for tax evasion. Rather, Defendants claim that snippets from certain emails and speculation by Stephen Scheets "strongly indicate" that "'somebody, somewhere [in the government] has protected'" Sarah Catherine (Dkt. #438 at p. 9 (quoting Dkt. #438-4 at ¶ 31)). But this is far too speculative to constitute evidence of an agreement. Thus, this is not evidence that is favorable to the Defense nor is it "material" evidence. *See United States v. Ortiz-Montemayor*, No. DR-06-CR-667, 2007 WL 9757952, at *3 (W.D. Tex. Jan. 22, 2007) (citing *United States v. Villarreal*, 963 F.2d 725, 730 (5th Cir. 1992) (holding that *Brady* was not violated when the evidence at question did not rise above the level of conjecture, hearsay, or speculation)).

Defendants also fail to prove the evidence was "suppressed by the Government." *Brumfield*, 89 F.4th at 513. Defendants claim that snippets from certain emails and speculation by Stephen Scheets demonstrate that the Government agreed not to prosecute Sarah Catherine for tax evasion. But the Government's representation at trial through counsel and by judicial

13

admission in its Response to the Motions, state that it never made a promise not to prosecute Sarah Catherine for tax evasion (Dkt. #337 at p. 28; Dkt. #441 at p. 3). Accordingly, the Court finds that Defendants have not satisfied their burden to demonstrate that the government suppressed evidence. This conclusion is bolstered by the fact that "motions for new trial are disfavored and must be reviewed with great caution." *Smith*, 804 F.3d at 734. Therefore, the Court finds that Defendants fail to prove their *Brady* claim predicated on the emails and Stephen Scheets's declaration.

V.   *Napue* Violation

Defendants cannot prove their alleged *Napue* violation. To succeed on a *Napue* violation, Defendants must first establish that the witness—here, Sarah Catherine—testified falsely. *Brumfield*, 89 F.4th at 519; *see also United States v. Manners*, No. 09-10064, 384 F. App'x 302, 308 (5th Cir. 2010) (noting that, to obtain relief, a defendant must prove each element of a *Napue* violation). Here, Defendants cannot carry that burden. Defendants rely upon a single sentence in the email Sarah Catherine sent to two AUSAs on October 4, 2022. In this email she stated, among other things, "[t]his is also after your prior US Attorney and my old attorney made sure I didn't take the [F]ifth [Amendment] and testified on credit card bills that I knew nothing about" (Dkt. #438-3 at p. 1). First, the veracity of the statement's truthfulness is undermined given that it is contained in an email, not an affidavit or other type of sworn statement. Second, her testimony at trial and the evidence in the proceeding directly contradict her statement that she knew nothing about the credit card statements she testified about during her direct examination. At trial on July 13, 2021, the Government questioned Sarah Catherine (under oath) about certain credit card statements (Dkt. #328 at p. 1). Notably, the Government laid the foundation that Sarah Catherine was intimately aware with the various bills and statements that came into the office because of her

position as a 50/50 partner in Sooner Management (*E.g.*, Dkt. #328 at pp. 76–77) ("I always saw those bills . . . I had access to everything. So it was things I saw anyway in the normal course of business."). The Government also explicitly asked her about credit card statements she had access to at Sooner Management (Dkt. #328 at p. 80). Importantly, the credit card bills Sarah Catherine testified about were bills on which she was listed as one of the cardholders (Dkt. #328 at p. 80). It defies reason for her not to know about the credit card statements when she was a 50/50 partner in the business, was a cardholder on the account, and even assisted the company with starting its accounting systems (Dkt. #328 at pp. 56, 76–77, 80). This conclusion is bolstered by the fact that her testimony at trial was under oath and her answers could subject her to a perjury charge if she lied. 18 U.S.C. § 1621. Thus, the Court finds that Defendants cannot prove that Sarah Catherine testified falsely at trial. Accordingly, Defendants' *Napue* challenge falls flat.

In conclusion, the Court finds that Defendants are not entitled to a new trial, an evidentiary hearing, or discovery because all of the alleged claims of error fail.

## CONCLUSION

It is therefore **ORDERED** that the Motion Of Laura And Mark Jordan For A New Trial Based On Newly Discovered Evidence, Motion For Discovery & Motion For An Evidentiary Hearing (Dkt. #438) are hereby **DENIED**.

**IT IS SO ORDERED.**
SIGNED this 11th day of February, 2025.

AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE